## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| MARK ROYAL and VICKI ROYAL, | ) | |
| | ) | FILED STAMP: APRIL 23, 2008 |
| Plaintiffs, | ) | 08CV2325 J. N. |
| | ) | |
| v. | ) | No.   JUDGE CONLON |
| | ) | MAG. JUDGE COLE |
| AMERICAN INTERNATIONAL | ) | JURY DEMANDED |
| INSURANCE COMPANY | ) | |
| | ) | |
| Defendant. | ) | |

### COMPLAINT FOR DECLARATORY JUDGMENT,
### BREACH OF CONTRACT, INJUNCTIVE AND OTHER RELIEF

Plaintiffs Mark Royal and Vicki Royal ("Royals" or "Plaintiffs"), by and through their

attorneys, Greenberg Traurig, LLP, and for their Complaint against Defendant American

International Insurance Company ("Defendant" or "AIIC") allege as follows:

### NATURE OF THIS ACTION

1.      This is an action for, declaratory judgment, breach of contract and for other relief

with respect to benefits due under a Homeowners Insurance Policy issued by AIIC to Plaintiffs

for losses arising on or about April 24, 2007 as a result of Plaintiffs' home being repeatedly

sprayed by a skunk (the "Occurrence").

2.      Shortly after the Occurrence, Plaintiffs submitted a claim for coverage under a

Homeowners Insurance Policy issued by AIIC to Plaintiffs.  Although AIIC initially accepted

coverage and paid certain benefits, AIIC has refused to pay the entire range of benefits owing

and due to Plaintiffs under the Homeowners Insurance Policy issued by AIIC to Plaintiffs.  In so

doing, and throughout the entire history of Plaintiffs' claim for coverage, AIIC, through its agent

AIG Private Client Group ("AIG PCG"), AIIC's claim servicing and handling unit, has

vexatiously and unreasonably delayed payment of hundreds of thousands of dollars of benefits

due and owing under the Homeowners Insurance Policy, has asserted Policy defenses that do not exist, has completely failed to implement an appropriate remediation protocol, and has instructed the Plaintiffs to hire contractors that were not prepared or experienced to remediate skunk odor from the Plaintiffs' home and furnishings.

3.    Plaintiffs bring this lawsuit to recover benefits owing and due under the Homeowners Insurance Policy issued by AIIC to Plaintiffs and for additional damages arising out of AIIC's vexatious and unreasonable handling of Plaintiffs' claim under their insurance policy.

### THE PARTIES

4.    Plaintiffs Mark Royal and Vicki Royal are residents of the State of Illinois.  At the time of the Occurrence, Mark and Vicki Royal resided at 1526 Sheridan, Highland Park, Illinois. The Occurrence giving rise to this lawsuit took place at 1526 Sheridan, Highland Park, Illinois.

5.    Defendant AIIC is an insurance company organized under the laws of the State of Delaware, with its principal place of business in New York, New York.  At all times pertinent, AIIC was, and is, licensed to do business and was, and is, doing and transacting business in Lake County, Illinois.

6.    AIG PCG was, and is, AIIC's claim service and handling unit providing claims handling, processing and payment (or not paying, as the case may be) services for the claims for which relief has been sought herein.  At all relevant times, AIG PCG was acting on behalf of AIIC.

**JURISDICTION AND VENUE**

7.    Pursuant to 28 U.S.C. § 1332(a), this Court has jurisdiction of this matter under diversity of citizenship jurisdiction because Plaintiffs are not citizens of the State in which AIIC is a citizen and seek damages in excess of $75,000.

8.    Pursuant 28 U.S.C. § 1391(a), venue is proper in this Court as a substantial part of the events giving rise to Plaintiffs' claims occurred in Lake County, Illinois.

**THE INSURANCE POLICY AND ADMITTED COVERAGE**

9.    AIIC issued Homeowners Policy No. HO 0000302989 (the "Policy") to Mark and Vicki Royal for the Policy Period September 12, 2006 through September 12, 2007.  A true and correct copy of the Policy is attached hereto as Exhibit A.

10.    The Policy provides coverage for all risks of direct physical loss or damage to Plaintiffs' Dwellings, one of which was, and is, located at 1526 Sheridan, Highland Park, IL 60035 (the "Property"), Other Permanent Structures and Contents, as those terms are defined in the Policy.  (Exhibit A, Declarations Page and pp. 1-2).

11.    The Policy defines Occurrence, in pertinent part, as "a loss or an accident, to which this insurance applies, . . . which occurs during the Policy Period and results in personal injury or property damage."  (Exhibit A, p. 1).

12.    The Policy defines Property Damage as "physical injury to, destruction of, or loss of use of tangible property and the resulting loss of its use."  (Exhibit A, p. 2).

13.    The Policy affords Guaranteed Rebuilding Cost Coverage for loss or damage to the Dwelling at issue in this case in the amount of $1,148,500.  (Exhibit A, Declarations Page and p. 2).

14.     Under the Policy, Guaranteed Rebuilding Cost Coverage means that, for a covered loss, AIIC will pay the reconstruction cost of Plaintiff's home or other permanent structures, for each occurrence, *even if the amount is greater than the amount shown on the Declarations Page*.  (Exhibit A, p. 2) (emphasis added).

15.     The Policy Defines Reconstruction Cost as "the lesser of the amount at the time of the loss required to:

        a.     Restore or repair a structure; or
        b.     Replace or rebuild a structure at the same location; with materials of like kind and quality.

(Exhibit A, p. 2 ).

16.     Under the Policy, if a loss occurs to Contents located at a residence with Content coverage, AIIC will pay up to the coverage limit for Contents for that location, for each Occurrence.  (Exhibit A, p. 3).   The Policy affords coverage for loss or damage to Contents in the amount of $700,000.  (Exhibit A, Declaration Page).

17.     The Policy defines Contents as "personal property owned by, or in the possession of, you or a family member."  (Exhibit A, p. 1).

18.     The Policy also affords unlimited additional coverage for Additional Living Expenses:

> If a covered loss makes your residence uninhabitable, we cover any reasonable increase in living expense incurred by you to maintain your household's usual standard of living.   Payment will continue for the shortest reasonable amount of time necessary to restore your residence to a habitable condition or for your household to permanently locate elsewhere.
>
> . . .
>
> We will also pay reasonable expenses associated with the kenneling of your domestic animals only.

(Exhibit A, p. 4).

19.    The Policy also affords additional coverage for Precautionary Repairs:

[W]e will pay the reasonable expenses you incur, for necessary repairs to protect your residence against future loss.

(Exhibit A, p. 5).

20.    The Policy also affords additional coverage for Debris Removal:

We will pay the reasonable expenses to remove debris of a covered loss and the property that caused that covered loss.

(Exhibit A, p. 5).

21.    The Policy also affords additional coverage for Lock Replacement:

We will pay for the cost of replacing the locks in a residence listed on the Declarations Page if the keys to that residence are lost or stolen.

(Exhibit A, p. 5).

22.    The Policy also affords additional coverage for Rebuilding to Code:

We will pay the extra expenses to obey any law or ordinance that regulates the repair, rebuilding or demolition of property damaged by a covered loss.

(Exhibit A, p. 5).

23.    The Policy also affords additional coverage for Property Removal for Safekeeping:

We will pay for any reasonable expenses incurred for the moving and storing of contents from a residence because the contents are in danger as a result of a covered loss.

(Exhibit A, pp. 5-6).

24.    On or about April 24, 2007, Plaintiffs' home was repeatedly sprayed by a skunk that had created a maze of tunnels under the front porch of Plaintiffs' home.  The skunk was not extracted from Plaintiffs' home for about two weeks.

25.    The Occurrence is a loss covered under the Policy.

26.     On April 26, 2007, Plaintiffs submitted notice of the Occurrence to AIIC and made a claim under the Policy for losses and damage resulting from the Occurrence ("Claim").

27.     On May 24, 2007, AIIC accepted coverage for Plaintiffs' Claim under the Policy. In so doing, AIIC did not assert any specific defense to coverage under the Policy.

28.     At no time since accepting coverage has AIIC identified any specific coverage defense under the Policy related to the Occurrence, the nature of the Occurrence, the timeliness of the Claim, or any other aspect of the Loss for which it would be reserving its rights to deny or limit coverage.

29.     On February 5, 2008, AIIC wrongfully denied coverage asserting that the Royals committed "fraud" by taking action to mitigate the skunk odor from their home, after AIIC had repeatedly accused the Royals for "failing to mitigate," and after the Royals specifically advised AIIC of the actions they were taking.

## BACKGROUND FACTS

30.     Plaintiffs and their children were forced from their home by the skunk's odor.

31.     In addition to being ejected from their home, Plaintiffs' personal property was removed from Plaintiffs' home and either discarded or sent for decontamination processing as determined and directed by AIIC or its representatives.

32.     Between April and July of 2007, every one of the consultants selected by AIIC to eradicate the skunk odor from the Royals' home failed to do so.

33.     On August 8 and 10, 2007, respectively, AIIC, knowing that the Royals' home was uninhabitable and, therefore, uninsurable, sent a Notice of Cancellation of the Policy to the Royals. Immediately thereafter, AIIC sent a Notice of Non-Renewal to the Royals, cutting off coverage for the Royals' home as of September 12, 2007.

34.     Plaintiffs pleaded with AIIC not to cancel their Policy while their home was uninhabitable and asked AIIC to renew the Policy for one year.  Instead, AIIC merely extended the Royals' Policy for an arbitrary 30-day period.

35.     Plaintiffs then sought the intervention of the Illinois Division of Insurance (the "Insurance Division") and appealed AIIC's wrongful cancellation and non-renewal of their Policy.

36.     On October 23, 2007, the Insurance Division informed AIIC that it had violated Illinois law in connection with the non-renewal of the Royals' Policy and instructed AIIC to renew the Policy for another full year.

**AIIC'S UNMITIGATED FAILURE TO REMEDIATE PLAINTIFFS' HOME**

37.     Shortly after the Claim was made on April 26, 2007, AIIC identified Art Brown, as its principal representative for handling Plaintiffs' Claim.  Mr. Brown identified Frank Martino, of L.J. Shaw & Company, as the independent adjuster on whom AIIC would rely to adjust the Claim.  At all relevant times, Mr. Martino was authorized to act on behalf of and was, in fact, acting on behalf of AIIC.

38.     AIIC controlled virtually every aspect of how the Royals' Claim would be addressed.  Despite the fact that it had no right under the Policy to do so, AIIC directed which contractors would be hired to remediate the skunk odor from Plaintiffs' home.  However, AIIC never identified any consultants who either specialized in or had experience with remediating skunk odor.  Serv Pro, Inc. was one of the contractors that AIIC instructed Plaintiffs' to use.

39.     As part of AIIC's initial response on or about April 26, 2007, Mr. Martino and/or Serv Pro determined that all of Plaintiffs' personal property including, for example, carpeting,

blinds, mattresses, pillows, luggage, and any other like-items, should be removed from Plaintiffs'
home and thrown out.

40.     On or about April 27, 2007, Serv Pro, with the approval of Mr. Martino, began
stripping the Royals' home of all of its contents, furnishings, appliances, curtains, carpeting, and
ceiling tiles.

41.     On or about April 27, 2007, Mr. Martino and/or Serv Pro declared that various
items such as all appliances, mattresses, pillows, luggage, carpeting, and like items were a total
loss and disposed of them, including all items and goods that contained plastic.

42.     Mr. Martino and/or Serv Pro also determined that certain portions of drywall and
other building materials, including basement ceiling tiles must be removed.

43.     Without any expertise or guidance to support its approach, AIIC directed and/or
permitted the contractors to perform the remediation of Plaintiffs' home.

44.     Apparently recognizing that the skunk odor had already seeped into the drywall
and ceiling tiles, the contractors began to remove portions of drywall from certain rooms of the
house.   The contractors did not remove all the drywall in the house, or all the drywall in a
particular room, or even all the drywall on a particular wall.   Rather, they arbitrarily removed
various portions in various places.

45.     Later, AIIC authorized the further removal of drywall and other building materials
from the Royals' home in an effort to eliminate the skunk odor.

46.     AIIC's chosen contractors also injected a variety of harsh solvents and chemicals
into Plaintiffs' home.   These products were not designed for and were ineffective products and
techniques for remediating skunk odor.   Moreover, at no time during the months of April, May,

June, July and August 2007 did AIIC or any of its chosen contractors provide the Royals with a comprehensive remediation plan or strategy.

## AIIC Wrongly Declares the Skunk Odor Eradicated

47.    On or about May 31, 2007, AIIC representatives, Jeremy Nachreiner and Art Brown, trespassed into Plaintiffs' home while Plaintiffs were not present. Plaintiffs are unaware of precisely what Mr. Nachreiner and Mr. Brown did while they were in Plaintiffs' home alone, but afterwards, Mr. Nachreiner and Mr. Brown pronounced that they "detected only a very slight skunk odor in the basement closet."

48.    Then, on June 28, 2007, AIIC wrote that the "skunk smell has been eradicated."

49.    Plaintiffs were so astonished at these pronouncements that they implored AIIC to obtain an expert's opinion, rather than merely rely on their own noses.

50.    AIIC agreed to hire an expert solely to answer the question of whether the home still smelled of skunk odor.  On July 18, 2007, AIIC's counsel wrote that AIG PCG agrees to use Dr. Hirsch Friday to determine whether the skunk smell has been eradicated from the building." Dr. Alan Hirsch, of the Smell and Taste Research Foundation, based in Chicago, Illinois, is a leading expert in the field who has consulted for the Illinois Environmental Protection Agency and the Illinois Attorney General's Office.

51.    On or about July 20, 2007, Dr. Hirsch and his team of specialists conduct a blind odor panel and took scientific readings during their inspection of the Royals' home.

52.    In a report dated July 27, 2007, Dr. Hirsch's findings confirmed that Plaintiffs' home was filled with skunk odor and noxious chemical odors that caused a physical reaction to those present at the home.  A true and correct copy of Dr. Hirsch July 27, 2007 Report is attached as Exhibit B.  Specifically, Dr. Hirsch concluded:

> In summary, the tests conducted demonstrated very substantial
> levels of odors in the primary and secondary locations. This was
> clearly the odor of skunk. […] The skunk odor was noted
> immediately upon entering the house and the level of skunk odor
> combined with the other construction and restoration odors is so
> high as to be trigeminal irritants and is equivalent to what I would
> see at a house located next to a landfill site.

(See Exhibit B, p. 6).

53.     After AIIC attempted to criticize and improperly interpret Dr. Hirsch's findings,

Dr. Hirsch confirmed and clarified his findings in a follow-up report dated August 28, 2007, a

true and correct copy of which is attached as Exhibit C, to make it abundantly clear that the

Royals' home was filled with skunk odor:

> It was evident to all investigators present on July 20, 2007 that the Royal
> house was encumbered by a miasma of malodor that was skunk in nature.
> This was readily apparent upon initially entering the residence when
> investigators were overcome by the noisome undeniably skunk effluvium
> which was of such high intensity, that it induced trigeminal stimulation
> with irritation of eyes, tearing and throat irritation. The skunk malodor
> was pervasive throughout the house and all sites tested except in the last
> room examined (home office).

(See Exhibit C, p. 1). A copy of Dr. Hirsch's follow-up report was provided to AIIC.

54.     Further, Dr. Hirsch concluded that all prior efforts at remediation had clearly

failed and that an "aggressive" remediation plan was required, which would include the home's

foundation:

> Given the duration of elapse from initial contamination and
> significant subsequent level of odor, despite efforts at remediation,
> it is evident that the contamination persists. The efforts at
> remediation and encapsulation have not, to date, been very
> effective at this site and I would encourage aggressive efforts at
> remediation. Until such odor removal is able to be performed, I
> would strongly encourage evacuation until such time as the odor
> dissipates or is eliminated (which, I base on my past experience,
> could be as long as up to three years). Aggressive remediation
> approach, including that of the foundations and all that the odor
> has impregnated, should be attempted.

(See Exhibit C, p. 2).

**AIIC's Retention of an Insurer-Friendly**
**Consultant to Contradict Dr. Hirsch's Expert Report**

55.    Rather than accept the findings of Dr. Hirsch and begin to discuss a remediation plan consistent with Dr. Hirsch's opinions, AIIC immediately began attacking the qualifications of Dr. Hirsch and the appropriateness of his findings and went so far as to deny that it had agreed to hire Dr. Hirsch or that it agreed to rely on his findings.

56.    Upon receipt of Dr. Hirsch's report, AIIC engaged in a frantic search for another consultant and hired Martin L. King ("King") to contradict Dr. Hirsch's findings.   In a letter dated August 22, 2007, four months after the Claim was made, AIIC claimed that it had found a skunk expert who had worked on "20 - 30 skunk cases."  AIIC tried to pass off Mr. King as independent, claiming that he has worked for "plaintiffs and defendants" and wrongly stating that Mr. King had "no bias toward any person or industry."

57.    Upon information and belief, and contrary to AIIC's written representations, Mr. King sat, and may still sit, on a board for *Claims Magazine*, the leading magazine for property/casualty insurance claims professionals and corporate risk managers.

58.    During an interview with Plaintiffs' counsel, AIIC's counsel, and Mr. Nachreiner, Mr. King admitted that he worked for AIIC or its affiliated insurance companies before, and that the "principal part of [his] business" is claims, adjusting and/or appraisal work for insurance companies.  When asked by AIIC's counsel whether he also worked for homeowners, Mr. King unequivocally stated that he does not like to work for homeowners.

59.    When asked to do so, Mr. King was unable to provide a reference for any one of the 20 skunk cases on which he allegedly worked.  Although Plaintiffs subsequently requested

11

such references, neither AIIC nor Mr. King have since been able to provide a single credible reference for one of Mr. King's skunk remediation cases.

60.     Concerned about the apparent bias Mr. King had in favor of insurance companies and against homeowners, and despite Mr. King's inability to provide any skunk remediation references, Plaintiffs nevertheless agreed to let Mr. King inspect Plaintiffs' home.

61.     Rather than work with Plaintiffs' schedule, AIIC arbitrarily scheduled the King inspection for August 31, 2007.

62.     Although Plaintiffs advised AIIC that they were not available on that date, and advised AIIC not to have Mr. King come in for the requested inspection, AIIC ignored the Royals, flew Mr. King in for the inspection, and threatened to cut off Plaintiffs' Additional Living Expenses if the home was not made available for inspection on August 31, 2007.  Under this threat, Plaintiffs were forced re-arrange their schedules to make the residence available to Mr. King for inspection on August 31, 2007.

63.     AIIC claimed that Mr. King would provide an "on-the-spot" remediation protocol and instructed the Royals to have their contractor present that day to discuss the "on-the-spot" remediation protocol.

64.     On August 31, 2007, Mr. King visited Plaintiffs' home.  Unlike Dr. Hirsch's team of odor specialists, Mr. King did not conduct any testing of the air.  Mr. King did not take any samples of building materials.  Mr. King did not take any scientific readings or measurements of any kind.  Rather, Mr. King merely walked around sniffing the walls, dirt and air.

65.     Surprisingly, Mr. King did not provide any "on-the-spot" remediation protocol and did not speak with the Royals' contractor who was present.  In fact, AIIC, at the outset of

Mr. King's inspection, instructed that no one would speak to Mr. King at all.  Mr. King left without offering any advice whatsoever.

66.     Prior to Mr. King's arrival at the Royals' home, AIIC advised that Mr. King would have to return to the home to do further inspection and to speak with Dr. Hirsch.  Mr. King has never returned to the Royals' home and has never spoken with Dr. Hirsch.

67.     For weeks the Royals heard nothing from AIIC.  On or about September 20, 2007, three weeks after inspecting Plaintiffs' home, Mr. King devised what he believed was a remediation protocol which he shared with AIIC but not with the Royals.

68.     Even though AIIC agreed that Mr. King was not going to opine on whether the home smelled like skunk, Mr. King stated in his report that AIIC asked him to do just that.  Mr. King opined that the home did not smell of skunk.

69.     Mr. King did not devise an "aggressive" remediation plan as Dr. Hirsch had concluded was necessary.  Instead, Mr. King, concluded that all the skunk odor in the entire home could be remediated through the application of Kraebaum's formula, a liquid solution; to a very limited area of the home -- basically, one wall in two rooms of the home.  Option 1 involved blindly spraying a liquid solution into the wall cavity from the inside of the home, while Option 2 involved removing the brick veneer and applying the same liquid solution from the exterior of the home.

70.     Mr. King determined that this minimalist and localized treatment would solve the problem even though Mr. King was unable to make any determination that the area he recommended for treatment harbored any skunk odor.

71.     To support his conclusions, Mr. King relied on and attached to his report two scientific articles relating to the chemistry and neutralization of skunk odor.  Both of those articles were authored by William F. Wood, a Chemistry Professor at Humboldt State University.

72.     On October 1, 2007, AIIC tendered a check in the amount of $11,920 for the cost of implementing Mr. King's recommendations.  AIIC also informed Plaintiffs that coverage under the Policy would end on December 9, 2007 and that Additional Living Expenses would be cease as of that date as AIIC had arbitrarily determined that Mr. King's remediation protocol could be accomplished, and Plaintiffs' house could be put back together, by that date.

**Professor Wood - The Expert On Whom AIIC Relied - Debunks King's Recommendations**

73.     Plaintiffs raised serious questions about the efficacy of Mr. King's proposals with AIIC which AIIC refused to address.  The Royals made numerous requests to discuss with AIIC the apparent problems and inconsistencies in Mr. King's report, as well as Mr. King's recommendations.  AIIC refused.

74.     Soon thereafter, Plaintiffs asked Professor Wood if Mr. King's protocols for eradicating the skunk odor from Plaintiffs' home would be effective.  Professor Wood reviewed Mr. King's Report, Dr. Hirsch's Reports, and additional materials, and provided his opinions regarding Mr. King's protocols in a report dated October 25, 2007, a true and correct copy of which is attached as Exhibit D).

75.     In his report, Professor Wood explained the science behind skunk odor and how it interacts with building materials.  Professor Wood also explained the scientific and practical reasons why the formula and protocols proposed by Mr. King would be ineffective in remediating the skunk odor from Plaintiffs' home.

76.     Professor Wood concluded that both of the options recommended by Mr. King would fail to remediate the skunk odor from Plaintiffs' home.  Professor Wood also concluded that Mr. King's conclusion that his protocols would "preclude" the possibility of any return of the odor was "without any factual basis or support."

77.     Professor Wood also explained that Kraebaum's formula "will not work for skunk spray that has drifted over a large area or is trapped in a house."

78.     Professor Wood also concluded that the only way to ensure timely eradication of the skunk odor, other than waiting an indeterminate period of time for the skunk odor to dissipate from the home, is to remove the additional building materials containing the skunk odor. Professor Wood determined that this could include removal of the concrete foundation, sub-floor, wood, beams, and paint that had been exposed to the skunk odor.

79.     After weeks of refusing to do so, AIIC finally agreed to meet with the Royals on October 30, 2007.  On that date, Plaintiffs submitted Professor Wood's report to AIIC, explaining that Mr. King's protocols were doomed to failure.  Plaintiffs also advised AIIC that in light of Dr. Hirsch's and Professor Wood's reports, they were going to move forward with removing additional building materials in order to eradicate the skunk odor.

80.     In addition, on October 30, 2007, the Royals informed AIIC that the Village of Highland Park required that the Royals obtain architectural drawings and permits before work could be commenced on the Royals' home, and that the permitting process would take at least 6 weeks.  For this reason, the Royals explained that the December 9, 2007 date on which AIIC would cut-off the payment of Additional Living Expenses was unrealistic.  To date, AIIC has completely ignored this fact and has refused to pay any funds for the architectural drawings - the prerequisite for obtaining permits.

81.     At the October 30, 2007 meeting, AIIC had promised to get back to the Royals with an immediate response but did not respond or instruct Plaintiffs not to proceed.   On November 8, 2007, Plaintiffs again notified AIIC that they were moving forward with removing the building materials in an attempt to mitigate the skunk odor.

82.     More than 2 weeks after their meeting on November 15, 2007, AIIC informed Plaintiffs that it disagreed with Professor Wood's analysis and report and that it would not reimburse Plaintiffs for any costs associated with removing the additional building materials.

**Involvement of the Illinois Division of Insurance**

83.     Around this time, the Insurance Division began to address AIIC's failure to eradicate the skunk odor from the structure of the Royals' home.

84.     A highly experienced representative from the Insurance Division recommended that the parties allow the Insurance Division to identify and select the consultant(s) qualified to identify the extent to which the structure of the Royals' home was still contaminated with skunk odor and the process by which that odor would be eradicated.

85.     The Insurance Division's objective was to segregate the issue of how the structure of the home would be remediated from the remainder of the Royals' Claim.  So, in November, both AIIC and the Royals agreed to place the issue of how the home would be remediated in the hands of the Insurance Division and on a track separate from the remainder of the Royals' Claim.

86.     Then, on or about December 7, 2007, the Royals agreed, at the request of the Insurance Division, that they would suspend further work on removing building materials.  That same day, AIIC agreed that it would continue to make payments as they were obligated to do so under the Policy.

16

87.     On or about January 14, 2008, after trying for two months, the Division of Insurance advised AIIC and the Royals that it was unable to locate an independent consultant for the project.  This news was very disappointing for the Royals as they had hoped that the Insurance Division's independent consultant could develop a plan to provide a conclusive strategy for eradicating the skunk odor.

88.     The Insurance Division stated that it was unsure how to move forward.  The Royals were equally unsure what to do as they had been effectively put on hold.

### AIIC's Wrongful Denial of Plaintiffs' Claim

89.     On November 8, 2008, the Royals tendered two reconstruction estimates which would ensure that the skunk odor would be remediated from Plaintiffs' home.  One estimate was for tearing down the home and rebuilding it.  The second estimate was for removing the majority of building materials from the home and then reconstructing the home.  Both of these approaches were consistent with the scientific experts' opinions.  AIIC flatly refused to approve, or even discuss, either of these options.

90.     Then, on January 18, 2008, the Royals advised AIIC that their efforts for reducing the skunk odor -- through the removal of additional building materials -- had met with some success.  They also advised AIIC that they were exhausted by the turmoil and constant stress that controlled their lives the longer they were out of their home.

91.     The Royals advised AIIC that they were so desperate to get their lives back together that they were willing to consider simply reconstructing their home even though they were unsure whether the skunk odor was completely eradicated.

92.     On January 22, 2008, Plaintiffs submitted to AIIC a commercially reasonable estimate for reconstructing their home.  AIIC asked to view the home to confirm that the January

22, 2008 estimate accurately reflected the work that needed to be done.  Plaintiffs agreed to make their home available, as they had always done, on January 28, 2008.

93.     Although Plaintiffs repeatedly asked AIIC who would be coming to their home on January 28, 2008, AIIC refused to answer.

94.     On January 28, 2008, a group of four AIIC representatives showed up along with surprise consultant, William Burns; AIIC refused to disclose what Mr. Burns was planning on doing and refused to explain why AIIC declined to previously disclose his participation in the process.

95.     AIIC's inspection confirmed that the commercially reasonable estimate accurately reflected the work that needed to be done to reconstruct Plaintiffs' home.

96.     This was the third, and least expensive alternative, that the Royals submitted to AIIC for the eradication of the skunk odor from their home.

97.     However, on February 5, 2008, AIIC sent a letter wrongfully denying the Royals' Claim ("Denial Letter"), even though the costs were expressly covered under the Guaranteed Rebuilding Cost coverage provision in the Policy.  A true and correct copy of the Denial Letter is attached as Exhibit E.

98.     Demonstrating AIIC's complete lack of understanding of skunk odor, AIIC wrote, "AIIC has consistently disputed that any skunk thiols contaminated the interior of the home based upon its previous inspections and consultants [sic] reports."   (See Exhibit E, p. 1). However, if skunk thiols were never present in the "interior of the home" then there never would have been any skunk odor in the home to begin with and, therefore, no reason for AIIC to have directed that the entire contents of the home be removed, that drywall and other building

materials be torn out, that appliances be thrown out, and that all the Royals' clothing and accessories be chemically processed.

99.    AIIC also asserted that the Royals had a "duty to allow for timely inspections and to provide all material evidence related to any claimed property damage."  (See Exhibit E, p. 2).  However, the only provisions of the Policy to which AIIC referred -- Part IV, A., 4, 5 and 6 -- have not been breached by the Royals and nothing in the Denial Letter supports AIIC's position.

100.    There is no "duty to allow for timely inspections."  Part IV of the Policy only requires the Royals to "show the damaged property" "as often as [AIIC] reasonably requires."  The Royals have shown the property as often as AIIC has required, even when AIIC's requests were not reasonable.

101.    Contrary to AIIC's assertion in the Denial Letter, there is no "duty" in Part IV of the Policy to "provide all material evidence related to any claimed property damage."

102.    In the Denial Letter, Mr. Brown, on behalf of AIIC, went on to accuse the Royals of "concealment" and "fraud" for allegedly failing to advise AIIC of their efforts to eradicate the odor from their own home.  (See Exhibit E, pp. 3-4).  After months of warning the Royals that they had a "duty to mitigate" the skunk odor, AIIC used the fact that the Royals took affirmative steps to mitigate the skunk odor as its justification for denying coverage.  In addition, AIIC claims to have had no prior knowledge despite being informed on October 30, November 8, and again on December 6-7 that the Royals were continuing the process, initially started by AIIC, of removing building materials.

103.    In the Denial Letter, AIIC also stated that the Royals must file this lawsuit by April 26, 2008.  (See Exhibit E, p. 5).  AIIC clearly misstates the Policy requirement.

104.    AIIC also denied Plaintiffs' Claim under the Additional Living Expenses coverage provision to the extent Plaintiffs' Claim was based on expenses incurred after February 5, 2008.

### AIIC's Continuing Delay Tactics

105.    Between April and August 2007, AIIC failed or refused to search for and/or identify what it believed was a consultant that had any experience with skunk odor remediation, and only sought out such a consultant after receiving the July 27, 2007 report of Dr. Hirsch.

106.    After promising an "on-the-spot" remediation plan from Mr. King on August 31, AIIC waited another month before instructing the Royals on the work recommended by Mr. King for which AIIC would pay.   AIIC did not provide the Royals with this information until October 3, 2007, in a letter which it back-dated to October 1, 2007.

107.    Then, AIIC repeatedly refused to meet with the Royals to discuss a plan for remediating their home, claiming there was nothing to talk about, for the entire month of October, finally agreeing to meet on October 30, 2007.

108.    On October 30, 2007, AIIC promised to immediately respond to the scientific report of Professor Wood.  AIIC again went silent for more than two weeks.

109.    After AIIC and the Royals agreed to permit the Insurance Division to identify an independent consultant to advise the parties on a remediation plan, both AIIC and the Royals agreed to wait and take no further action.

110.    Then, on February 6, 2007, the day after sending the Denial Letter, the Director of Insurance of the State of Illinois asked both AIIC and the Royals to agree to a meeting to discuss a solution.

111.    The Royals immediately agreed to such a meeting.  AIIC did not.

20

112.    On or about February 21, 2008, AIIC finally informed the Director of Insurance that it would meet on March 7, 2008.  The Royals agreed to a meeting on that date.

113.    On Friday, February 22, 2008, during a call with the Director of Insurance to discuss the upcoming meeting, AIIC abruptly canceled the March 7, 2008 meeting, claiming that an in-house lawyer for AIIC (who had no prior involvement with the Claim) was not available. During that call, AIIC raised, for the first time, that Plaintiffs' law firm, Greenberg Traurig, LLP had a conflict of interest that precluded its continued representation of the Royals.  Nonetheless, the Director of Insurance asked AIIC to work with the Royals on agreeing to a meeting date while the parties addressed the purported conflict issue.

114.    On Monday, February 25, 2008, Plaintiffs provided AIIC with 11 alternative dates to re-schedule the meeting.  AIIC never responded.

115.    On February 27, 2008, Plaintiffs again asked AIIC to agree on a date in March to meet with the Director of Insurance to discuss a resolution to Plaintiffs' Claim.  AIIC never responded.

116.    On February 29, 2008, Greenberg Traurig, after carefully considering AIIC's assertion of the purported conflict of interest, specifically informed AIIC of the many reasons why it did not have a legal conflict.  In addition, Greenberg Traurig pointed out that AIIC had waived any legal conflict issue by waiting nine months to first assert it.

117.    On March 4, 2008, AIIC responded to Greenberg Traurig's February 29, 2008 letter but failed to address any of the arguments set forth in that letter.

118.    On March 6, 2008, Greenberg Traurig reiterated its position in writing, and requested that the parties meet with the Director of Insurance, as previously agreed upon, in order to come up with a resolution for Plaintiffs' Claim.

119.    On March 12, 2008, AIIC abandoned its prior reason for asserting a conflict of interest and offered new but inaccurate information to assert that Greenberg Traurig had a legal conflict.   AIIC went even further, recommending that the Royals find other counsel to represent them.

120.    On March 27, 2008, Greenberg Traurig once again advised AIIC that it had no legal conflict and explained why the facts and the law could not support such an assertion.  In the same letter, Greenberg Traurig requested that AIIC agree to re-schedule the meeting with the Director of Insurance.

121.    Three weeks passed and AIIC did not agree to any meeting and did not provide any substantive response to the March 27, 2008 letter.

122.    Then, on Friday, April 18, 2008, almost two months after it first raised the purported conflict of interest issue and only a few days before the Royals were required to file this lawsuit, AIIC called to say that it was not going to assert any objection to Greenberg Traurig's continued representation of the Royals and would not seek to disqualify the firm from representing the Royals.

123.    Throughout this two-month "conflict of interest" period, AIIC refused to agree to any meeting with the Director of Insurance and ceased making payments required under the Policy for the Royals' Additional Living Expenses.

### AIIC'S FAILURE TO PROPERLY ADDRESS AND REMEDIATE PLAINTIFFS' CLAIM FOR DAMAGE TO THEIR PERSONAL PROPERTY

124.    AIIC repeatedly changed the agreements made on May 15, 2007.  For example, the parties agreed that Serv Pro would remove the balance of the Plaintiffs' belongings and clean the hard surfaces in the home.  Then, Mr. Martino decided to use Design Construction Concepts (DCC) for cleaning, reconstruction and the overall management of the process, so that one

company would be responsible.  The very next day, AIIC decided that Serv Pro would no longer handle the moving of the Plaintiffs' belongings but that a company called Universal would remove the balance of the items and clean them.  Then, on the same day that the Royals hired Universal, Mr. Martino again reversed course, and instructed the Plaintiffs not to use Universal but Great Lakes Restoration.

125.    From the outset of Plaintiffs' Claim, Mr. Martino immediately determined that the Plaintiffs' appliances were unsalvageable, or "toast" as he described it as the plastic and/or fiberglass insulation had been exposed to the skunk odor.  Accordingly, relying upon Mr. Martino's determinations, the appliances were disposed of.

126.    Then, on May 17, 2007, Mr. Brown reversed course by stating the appliances should instead be "cleaned."  Upon information and belief, Mr. Brown knew that the appliances had been disposed of when he wrote his May 17, 2007 letter.

127.    Similarly, AIIC required that Plaintiffs' personal property, including clothing, be cleaned.

128.    The Royals did not want their clothing to be cleaned in the traditional way (i.e., the manner in which smoke and fire damaged clothing are cleaned).  Without any knowledge that the "cleaning" process would be effective for skunk odor, and after being specifically warned by the Royals that it would not be effective, AIIC insisted that all the Royals' clothing, towels, linens, shoes, belts, accessories, etc., be processed.

129.    On May 23, 2007, the Royals advised AIIC that the sample of clothing that was "cleaned" by AIIC's chosen contractor harbored a horrible chemical odor as bad as the skunk odor which had previously permeated the clothing.  Moreover, the processing specifically caused those clothes to be "crispy or crunchy" and/or "discolored."   Accordingly, the Royals

specifically requested that no further "cleaning" of their clothing be conducted until a more appropriate process could be identified. Despite being told in writing that the Royals did not authorize any more cleaning of their clothing, AIIC continued with chemical processing of Plaintiffs' clothing.

130.    AIIC forced Plaintiffs to have their clothes "cleaned" by threatening the Royals that the Policy required that the clothes be processed and that their failure to do so would be a failure to mitigate damages and, therefore, a breach of the Policy.

## AIIC'S REPEATED FAILURES TO TIMELY PAY COVERED ELEMENTS OF THE CLAIM

131.    At no time during the pendency of Plaintiffs' Claim has AIIC voluntarily paid amounts it is obligated to pay under the Policy without the involvement of Plaintiffs' insurance broker or attorney.

132.    At various times during the pendency of Plaintiffs' Claim, Plaintiffs submitted receipts and invoices to AIIC for living and other expenses incurred by Plaintiffs during the attempted remediation of Plaintiffs' home and personal property.

133.    Rather than fulfilling its contractual obligations to timely pay the submitted receipts and invoices, AIIC delayed payment of the receipts and invoices and failed, at times, to make payment altogether.

134.    Despite various letters, e-mails, and meetings requesting that AIIC address Plaintiff's outstanding Claim amounts (i.e., whether they would be accepted and paid or denied), and after repeated promises on the part of AIIC to do so, AIIC repeatedly failed or refused to timely respond to the Plaintiffs' requests.

135.    Even when AIIC affirmatively promised to make payments on amounts submitted by Plaintiffs within a certain amount of time, AIIC failed to do so.

136.    For example, during a meeting requested by Plaintiffs on July 17, 2007, AIIC agreed to pay all outstanding and uncontested receipts by July 20, 2007.  At the time, AIIC's representative, Mr. Nachreiner, specifically stated that the invoices and receipts submitted in May of 2007 had been reviewed and would be addressed immediately.   AIIC failed to do so.

137.    Also, at the July 17, 2007 meeting, AIIC agreed to review the estimate for repairs to the dwelling that the Royals had agreed to provide to AIIC the following day.  On July 18, 2007, the Royals, as promised, provided those estimates.  AIIC, however, did not respond or pay in a timely manner.

138.    Then, on August 17, 2007, during a telephone conference, Mr. Nachreiner promised that AIIC's payments related to the estimates submitted on July 18, 2007 would be provided "within 15 minutes" after the conclusion of the call.  They were not.  AIIC was reminded of its commitment five days later, but AIIC still provided no response.  Moreover, in their September Statement of Loss, AIIC continued to ignore the July 18, 2007 estimates among other items.  It was not until their purported "final payment" and Statement of Loss of October 3, 2007 that AIIC finally addressed the July 18, 2007 estimates.

139.    As another example, in late July, Plaintiffs submitted an additional $56,000 of additional living expense invoices for AIIC's consideration and payment.  (For example, rent for the month of August had not yet been paid even though it was due on the first of the month.) The Royals asked that payment be made, in light of the prior extended delays, within 48 hours. No such payment was forthcoming.

140.    Instead, on August 28, 2007, AIIC's lawyer sent a letter indicating that they were still "reviewing" the outstanding receipts.

141.    AIIC's delays and missed deadlines became so significant that Plaintiffs forced AIIC to sign a Memorandum of Understanding on August 31, 2007 (the "MOU").  A true and correct copy of the MOU is attached hereto as Exhibit F.

142.    In the MOU, AIIC again promised to review submitted receipts and pay the Royals for the outstanding amounts no later than September 5, 2007.   Most importantly, AIIC agreed that if it failed to pay uncontested amounts and/or provide a good faith basis for denying the remaining amounts by that date, AIIC would waive any right to contest the validity of the receipts offered.

143.    Despite its agreement to do so, AIIC failed to address the receipts that had been outstanding in good faith.   Rather, AIIC denied the overwhelming majority of the receipts submitted in July raising a variety of "questions," the answers to which AIIC already knew or did not need.

144.    The most salient example is AIIC's failure to pay in excess of $5,000 for the kenneling of the Royals' dog while they were living in a hotel.  Not only did AIIC unjustifiably discount the actual amount of the invoice by $3,000, it also asked for the date of the invoice which was plainly visible on the face of the receipt itself.   Even though AIIC was repeatedly advised of this egregious failure multiple times in writing, they have, to date, still not fully reimbursed the Royals for the kenneling of their pets even though the Policy specifically provides coverage for all kenneling expenses.

145.    On October 17, 2007, AIIC wrote to Plaintiffs that AIIC had "paid everything owed to the Royals."

146.    Remarkably, at the October 30, 2007 meeting, AIIC professed ignorance as to what items had been submitted *but not yet paid*.  AIIC then asked the Royals to spend their time

and money to have their counsel prepare yet another list of outstanding items that had not been addressed by AIIC.  Also during the meeting, Mr. Nachreiner admitted to having received on September 4, 2007, a listing of personal property for which the Royals needed to be reimbursed amounting to approximately $47,000 -- a list of items which AIIC had simply ignored.

147.    Then, on November 8, 2007, Plaintiffs sent AIIC another letter enclosing information and receipts documenting additional outstanding items and expenses incurred by Plaintiffs as a result of the Occurrence that had yet to be paid by AIIC, and identifying numerous items AIIC failed to take into account in properly evaluating their Claim.  Some of the items resubmitted on November 8, 2007 had previously been submitted as early as July 2007.

148.    Rather than paying the expenses identified in the November 8, 2007 correspondence, AIIC simply responded that it was "reviewing" the submitted items.

149.    On December 7, 2007, AIIC agreed with the Insurance Division that it would make all payments due under the Policy while the Insurance Division sought a consultant that could assist the parties with a solution to the Claim.  AIIC did not make those payments as promised.

150.    On December 19, 2007, Plaintiffs, once again, sent AIIC a letter requesting that AIIC pay the items and expenses identified in the November 8, 2007 letter, noting, once again, that the identified items and expenses were outstanding and had not been paid for many months.

151.    It took AIIC another two months to address Plaintiffs' November 8, 2007 letter. In its January 11, 2008 letter, AIIC remarkably made numerous false statements as well as statements which directly contradicted and belied the prior positions taken by AIIC in refusing to make payments required under the Policy.

27

**First Claim for Relief Against AIIC**
**(Declaratory Judgment – Duty to Pay or Reimburse**
**Plaintiffs for Benefits Owing and Due Under The Policy)**

152.    Plaintiffs repeat the allegations set forth in paragraphs 1 through 156, as if fully set forth herein.

153.    AIIC is obligated under the Policy to pay or reimburse in full Plaintiffs' Claim under the Guaranteed Rebuilding Cost, Contents, Additional Living Expenses and other coverage provisions for losses arising out of the Occurrence.

154.    The Royals have complied with all of their duties and obligations under the Policy and, in particular, have made the home available whenever AIIC has demanded access.

155.    AIIC has failed to acknowledge, accept or undertake its obligations to pay or reimburse in full their legal liabilities in connection with Plaintiffs' Claim

156.    AIIC's assertion of "concealment" and "fraud" is not supported by any facts that have been asserted as AIIC was informed in advance of the Royals' plans.  Further, the Policy and Illinois law limits the application of the purported "fraud."

157.    An actual and justiciable controversy presently exists between Plaintiffs and AIIC under the Policy concerning AIIC's obligations to pay or reimburse in full legal liabilities arising out of the claims asserted by the Plaintiffs as set forth herein.

**Second Claim for Relief Against AIIC**
**(Breach of Contract Under the Policy)**

158.    Plaintiffs repeat the allegation set forth in paragraphs 1 through 156, as if fully set forth herein.

159.    The Policy is a valid and binding insurance policy.

160.    All conditions to AIIC's performance have been satisfied or performed by Plaintiffs, or their performance is or has been waived or excused by the conduct of AIIC or by operation of law.

161.    AIIC has breached its contractual obligations to Plaintiffs as alleged herein, including those set forth in the Policy, by:

    a.    Failing or refusing to fully undertake its obligations to pay or reimburse Plaintiffs for loss and/or damage to Plaintiffs' personal property;

    b.    Failing or refusing to fully undertake its obligations to pay or reimburse Plaintiffs for loss and/or damage to Plaintiffs' Contents, as that term is defined in the Policy;

    c.    Failing or refusing to fully undertake its obligations to pay or reimburse Plaintiffs for their Additional Living Expenses; and

    d.    Wrongfully applying storage and moving costs to the limited Contents coverage provided by the Policy.

162.    AIIC has also breached its contractual obligations by denying Plaintiff's claim under the Guaranteed Rebuilding Cost coverage provision in the Policy.

163.    The costs and/or estimates were submitted to AIIC on November 8, 2007 and December 19, 2007.

164.    As a direct and proximate result of AIIC's material breaches of contract, which is continuing to at least the date of this Complaint, AIIC has deprived Plaintiffs of the benefit of the insurance coverage for which AIIC was paid substantial premiums.

165.    As a result of all the foregoing conduct, AIIC has breached the implied covenant of good faith and fair dealing and inherent in every contract.

166.    Plaintiffs have complied with and fully performed all applicable terms and conditions under the Policy, including payment of premiums and fulfilling their duties to cooperate and mitigate.

167.    No exclusion to coverage applies to bar coverage under the Policy.

168.    In the alternative, the performance of or compliance with such duties, terms and conditions has been waived by AIIC's failure to reserve any specific coverage defense or otherwise excused by the conduct of AIIC or by operation of law.

169.    As a direct and proximate result of AIIC's material breaches of contract, Plaintiffs have sustained damages in an amount in excess of $75,000 and such damages are continuing. Plaintiffs also are entitled to all other direct, indirect, consequential, special and compensatory damages as a result of AIIC's material breaches of contract.

170.    As a direct and proximate result of AIIC's material breaches of contract, AIIC is estopped from enforcing, and therefore may not enforce, against Plaintiffs any contractual obligation, limitation or exclusion set forth in the Policy, including without limitation any provision purporting to exclude certain types of damages, or any provision purporting to impose on Plaintiffs a duty to cooperate or to mitigate damages, or similar obligations.

### Third Claim for Relief Against AIIC
### (Anticipatory Breach of Contract Under the Policy)

171.    Plaintiffs repeat the allegations set forth in paragraphs 1 through 156, as if fully set forth herein.

172.    AIIC has repudiated their contractual obligations set forth in the Policy by indicating that it does not intend to honor its contractual obligations to Plaintiffs. AIIC, *inter alia,* has indicated that it does not intend: (i) to fully pay Plaintiffs for damage to Plaintiffs' personal property; (ii) to fully reimburse Plaintiffs for Additional Living Expenses and Contents

coverage; and (iii) to otherwise undertake fully, without reservation, its contractual obligations with respect to Plaintiffs' Claim; and (iv) fully reimburse Plaintiffs for all the receipts submitted and which have yet to be submitted.

173.    The foregoing conduct by AIIC has rendered Plaintiffs insecure and has caused Plaintiffs reasonably to believe that AIIC will not perform its contractual obligations to Plaintiffs as and when due.

174.    Plaintiffs have performed all duties under the Policy, have complied with and fully performed all applicable terms and conditions under the Policy, including payment of premiums and fulfilling their duties to cooperate and mitigate, and are entitled to the full benefits and protections of the Policy with respect to their Claim.

175.    In the alternative, the performance of or compliance with such duties, terms and conditions has been waived or otherwise excused by the conduct of AIIC or by operation of law.

176.    As a direct and proximate result of AIIC's anticipatory breach of contract, Plaintiffs have sustained damages in an amount in excess of $75,000 and such damages are continuing.  Plaintiffs also are entitled to all other direct, indirect, consequential, special and compensatory damages as a result of AIIC's anticipatory breach of contract.

### Fourth Claim for Relief Against AIIC
### (Vexatious and Unreasonable Conduct - Section 155 of the Illinois Insurance Code)

177.    Plaintiffs repeat the allegations set forth in paragraphs 1 through 156, as if fully set forth herein.

178.    AIIC, as Plaintiffs' insurer, has an implied obligation to act in good faith and fair handling in processing Plaintiffs' claims for insurance coverage under the Policy.

179.    AIIC, via its claim servicing unit, AIG PCG, acted, and continues to act, as the claim handler with respect to the claim asserted by Plaintiffs under the Policy.  In that role, AIIC,

through its claim servicing unit, AIG PCG, has primary control over Plaintiffs' claim and has undertaken all of the claim handling functions.

180.    AIIC, through its claim servicing unit, AIG PCG, has engaged in a pattern of conduct designed to deny Plaintiffs the value of the insurance coverage purchased from AIIC.

181.    For nearly a year, AIIC, through its claim servicing unit, AIG PCG, has vexatiously and unreasonably delayed providing Plaintiffs with benefits owing and due under the Policy.

182.    For nearly a year, AIIC, through its claim servicing unit, AIG PCG, has vexatiously and unreasonably delayed, and has otherwise failed, to pay benefits owing and due under the Guaranteed Rebuilding Cost Coverage provision in the Policy.

183.    For nearly a year, AIIC, through its claim servicing unit, AIG PCG, has vexatiously and unreasonably delayed, and has otherwise failed, to pay benefits owing and due under the Contents coverage provision in the Policy.

184.    For nearly a year, AIIC, through its claim servicing unit, AIG PCG, has vexatiously and unreasonably delayed, and has otherwise failed, to reimburse Plaintiffs for their Additional Living Expenses.

185.    For nearly a year, AIIC, through its claim servicing unit AIG PCG, failed to affirm or deny liability on claims made within a reasonable time in violation of its duties pursuant to 50 Ill. Admin. Code tit. 50, §919.50(a).

186.    For nearly a year, AIIC, through its claim servicing unit AIG PCG, has failed to offer payment within 30 days after affirmation of liability in violation of its duties pursuant to Ill. Admin. Code tit. 50, §919.50(a).

187.    For nearly a year, AIIC, through its claim servicing unit, AIG PCG, has engaged

in improper claims practice in violation of 215 ILCS 5/154.5 and 5/154.6.  Such conduct

includes, but is not limited to, the following:

(a)    Misrepresenting the Royals' obligations under the Policy;

(b)    Misrepresenting the time in which AIIC would take certain actions required of it under the Policy;

(c)    Failing to promptly resolve Plaintiffs' claim;

(d)    Forcing Plaintiffs to make repeated demands for payments before taking any action;

(e)    Forcing Plaintiffs to use certain contractors which had an economic or other advantageous relationship with AIIC;

(f)    Forcing Plaintiffs to use certain contractors that did not have the expertise to perform the work requested of them or who otherwise performed sub-standard work;

(g)    Forcing Plaintiffs to use certain contractors that engaged in unreasonable business practices;

(h)    Failing and/or refusing to disclose the location of Plaintiffs' personal belongings and property despite repeated requests for that information;

(i)    Knowingly permitting or acquiescing to the surreptitious videotaping of the Plaintiffs while they attempted to inspect their personal belongings and property;

(j)    Failing and/or refusing to make timely payments of Additional Living Expenses as required under the Policy;

(k)    Failing and/or refusing to direct its untimely payments of Additional Living Expenses to the address identified by Plaintiffs for receipt of same;

(l)    Forcing Plaintiffs to take certain actions which caused more damage to their personal property, despite the Plaintiffs advising AIIC that the "cleaning" methods at issue would be ineffective and destructive; and;

(m)    Asserting that Plaintiff's counsel, Greenberg Traurig, LLP had a legal conflict of interest that precluded its continued representation of the Royals without ever providing a basis for that assertion.

188.    For nearly a year, AIIC's conduct, through its claim servicing unit, AIG PCG, has

been vexatious, unreasonable, willful and in reckless disregard of the legitimate interests of Plaintiffs under the Policy.

189.    As a direct result of the foregoing conduct, Plaintiffs have suffered, and are entitled, under Section 155 of the Illinois Insurance Code, 215 ILCS 5/155, to recover their reasonable attorneys' fees, costs and statutory damages in excess of $75,000 to be proven at trial.

### Fifth Claim for Relief Against AIIC
### (Trespass the Chattel)

190.    Plaintiffs repeat the allegations set forth in paragraphs 1 through 156, as if fully set forth herein.

191.    On the date of the Occurrence, Plaintiffs were owners and maintained possession of a large amount of clothing, linens, accessories, towels, footwear,

192.    In April 2007, AIIC directed Plaintiffs to have Evans Cleaners ("Evans") "clean" Plaintiffs' clothes and other textiles that had been exposed to the skunk odor.

193.    On April 27, 2007, Evans removed certain clothes from Plaintiffs' home and used certain carcinogenic formulas to "clean" the clothes.

194.    Upon information and belief, Evans subjected the Royals' clothing, accessories, towels, linens, footwear, etc., to repeated chemical processing as the skunk odor was difficult, if not impossible, to eliminate.

195.    In May, 2007, Plaintiffs received a sample of the items "cleaned" by Evans.  The clothes smelled of skunk and other chemicals.  Plaintiffs specifically instructed AIIC that it should not further process their clothing and other textiles.

196.    Ignoring Plaintiffs' instructions, AIIC argued that all of the Plaintiffs' belongings had to be subjected to the chemical processing.

197.    The majority of Plaintiffs' clothing and other textiles were ruined as a result of Evans' chemical processing and reprocessing.

198.    Certain items of Plaintiffs' clothing were no longer salvageable even though such items were new, unused and/or minimally used.

199.    A number of Plaintiffs' shoes were also destroyed though the cleaning process. The majority of the affected shoes were crunchy, crispy, misshaped and/or stained.

200.    In addition, because certain items of Plaintiffs' clothing had sentimental value, Plaintiffs expended additional costs in an attempt to restore said items.  Plaintiffs' attempts to restore these items of clothing were ultimately unsuccessful.

201.    At all relevant times, Plaintiffs have been the owners of the clothing that Evans subsequently processed and/or reprocessed.

202.    On April 27, 2007 and July 20, 2007, Evans, under the direction of AIIC, removed clothing from Plaintiffs' possession in order to "process" and/or "reprocess" the items.

203.    On October 30, 2007, Mr. Nachreiner specifically stated that Plaintiffs' clothing and other items should *never have been processed* in the first instance.

204.    But for and by reason of AIIC's unlawful detention and treatment and processing of Plaintiffs' personal property Plaintiffs have sustained the damages in excess of $75,000 and such damages are continuing.

### Sixth Claim for Relief Against AIIC
### (Violation of the Illinois Consumer Fraud and Deceptive Trade Practices Act)

205.    Plaintiffs repeat the allegations set forth in paragraphs 1 through 156, as if fully set forth herein.

206.    As part of its efforts to sell insurance policies to Plaintiffs and other insureds, AIIC represented to Plaintiffs and other insureds that it would promptly and fairly investigate all

claims made under its policies, and would promptly pay its insureds for all losses within policy coverage.

207.    As part of its efforts to sell homeowner insurance policies to Plaintiffs and other insureds, AIIC represented to Plaintiffs and other insureds that, in the event of a disaster or of an occurrence covered under the policies, it would fulfill its contractual obligations under the policies and restore Plaintiffs and other insureds to their pre-loss state and/or condition.

208.    At all times relevant, AIIC has engaged in a practice of not paying promptly and completely claims made under policies which AIIC knew were due and owing to its insureds.

209.    At all times relevant, AIIC has engaged in a practice of delaying the payment of proper claims as a means of causing its insureds to negotiate with AIIC for settlement payments which are less than the full and fair value of the insured's claims.

210.    At all times relevant, AIIC has engaged in a practice of delaying the payment of proper claims as a means of causing its insureds to negotiate with AIIC for settlement of valid claims for amounts less than the amounts required to restore the insured to their pre-loss state and/or condition.

211.    AIIC concealed and omitted to disclose its practice of attempting to settle and negotiate valid claims for amounts less than the losses suffered by its insureds.

212.    AIIC's misrepresentations violate the Illinois Consumer Fraud and Deceptive Trade Practices Act in that they misled the Plaintiffs and caused Plaintiffs to believe that they had purchased insurance coverage from AIIC which would promptly and fully indemnify the Plaintiffs for any loss within the Policy limits and coverage.

213.    As a result of the foregoing conduct, Plaintiffs have sustained damages in excess of $75,000, plus costs of filing this action, including reasonable attorneys' fees under Section 8 of the Consumer Fraud and Deceptive Trade Practices Act.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

1.    That this Court determine and declare that AIIC is obligated to pay or reimburse in full Plaintiffs' Claim under the Policy.

2.    For Plaintiffs' damages to be proven at trial;

3.    For compensatory damages in an amount or amounts to be determined of fact at trial, reasonable attorneys' fees, costs, and statutory damages;

4.    On all Claims for Relief, Plaintiffs are entitled to ancillary relief including:

(a)    Such orders, including injunctive relief, as are necessary to preserve this Court's jurisdiction over the parties and issues herein;

(b)    Prejudgment and post-judgment interest according to law;

(c)    Plaintiffs' costs and expenses of this lawsuit; and

5.    On all Claims for Relief, such other and further relief as this Court deems just and proper.

**PLAINTIFFS HEREBY DEMAND A TRIAL BY JURY.**

Respectfully submitted,

MARK ROYAL and VICKI ROYAL

By:___/s/ Anthony L. Abboud_____
        One of Their Attorneys

Anthony L. Abboud
Paul A. Del Aguila

Greenberg Traurig, LLP
77 West Wacker Drive, Suite 2500
Chicago, Illinois 60601
(312) 456-8435

*CHI 56,851,298v7 4/23/2008*

08CV2325 J. N.
JUDGE CONLON
MAG. JUDGE COLE

# EXHIBIT A

 **Private Client Group**



H O M E O W N E R S

American International Ins Co.
(Name of issuing company)

# Declarations Page

Your Declarations Page shows at a glance the coverage you have and your premium. Your Declarations Page is part of your policy. Please read your policy carefully, including your Declarations Page and any attached Endorsements, for a description of your coverage.

**Policy Number:**
HO 0000302989

**Policy Period:** 09/12/2006 - 09/12/2007
At 12:01 A.M. standard time at your mailing address shown below

**Name of Insured and Mailing Address:**
Vicki and Mark Royal
1526 Sheridan
Highland Park, IL 60035

**Agency Name, Address, Phone # & Code:**
Mesirow Insurance Services
321 N. Clark Street
Suite 1200
Chicago, IL 60610

(312) 595-6200          50033

### YOU WILL BE BILLED SEPARATELY FOR ANY PREMIUM DUE.

The kind of losses that are covered and any special limits or deductibles that apply, are explained in detail in your Policy.
Summary of Coverage by Location:

**1526 Sheridan     Highland Park, IL 60035**

| COVERAGE | PAYMENT BASIS | COVERAGE LIMIT |
|---|---|---|
| Dwelling | Guaranteed Rebuilding Cost | $1,148,500 |
| Other Permanent Structures | Guaranteed Rebuilding Cost | $200,000 |
| Contents | Replacement Cost | $700,000 |
| Loss of Use | | Unlimited |
| Liability | | $500,000 |
| Medical Payments | | $10,000 |

A deductible of $1,000 applies to this location unless a special deductible applies.     Location Premium:     $5,884.00

Forms and Endorsements Attached for Location: PCHO-MSE (8/02), GLBA-PCG2 (5/01), PCHO-DWLL (8/02),
PCHO-FLD (06/05), PCHO-FLE (7/02), PCHO-IFEC (7/01), PCHO-AEIL (8/02)

Mortgagee #002     Loan 3013357953

Washington Mutual Bank
ISAOA/ATIMA
P.O. Box 100590
Florence, SC 29501-0590

| | | |
|---|---|---|
| Location Extension Schedule Premium: | $3,383.00 |
| **Total Premium:** | **$9,267.00** |

PCHO-DEC1 (07/01)

 **Private Client Group**



**HOMEOWNERS**

American International Ins Co.
(Name of issuing company)

# Location Extension Schedule Page

**Summary of Coverage by Location for Policy:**    HO 0000302989

Mortgagee # 003    Loan 0749776852
Washington Mutual Bank
ISAOA/ATIMA
PO Box 702808
Dallas, TX 75370-2808

**366 South Ave    Glencoe, IL 60035**

| COVERAGE | PAYMENT BASIS | COVERAGE LIMIT |
|---|---|---|
| Dwelling | Replacement Cost | $1,050,000 |
| Other Permanent Structures | Replacement Cost | $210,000 |
| Contents | Replacement Cost | $735,000 |
| Loss of Use | | Unlimited |
| Liability | | $500,000 |
| Medical Payments | | $10,000 |

A deductible of $5,000 applies to this location unless a special deductible applies.    Location Premium:    $3,383.00

Forms and Endorsements Attached for Location: PCHO-MSE (8/02), GLBA-PCG2 (5/01), PCHO-DWLL (8/02), PCHO-FLD (06/05), PCHO-AEIL (8/02)

Mortgagee # 001    Loan 659197171
Bank of America #133
Its Successors and/or Assigns
PO Box 1675
Coraopolis, PA 15108

**Location Extension Schedule Premium Subtotal:    $3,383.00**





**AIG** Private Client Group



# HOMEOWNERS

## HOMEOWNERS COVERAGE

### QUICK REFERENCE

**Declarations Page**

**Your Name and Address**
**Transaction**
**Policy Period**
**Coverage Limits**
**Premium**
**Forms**

Coverage is provided by the American International Group, Inc., member company named on the Declarations Page. Each is a stock company.

| Policy Provisions | Beginning on Page |
|---|---|
| **PART I - Definitions** | 1 |
| **PART II - Property** | 2 |
|     A. Insuring Agreement | |
|     B. Payment of a Loss | |
|     C. Additional Coverages | |
|     D. Exclusions | |
| **PART III - Liability** | 9 |
|     A. Insuring Agreement | |
|     B. Payment of a Loss | |
|     C. Defense Coverage and Claim Expense | |
|     D. Additional Coverages | |
|     E. Exclusions | |
| **PART IV - Conditions** | 11 |

The Contract together with the Declarations Page and Endorsements, if any, complete the policy.

PCHO (09/06)

THIS POLICY IS NOT COMPLETED WITHOUT A DECLARATIONS PAGE

## HOMEOWNERS COVERAGE - POLICY PROVISIONS

The insurance company named on your Declarations Page will provide the insurance described in this policy. You agree to pay the premium and comply with your responsibilities described in this policy. Various provisions in this policy restrict or exclude coverage. Read the entire policy carefully to determine your rights and duties, and what is and is not covered. We have no duty to provide coverage unless there has been full compliance with policy PART IV - CONDITIONS.

## PART I - DEFINITIONS

Words with special meanings are defined here or in the part of the policy where they are used. Throughout the policy, defined terms will be bolded when used.

In this policy, the words "you", "your" and "yours" refer to the person or persons named on the Declarations Page and his or her "spouse" who lives in the same household. The words "we", "us", "our" and "ours" mean the insurance company named on the Declarations Page.

As used herein, a Declarations Page includes any schedule that supplements it.

Also, in this policy the words:

**Aircraft** means any contrivance used or designed for flight, except model or hobby craft not used or designed to carry people or cargo.

**Bodily Injury** means bodily harm, including resulting sickness or disease, required care, loss of services or death.

**Business** means a part-time or full-time trade, occupation or profession, including farming or ranching, other than **incidental business.**

**Contents** means personal property owned by, or in the possession of, you or a **family member.**

For any **residence** listed on the Declarations Page that is a condominium or cooperative, or rental unit, **contents** includes additions, alterations, items of real property, installations or fixtures that you paid for or acquired at your expense along with the **residence**. The property must be your insurance responsibility under the governing rules of the Condominium or Cooperative Association.

**Damages** means the sum required to satisfy any claim covered by this policy, whether settled and agreed to in writing by us or resolved by judicial review.

**Family Member** means a person related to you by blood, marriage or adoption that lives in your household including a ward or foster child.

**Fungi** means any type or form of fungus, including but not limited to all forms of mold or mildew, and any mycotoxins, spores, scents, vapors, gas or substance, including any by-products, produced or released by **fungi.**

**House** means the owned one, two, three or four family dwelling at which you reside at, intend to reside at, or any location named on the Declarations Page that is not a condominium or a cooperative.

**Incidental Business** means a **business** activity that does not produce gross revenues in excess of $10,000 in any year, has no employees subject to workers' compensation or other similar disability laws, and conforms to federal, state and local laws. **Incidental business** includes the **business** of farming provided that it does not involve employment of others for more than 1,250 hours of farm work during the Policy Period, and does not produce more than $25,000 in gross annual revenues from the raising or care of animals or agriculture. **Incidental business** includes **residences** listed on the Declarations Page that you own and rent to others.

**Insured person** means:

a.  You or a **family member;**

b.  An Additional Insured named in the policy;

c.  Any person given permission by you or a **family member** to use a vehicle or **watercraft** covered under this policy with respect to their legal responsibility arising out of its use; or

d.  A **spouse**. A **spouse** is a marriage partner. The term **spouse** also includes an individual registered under state law as a domestic partner of the **insured person** shown on the Declarations Page.

**Landscaping** means your trees, lawn, shrubs, and other plants, not including forestry or brush, on the grounds of your **residence.**

**Medical Expenses** means reasonable charges for medical, dental, hospital, surgical, X-ray, prosthetic devices, professional nursing, ambulance, and funeral services.

**Occurrence** means:

a.  A loss or an accident, to which this insurance applies, including continuous or repeated exposure to substantially the same general harmful conditions, which occurs during the Policy Period and results in **personal injury** or **property damage;** or

b.  An offense, to which this insurance applies, including a series of related offenses, committed during the Policy Period that results in **personal injury** or **property damage.**

**Other Permanent Structures** means outdoor structures you own that are situated on the grounds of

your **residence.**

**Personal Injury** means the following injuries, or resulting death:

a. **Bodily injury;**

b. Wrongful detention, false imprisonment or false arrest;

c. Shock, emotional distress, mental injury;

d. Invasion of privacy;

e. Defamation, libel or slander;

f. Malicious prosecution;

g. Wrongful entry or eviction; or

h. Assault and battery when committed with the intent of protecting persons.

**Property Damage** means physical injury to, destruction of, or loss of use of tangible property and the resulting loss of its use.

**Reconstruction Cost** means the lesser of the amount at the time of the loss required to:

a. Restore or repair a structure; or

b. Replace or rebuild a structure at the same location;

with materials of like kind and quality. **Reconstruction cost** does not include any amount required for the excavation, replacement or stabilization of land under or around a structure.

**Recreational Motor Vehicle** means:

a. A motorized land vehicle designed for use off public roads and not subject to motor vehicle registration or operator licensing;

b. A motorized land vehicle in dead storage at your **residence;** or

c. A motorized land vehicle used solely on and to service a location shown on the Declarations Page.

**Residence** means any of the following which is listed on the Declarations Page:

a. Any **house, other permanent structures** and grounds that you own;

b. Any condominium unit, cooperative, or apartment that you own or reside in; or

c. Any other type of home you rent to live in.

**Residence Employee** means:

a. Your employee whose duties are related to the maintenance or use of the **residence** premises, including household or domestic services; or

b. One who performs similar duties elsewhere not related to your **business.**

**Watercraft** means a boat or craft designed for use on, over or under water.

| PART II - PROPERTY |
| --- |

**A. Insuring Agreement**

This policy covers you against all risks of direct physical loss or damage to your **house, contents** and **other permanent structures** unless an exclusion applies.

**B. Payment of a Loss**

1. Amount of Coverage for Your **House** and **Other Permanent Structures**

The amount of coverage for each **house** and for **other permanent structures** at each location shown on the Declarations Page is determined by the payment basis shown on the Declarations Page:

a. *Guaranteed Rebuilding Cost Coverage*

We will pay Guaranteed Rebuilding Cost when shown on the Declarations Page of this policy. Guaranteed Rebuilding Cost coverage means that for a covered loss we will pay the **reconstruction cost** of your **house** or **other permanent structures,** for each **occurrence,** even if this amount is greater than the amount of coverage shown on the Declarations Page. However, you must begin to repair or rebuild your **house** or **other permanent structures** within two years from the date of loss at the same location. If not, the maximum payable is the coverage limit shown for that location on the Declarations Page.

b. *Replacement Cost Coverage*

We will pay Replacement Cost when shown on the Declarations Page of this policy. Replacement Cost Coverage means that for a covered loss we will pay the **reconstruction cost** of your **house** or **other permanent structures,** up to the coverage limit shown for that location on your Declarations Page, for each **occurrence.** For a covered total loss we will pay the **reconstruction cost** up to the coverage limit shown for that location on your Declarations Page, for each **occurrence,** whether or not you actually rebuild your **house** or **other permanent structures.** The amount of coverage will be increased daily to reflect the current effect of inflation. At the time of a covered loss, your **house and other permanent structures** coverage will include any increase in the United States Consumer Price Index from the beginning of the Policy Period.

Your payment basis is subject to the following restriction. If at any time during the policy period, you are newly constructing your **house** or **other permanent structures;** constructing additions; or undergoing renovations equal to

or in excess of the lesser of 10% of the **house** coverage limit or $500,000; and/or it results in your moving out of the **house** for any period of time, the payment basis for your **house or other permanent structures** is the reconstruction cost less depreciation. This limitation will not apply if we otherwise give our prior written consent.

We may change the amount of coverage shown on the Declarations Page when the policy renews or when appraisals are conducted to reflect current costs and values.

2. Amount of Coverage For Your **Contents**

The coverage amount for your **contents** for each covered **residence** is listed on your Declarations Page. The amount we will pay for a covered loss will depend on where the covered loss occurs:

At a Residence:

a. If a loss occurs to **contents** located at a **residence** with **contents** coverage:

   i. Listed on the Declarations Page of this policy:

     We will pay up to the coverage limit for **contents** for that location, for each **occurrence**; or

   ii. Under another Homeowners policy in force with us:

     We will not pay any amount under this policy.

b. If a loss occurs to **contents** located at a **residence** that does not have **contents** coverage or at a **house**, condominium, cooperative or rental unit owned or rented by the **insured person** not listed on the Declarations Page of this policy or any other policy issued by us or one of our affiliated companies:

   We will pay up to 10% of the highest coverage limit for **contents** of any single location listed in this policy, for each **occurrence**. Payment will be made based on the single location and will not be made under more than one policy issued by us or one of our affiliated companies.

   However, **contents** at a newly acquired **residence** are not subject to this limitation for sixty (60) days after you begin to move property there.

Away From a Residence:

c. If a loss occurs to **contents** located away from any **residence** or location you own or live at:

   We will pay up to the highest coverage limit for **contents** for any single location listed in this policy, for each **occurrence**. Payment will be made based on the single location and will not be made under more than one policy issued by us or one of our affiliated companies.

The most we will pay for a covered loss is the lesser of the amount required to repair the damage or the full cost to replace the **contents** without deduction for depreciation, up to the coverage limit.

However, the most we will pay for a covered loss is the cost to repair or replace the **contents** less depreciation, up to the coverage limit, if the **contents** are obsolete or unusable for the purpose for which they were originally intended because of their age or condition.

If, after a covered loss to both **house** and **contents**, we pay more than the coverage limit for **house** coverage because of Guaranteed Rebuilding Cost, we will automatically increase the amount of **contents** coverage for that loss by the same percentage that we increased the amount of **house** coverage.

The amount of coverage for your **contents** will be increased daily to reflect the current effect of inflation. At the time of a covered loss, your **contents** coverage will include any increase in the United States Consumer Price Index from the beginning of the Policy Period.

3. Deductible

The deductible shown on the Declarations Page is the amount of a covered loss you will pay for each **occurrence**.

Your deductible shown on the Declarations Page will be reduced by any other deductible in this policy unless the deductible is a special deductible such as hurricane, wind and hail, or named storm.

Construction deductible. If at any time during the Policy Period, you are newly constructing your **house or other permanent structures**; constructing additions; or undergoing renovations equal to or in excess of the lesser of 10% of the **house** coverage limit or $500,000, and/or it results in your moving out of the **house** for any period of time, a 5% construction special deductible will apply to each **occurrence** in lieu of a base deductible. This deductible applies to your **house, other permanent structures, contents**, and additional coverages. The dollar amount of this deductible is based on the **house** coverage limit shown on the Declarations Page for that location at the time of the loss. This deductible does not eliminate any other special deductibles that may apply. If the deductible waiver for large losses endorsement was selected, that endorsement will not apply. The construction deductible will not apply to the loss if we otherwise give our prior written consent.

4. Pairs, Sets and Parts

For a covered loss to a pair or set, we will pay whichever is less:

a. The cost to replace the lost or damaged property;

**b.** The cost to restore or repair the damaged property to its pre-loss condition;

**c.** The difference between the market value of the pair or set before the loss and after the loss; or

**d.** The amount of coverage.

However, we will pay you the full replacement cost of the entire pair or set if you agree to surrender the remaining article(s) of the pair or set to us.

5. Special Limits of Liability

**a.** The limit shown for each of the following categories is the maximum we will pay for a covered loss to that type of contents. These special limits do not increase the amount of coverage of your contents.

|   |   |   |
|---|---|---|
| i. | Money, bank notes, money orders, drafts, checks or gold, silver or platinum bullion or ingots | $2,500 |
| ii. | **Watercraft,** including their outboard motors, equipment and furnishings | $5,000 |
| iii. | Trailers | $5,000 |
| iv. | Grave markers and Mausoleums | $50,000 |

**b.** The limit shown for each of the following categories is the maximum we will pay for a covered loss to that type of contents unless they are stored in a bank vault or bank safe deposit box, in which case we will pay up to the total amount for contents coverage listed in the policy for each occurrence. These special limits do not increase the amount of coverage of your contents.

|   |   |   |
|---|---|---|
| i. | Stamps, Coins & Medals | $5,000 |
| ii. | Negotiable papers, securities, accounts, evidences of debt, letters of credit, notes (other than bank notes), manuscripts, passports, tickets | $5,000 |

**c.** We will pay up to the coverage limit for contents coverage listed in the policy for each occurrence for contents in the following categories unless they are lost, misplaced or stolen, in which case we will only pay up to the limit shown below. These special limits do not increase the amount of coverage of your contents.

|   |   |   |
|---|---|---|
| i. | Jewelry, watches, | $5,000 |

precious stones or semi-precious stones, whether set or unset

|   |   |   |
|---|---|---|
| ii. | Furs | $5,000 |
| iii. | Guns | $5,000 |
| iv. | Silverware, goldware, pewterware or trophies | $10,000 |

**d.** We will pay up to the total amount of contents coverage listed in the policy for each occurrence for contents in the following categories unless the loss is caused by breakage, in which case we will only pay up to the limit shown below. These special limits do not increase the amount of coverage of your contents.

|   |   |   |
|---|---|---|
| i. | Crystal, china, porcelains, figurines, statues, sculptures, mirrors, wine bottles, glassware and similar items. | $50,000 |

**C. Additional Coverages**

These coverages are offered in addition to the amount of coverage shown on the Declarations Page unless stated otherwise. Your deductible applies to these coverages unless stated otherwise. Exclusions are described in section D. Exclusions and limits of liability, are described in section B., 5. Special Limits of Liability apply to these coverages.

1. Additional Living Expense

If a covered loss makes your residence uninhabitable, we cover any reasonable increase in living expenses incurred by you to maintain your household's usual standard of living. Payment will continue for the shortest reasonable amount of time necessary to restore your residence to a habitable condition or for your household to permanently locate elsewhere. If your residence is under construction and you are living in the residence at the time of loss, additional living expenses will cease once you are restored to the condition you were just prior to the loss. We will not pay any interests for loans or increased policy premiums associated with the rebuilding of your home. However, if prior to the loss you are not living in the residence or have moved out because of construction or renovations, then additional living expenses for this location will not apply.

We will also pay reasonable expenses associated with the kenneling of your domestic animals only.

2. Assessments

We will pay up to $100,000 per occurrence for your share of an assessment charged during the Policy Period against all the mem-

bers of a Homeowners, Condominium or Cooperative Association. The assessment must be as a result of a covered loss to property or as a result of liability that would be covered under this policy. We will not pay assessments charged for loss resulting from earthquake; however, we will pay your share of an assessment charged as a result of an ensuing covered loss due to theft, explosion, fire or glass breakage unless another exclusion applies. We will not pay more than $10,000 for any assessment that results from a deductible in your Association's insurance. The resultant assessment must be as a result of a covered loss to property or as a result of liability that would be covered under this policy. We will not pay assessments charged for loss resulting from earthquake; however, we will pay your share of an assessment charged as a result of an ensuing covered loss due to theft, explosion, fire or glass breakage unless another exclusion applies. Your deductible does not apply to this coverage.

3. Fair Rental Value

   If you are not able to rent out your **residence**, or a part of your **residence**, that you usually rent to others because of a loss covered by this policy, we will pay the fair rental value for the reasonable amount of time necessary to restore your **residence**, or that part of your **residence**, to a habitable condition.

4. Forced Evacuation

   If you are forced by civil authority to evacuate your **residence** as a direct result of a loss or a reasonable threat of a loss covered by this policy, we will reimburse you for the reasonable increase in your living expenses necessary to maintain your household's normal standard of living for up to thirty (30) days. We also cover any loss in fair rental value for up to thirty (30) days if your **residence** is rented to others.

5. Landscaping

   We will pay up to 5% of the coverage limit for the **house** or, if **house** coverage is not available, 5% of the coverage limit for the **contents** at the **residence** at which the covered loss occurs, but no more than $5,000 for any one tree, shrub or plant. **Landscaping** does not include forestry or brush.

   We will pay only for losses caused by:

   a. **Aircraft;**

   b. Fire, lightning or explosion;

   c. Riot or civil commotion;

   d. A vehicle not owned or operated by someone who lives at the **residence;** or

e. Theft, attempted theft, vandalism or malicious mischief.

   This additional coverage applies only if you repair or replace the damaged **landscaping** within 180 days of the date of loss.

6. Land

   In the event of a covered loss to your **house** or **other permanent structures** we will pay for required stabilization, excavation, or replacement of land under or around your **house** or **other permanent structures.** We will pay up to 10% of the amount of a covered loss to your **house** or **other permanent structures** for this coverage.

7. Construction Materials

   We cover materials and supplies owned by you at each location shown on the Declarations Page for use in the repair, alteration, or construction of your **residence** unless stated otherwise or an exclusion applies. These payments do not increase the amount of your coverage.

8. Precautionary Repairs

   After a loss covered by this policy, we will pay the reasonable expenses you incur for necessary repairs to protect your **residence** against further loss. These payments do not increase the amount of your coverage.

9. Debris Removal

   We will pay the reasonable expenses to remove debris of a covered loss and the property that caused that covered loss. We will also pay up to a total of $1000 to remove trees from the **residence** if felled by the peril of windstorm, hail, weight of ice or snow or sleet when there is no damage to covered property.

10. Lock Replacement

    We will pay for the cost of replacing the locks in a **residence** listed on the Declarations Page if the keys to that **residence** are lost or stolen. Your deductible does not apply to this coverage.

11. Rebuilding to Code

    We will pay the extra expenses to obey any law or ordinance that regulates the repair, rebuilding or demolition of property damaged by a covered loss.

12. Mine Subsidence

    We cover direct loss to your **house** and **other permanent structures** caused by lateral or vertical movement of a man-made underground line or mine-related excavations.

13. Property Removal for Safekeeping

    We will pay for any reasonable expenses incurred for the moving and storing of **contents** from a **residence** because the **contents**

are in danger as a result of a covered loss.

14. Data Replacement

We will reimburse you up to $5,000 for expenses you incur as a result of a covered loss to replace lost personal data stored on a personal computer or portable computing device that you own or lease.

15. Business Property

We will pay up to $25,000 for a covered loss to business property you own or lease.

16. Fire Department Charges

We will pay for the charges imposed by law or assumed by written agreement when a fire department answers a call to save or protect a residence listed on the Declarations Page. Your deductible does not apply to this coverage.

17. Back Up of Sewers and Drains

We will pay up to the coverage limits shown on the Declarations Page for physical loss or damage to property caused by:

a. Water which backs up through sewers or drains on the residence premises. A sewer or drain is a pipe mechanically connected to the residence plumbing system, gutters or downspouts, or other drainage pipe located used to drain water and waste away from the residence. A backup is not due to the inability of a sewer or drain to handle the amount of rainwater, surface water or groundwater trying to enter the sewer or drain.

b. Water which overflows from a sump pump pit if such overflow results from the mechanical breakdown of the sump pump. This additional coverage is intended to cover damage caused by water that overflows the sump pit due to mechanical breakdown of the sump pump, but not damage caused by surface or groundwater before it enters the sump pit. This coverage does not apply to direct physical loss or damage of the sump pump or related equipment, which is caused by mechanical breakdown.

These payments do not increase the amount of your coverage.

18. Property of Domestic Staff and Guests

We cover the personal property of your domestic staff and guests while it is on the premises of any residence listed on the Declarations Page. These payments do not increase the amount of your coverage.

19. Loss by Animals

We cover loss to your house, other permanent structures, and contents caused by domestic animals.

20. Arson Reward

We will pay up to $5,000 for information leading to an arson conviction in connection with a fire loss to property covered by this policy. The $5,000 limit is the most we will pay, regardless of the number of persons providing information. This coverage is additional insurance.

21. Food Spoilage

We cover food spoilage due to a temperature change in a refrigerator or freezer caused by an interruption of the power supply, originating either on or off-premises, or due to the mechanical breakdown of refrigeration equipment at any residence you live at or own. Wine or spirits are not considered food. These payments do not increase your amount of coverage. This coverage is subject to a $250 deductible.

22. Ensuing Fungi or Bacteria

We will pay up to $10,000 in total for a loss caused by fungi or bacteria resulting from a covered loss, including:

a. The cost to remove, clean-up, remediate, contain, treat, detoxify, neutralize, fungi or bacteria;

b. The cost to tear out and replace any part of the building or other covered property as needed to gain access to the fungi or bacteria;

c. The cost of testing or monitoring of air or property to confirm the absence, presence or level of fungi or bacteria whether performed prior to, during or after removal, repair, restoration or replacement. The cost of such testing will be provided only to the extent that there is a reason to believe that there is the presence of fungi or bacteria; and

d. Up to $5,000 for the reasonable increase in living expenses incurred by you to maintain your household's usual standard of living if your residence is uninhabitable. Payment will continue for the shortest period of time necessary to restore your residence to a habitable condition.

This is the most we will pay regardless of the number of occurrences, the number of locations insured, or the number of claims-made. We will not make any additional payments for Ensuing Fungi or Bacteria under any other Additional Coverage.

These payments do not increase the amount of coverage.

23. Loss Prevention Device

After a loss is covered by this policy, we will pay for the reasonable costs you incur up to $2,500 for the installation of an approved

loss prevention device to protect your **residence** against the same loss in the future. Approved loss prevention devices include fire alarms systems, fire suppression systems, security systems, sump pumps, automatic water shut-off devices, lightning suppression systems, back-up power systems and hail resistant roofing materials. These payments do not increase the amount of coverage.

This additional coverage only applies if the loss exceeds the location deductible.

## D. Exclusions

The following exclusions apply to PART II - PROPERTY section of your policy:

1. Pollution or Contamination

   We do not cover any loss, directly or indirectly, and regardless of any cause or event contributing concurrently or in any sequence to the loss, caused by the discharge, dispersal, seepage, migration or release or escape of pollutants. Nor do we cover the cost to extract pollutants from land or water, or the cost to remove, restore or replace polluted or contaminated land or water. A "pollutant" is any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and "waste". A "contaminant" is an impurity resulting from the mixture of or contact with a foreign substance. "Waste" includes materials to be disposed of, recycled, reconditioned or reclaimed.

2. Gradual or Sudden Loss

   We do not cover any loss caused by gradual deterioration, wet or dry rot, warping, smog, rust, or other corrosion. In addition, we do not cover any loss caused by inherent vice, wear and tear, mechanical breakdown or latent defect. However, we do insure ensuing covered loss unless another exclusion applies.

3. **Fungi** or Bacteria

   We do not cover any loss caused by the presence, growth, proliferation, spread or any activity of **fungi** or bacteria including the cost to test for, monitor, clean up, move, remediate, contain, treat, detoxify, neutralize or in any way respond to, or assess the effects of **fungi** or bacteria.

   This exclusion does not apply to:

   a. Coverage provided under PART II - PROPERTY. Additional Coverage. Ensuing **Fungi** or Bacteria; or

   b. Ensuing covered loss unless another exclusion applies.

4. Loss by Rodents, Insects, Birds or Vermin

   We do not cover any loss caused by

rodents, insects, birds or vermin except loss to glass that is part of a building, storm door or window. However, we do insure ensuing covered loss unless another exclusion applies.

5. Structural Movement

   We do not cover any loss caused by bulging, expansion, shrinking or settling, including resultant cracking, of foundation, floors, walls, patios, pavements, ceilings or roofs. However, we do insure ensuing covered loss unless another exclusion applies.

6. Surface and Ground Water Damage

   We do not cover any loss caused by:

   a. Flood, surface water, waves, tidal water, overflow of a body of water, or spray from any of these, whether or not driven by wind; or

   b. Water below the surface of the ground, including water which exerts pressure on, or seeps or leaks through a building, sidewalk, driveway, foundation, swimming pool or other structure.

   This exclusion does not apply to:

   a. **Contents** away from any **residence** or location you own or live at; or

   b. Ensuing covered loss unless another exclusion applies.

7. Water or Ice Damage to Certain **Other Permanent Structures**

   We do not cover loss to certain **other permanent structures** caused by freezing, thawing, or the pressure or weight of water or ice, whether driven by wind or not. However, we do insure ensuing covered loss unless another exclusion applies. The **other permanent structures** to which this exclusion applies are swimming pools, fences, tennis courts, hot tubs, patios, pavements, foundations, septic systems, retaining walls, wharves, docks, piers, bridges or bulkheads.

8. Faulty, Inadequate or Defective Planning

   We do not cover any loss caused by faulty, inadequate or defective:

   a. Planning, zoning, development, surveying, siting;

   b. Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

   c. Materials used in repair, construction, renovation or remodeling; or

   d. Maintenance;

   of part or all of any property whether on or off the **residence.**

   However, we do insure ensuing covered loss unless another exclusion applies.

9. Earthquake

We do not cover any loss to your **house** or **other permanent structures** caused by earthquake. However, we do insure ensuing covered loss due to theft, fire, glass breakage or explosion unless another exclusion applies.

**10.** Earth Movement

We do not cover any loss to your **house** or **other permanent structures** caused by earth movement including volcanic eruptions, landslides, mudflows, and the sinking, rising, or shifting of land. We do insure ensuing covered loss due to theft, fire, glass breakage or explosion unless another exclusion applies.

**11. Business** Property

We do not cover any loss to **business** property. This exclusion does not apply to coverage provided under PART II - PROPERTY, Additional Coverage, **Business** Property.

**12.** Motorized Land Vehicles

We do not cover any loss to motorized land vehicles including their equipment and accessories or any electronic devices designed to be operated solely by power from the electrical system of that vehicle. However, we do cover vehicles not subject to motor vehicle registration which are:

**a.** Used to service any **residence** you own or live at;

**b.** Designed to assist the handicapped; or

**c.** Designed for recreational use off public roads.

**13.** Renovations and Repairs

We do not cover loss caused by renovating, refinishing or repairing any kind of **contents.** This exclusion does not apply to jewelry, watches, and furs.

**14. Watercraft** Accidents

We do not cover any loss caused by the stranding, swamping or sinking of a **watercraft** or its trailer, or outboard motor.

We also do not cover any loss caused by collision of a **watercraft** other than collision with a land vehicle unless another exclusion applies.

**15.** Tenant Property

We do not cover any loss to property of roomers, boarders, or other tenants.

**16.** Temperature or Dampness

We do not cover any loss caused by extremes of temperature, dampness or dryness of atmosphere, or water vapor to your **house, other permanent structures** or **contents.**

This exclusion does not apply to:

a. Loss caused directly by rain, sleet, snow or hail; or

b. Coverage provided under PART II - PROPERTY, Additional Coverage, Food Spoilage.

**17. Aircraft**

We do not cover any loss to **aircraft** or **aircraft** parts.

**18.** Confiscation

We do not cover any loss caused by the destruction, confiscation or seizure by any government or public authority.

**19.** Acts of War

We do not cover any direct loss or ensuing loss to property caused by any kind of warlike action. War includes undeclared war, civil war, insurrection, rebellion, revolution, warlike act by a military force or military personnel, destruction or seizure or use for a military purpose, and including any consequence of any of these. Discharge of a nuclear weapon shall be deemed a warlike act even if accidental.

**20.** Loss to Fish, Birds or Animals

We do not cover any loss to fish, birds or animals.

**21.** Intentional Acts

We do not cover any loss caused by any act, whose consequences could have been foreseen by a reasonable person, committed:

a. By or at the direction of you, your spouse or a **family member;** and

b. With the intent to cause loss or damage.

**22.** Dishonest Acts

We do not cover any loss caused by any dishonest or criminal act by, or at the direction of, you or any **family member.**

**23.** Nuclear Hazard

We do not cover any loss caused directly or indirectly by "nuclear hazard". Nuclear hazard means any nuclear reaction, radiation, or radioactive contamination, all whether controlled or uncontrolled or however caused, or any consequence of any of these. However, ensuing covered loss due to fire resulting from a nuclear hazard is covered unless another exclusion applies.

**24.** Back Up of Sewers or Drains

We do not cover any loss due to a back up or overflow of a sewer or drain including any loss that contributes to any event. This exclusion does not apply to coverage provided under PART II - PROPERTY, Additional Coverage, Back Up of Sewers and Drains.

**25. Contents** Under Another Policy

We do not cover any loss to **contents** that

are insured under a private collections policy, valuable articles or similar policy not issued by us or one of our affiliated companies.

26. **Uninsured Owned Location**

We do not cover any loss caused directly or indirectly by wind to **contents** located at an owned house, condominium or cooperative that does not have **contents** coverage listed on the Declarations Page of this policy or any other policy issued by us or one of our affiliated companies.

**Contents** at a newly acquired location are not subject to this exclusion for sixty (60) days after you begin to move contents there.

---

### PART III - LIABILITY

#### A. Insuring Agreement

We will pay **damages** an **insured person** is legally obligated to pay for **personal injury** or **property damage** caused by an **occurrence** covered by this policy anywhere in the world, unless stated otherwise or an exclusion applies.

#### B. Payment of a Loss

The most we will pay for all claims for **personal injury** and **property damage** as a result of any one **occurrence** is the Liability coverage limit shown on the Declarations Page of this policy. This insurance applies separately to each **insured person** against whom a claim is made or suit is brought, but we will not pay more than the limit shown on the Declarations Page for any single **occurrence** regardless of the number of **insured persons**, claims made or persons injured. There is no restriction to the number of **occurrences** during the Policy Period for which claims may be made.

Payments under provision **C., Defense Coverage and Claim Expense**, except a settlement payment, are in addition to the Liability coverage limit in the policy shown on the Declarations Page.

#### C. Defense Coverage and Claim Expense

We will pay the costs to defend an **insured person** against any suit seeking covered **damages** for **personal injury** or **property damage**, even if the suit is false, fraudulent or groundless. You may choose counsel from a panel of firms selected by us. If a panel counsel is not established in the jurisdiction where the suit is brought, we reserve the right to select counsel.

We may investigate and settle any claim or suit at our discretion.

Additionally, we will pay:

1. All court costs and expenses on judgments assessed against any **insured person**;

2. Reasonable expenses incurred by an **insured**

**person** at our request up to a total of $10,000 for assisting us in the investigation or defense of a claim or suit;

3. The cost of bail bonds required of an **insured person** because of a covered loss;

4. All premiums on bonds required in a suit we defend, but not for bond amounts more than the coverage amount (we need not apply for or furnish any bond);

5. All expenses incurred by us;

6. Interest on the entire judgment which accrues after entry of the judgment and before we pay or tender, or deposit in court, that part of the judgment which does not exceed the amount of coverage; and

7. All prejudgment interest awarded against an **insured person** on that part of the judgment we pay or offer to pay. We will not pay any prejudgment interest based on that period of time after we make an offer to pay the amount of coverage.

In jurisdictions where we are prevented from defending an **insured person** for a covered loss because of laws or other reasons, we will pay any expenses incurred with our prior written consent for the **insured person's** defense.

Our duty to defend any claim or suit arising out of a single **occurrence** ends when the amount we have paid in **damages** for that **occurrence** equals the Liability coverage limit shown on the Declarations Page of this policy.

#### D. Additional Coverages

1. **Damaged Property**

If an **insured person** destroys or damages other people's property we will pay the replacement cost for that property up to $10,000 per **occurrence**.

2. **Credit Cards, Forgery, and Counterfeiting**

We will pay up to a total of $10,000 for:

a. Any amount an **insured person** is legally obligated to pay resulting from:

i. Theft or loss of a bankcard or credit card issued in the name of you or a **family member**; or

ii. Loss caused by forgery or alteration of any check or negotiable instrument.

A loss will not be covered unless all the terms for using the card, check or negotiable instrument, are complied with.

b. Loss caused by accepting in good faith any counterfeit paper currency.

At our option we may defend a claim or suit against you or a **family member** for forgery or counterfeiting. We will defend a claim or suit against you or a **family member** for loss or theft of a bankcard or credit card.

3. **Medical Payments to Others**

Regardless of liability, we will pay the nec-

essary **medical expenses** that are incurred or medically ascertained within three (3) years from the date of an accident causing **bodily injury** up to a total of $10,000 for each person. This coverage does not apply to **you** or a **family member** and only applies to an accident that:

a. Occurs to a person, at a **residence** with liability coverage listed on the Declarations Page, with permission from **you** or a **family member** to be there;

b. Arises from a condition at a **residence**, or at the steps, driveways or sidewalks immediately adjoining a **residence**, listed on the Declarations Page with liability coverage;

c. Is caused by an animal owned by or in the care of an **insured person**; or

d. Is caused by an **insured person** or a **residence employee** in the course of his or her employment by an **insured person**.

4. Limited **Residence** Premises **Business** Liability

We cover **personal injury** or **property damage** arising out of the physical condition of a **residence** shown on the Declarations Page when **business** or professional activities are legally conducted by any **insured person** at that **residence**. The most we will pay for any covered loss is the Liability coverage limit shown on the Declarations Page. Coverage is subject to the following:

a. **You** do not have any employees conducting **business** activities at your **residence** who are subject to workers' compensation or other similar disability laws;

b. **You** are not a home day care provider; and

c. There is no other valid collectible insurance.

**E. Exclusions**

This policy does not provide coverage for liability, defense costs or any other cost or expense for:

1. Motorized Land Vehicles

**Personal injury** or **property damage** arising out of the ownership, maintenance, use, loading or unloading of any motorized land vehicle. This exclusion does not apply to recreational motor vehicles except when they are used for participation in or practice for competitive racing.

2. Aircraft

**Personal injury** or **property damage** arising out of the ownership, maintenance, use, loading, unloading, or towing of any **aircraft**.

3. Watercraft

**Personal injury** or **property damage** arising

out of the ownership, maintenance, use, operation, loading or unloading of any **watercraft**:

a. That is twenty-six (26) feet or more in length or fifty (50) or more horsepower and which is owned by an **insured person** or furnished or rented to an **insured person** for longer than thirty (30) days;

b. Used for any **business** or commercial purpose; or

c. Used for participation in or practice for competitive racing (except sailboats less than twenty-six (26) feet in length).

4. Workers' Compensation or Disability

Any **damages** or benefits an **insured person** is legally obligated to provide under any workers' compensation, disability benefits, Jones Act or General Maritime Law, unemployment compensation, occupational disease or similar law. However, we do provide coverages in excess over any other insurance for **damages** a **covered person** is legally obligated to pay for **bodily injury** to a **residence employee** of a location listed on the Declarations Page which are not compensable under workers compensation, unless another exclusion applies.

5. Directors Errors or Omissions

**Personal injury** or **property damage** arising out of any **insured person's** acts, errors or omissions as an officer or member of the board of directors of any corporation or organization. This exclusion does not apply to **personal injury** or **property damage** arising out of an **insured person's** actions for a non-profit corporation or organization or for a Condominium or Cooperative Association unless another exclusion applies.

6. Care, Custody or Control

**Property Damage** to property owned by, rented to, occupied or used by, or in the care, custody or control of an **insured person** to the extent that the **insured person** is required by contract to provide insurance. This exclusion does not apply to **property damage** caused by fire, smoke, or explosion.

7. Insured Person

**Personal injury** to an **insured person** under this policy.

8. Discrimination

**Personal injury** arising out of actual, alleged or threatened discrimination or harassment due to age, race, national origin, color, sex, creed, handicapped status, sexual preference or any other discrimination.

9. Sexual Molestation or Corporal Punishment

**Personal injury** arising out of any actual, alleged or threatened by any person:

a. Sexual molestation, misconduct or

harassment;

b. Corporal punishment; or

c. Sexual, physical or mental abuse.

10. Transmitted Diseases

**Personal injury** resulting directly or indirectly from any illness, sickness or disease transmitted intentionally or unintentionally by an **insured person** to anyone. We do not cover any **damages** for any threat of exposure or any consequences resulting from that illness, sickness, or disease.

11. Business Pursuits

**Personal injury** or **property damage** arising out of an **insured person's business** property or **business** pursuits, investment activity or any activity intended to realize a profit for either an **insured person** or others. However, this exclusion does not apply to:

a. Volunteer work for an organized charitable, religious or community group;

b. Incidental **business** activity; or

c. Limited **Residence** Premises **Business** Liability Coverage.

12. Professional Services

**Personal injury** or **property damage** arising out of an **insured person's** performing or failure to perform professional services for which any **insured person** is legally responsible or licensed.

13. War

**Bodily injury** or **property damage** caused directly or indirectly by war, including the following and any consequence of the following:

a. Undeclared war, civil war, insurrection, rebellion, or revolution;

b. Warlike acts by a military force or military personnel; or

c. The destruction, seizure or use of property for a military purpose.

Discharge of a nuclear weapon will be deemed a warlike act even if accidental.

14. Assessments

Any assessment charged against an **insured person** as a member of an association, corporation or community of property owners.

15. Contractual

**Personal injury** or **property damage** arising from contracts or agreements, whether written or unwritten:

a. Made in connection with any **insured person's business** ; or

b. In which the liability of others is assumed after a covered loss.

16. Nuclear Hazard

**Personal injury** or **property damage** caused directly or indirectly by nuclear reaction, radiation, or radioactive contamination.

17. Intentional Acts

**Personal injury** or **property damage** resulting from any criminal, willful, intentional or malicious act or omission by any person. We also will not cover claims for acts or omissions of any person which are intended to result in, or would be expected by a reasonable person to cause, **property damage or personal injury**. This exclusion applies even if the injury or damage is of a different kind or degree, or is sustained by a different person, than expected or intended. This exclusion does not apply to **bodily injury** if the **insured person** acted with reasonable force to protect any person or property.

18. Wrongful Termination

**Personal injury** arising out of wrongful termination of employment.

19. Controlled Substance(s)

**Personal injury** or **property damage** arising out of the use, sale, manufacture, delivery or transfer or possession of a Controlled Substance(s) as defined by the Federal Food and Drug Law at 21 U.S.C.A. Sections 811 and 812. This exclusion does not apply to the legitimate use of prescription drugs of a person following the orders of a licensed physician.

## PART IV - CONDITIONS

A. Your Duties

1. Your duty is to notify your agent or broker of a change in occupancy.

2. Your duty is to notify your agent or broker at the beginning of any renovation or construction work and throughout the work to maintain an appropriate amount of coverage and confirm that appropriate protective safeguards are in place as determined by us.

B. Your Duties After a Loss

In the event of an **occurrence** which is likely to involve this policy, or if you or any other **insured person** under this policy is sued in connection with an **occurrence** which may be covered under this policy, you or an **insured person** must:

1. Give prompt notice to us or your agent or broker.

2. Notify the police in case of loss by theft.

3. Notify the credit card or fund transfer card company in case of loss under credit card or fund transfer card coverage.

4. Protect the property from further damage. If repairs to the property are required, you must:

   **a.** Make reasonable and necessary repairs to protect the property; and

   **b.** Keep an accurate record of all repair expenses.

**5.** Provide us with bills, receipts and related documents.

**6.** As often as we reasonably require:

   **a.** Show the damaged property;

   **b.** Provide us with records and documents we request; and

   **c.** Submit to separate examination under oath.

**7.** Send to us within sixty (60) days of our request, your signed sworn proof of loss which sets forth, to the best of your knowledge:

   **a.** The time and cause of loss;

   **b.** The interest of all others in the property;

   **c.** Other insurance which may cover the loss; and

   **d.** The dollar amount being claimed as your loss.

**8.** Provide us with the names and addresses of any known persons injured and any available witnesses.

**9.** Provide us with any suit papers and other documents which will help us defend any **insured person.**

**10.** Assist and cooperate with us in the conduct of the defense by helping us:

   **a.** To make settlement;

   **b.** To enforce any right of contribution or indemnity against any person or organization who may be liable to an **insured person;**

   **c.** To attend hearings and trials; and

   **d.** To secure and give evidence and obtain the attendance of witnesses.

**C.** Policy Period and Territory

The Policy Period is stated on the Declarations Page. This policy applies to an **occurrence** which takes place anywhere in the world unless otherwise limited by the policy.

**D.** Recovery

If the **insured person** has rights to recover all or part of any payment we have made under this policy, those rights are transferred to us. The **insured person** must do nothing after loss to impair such rights of recovery. At our request, the **insured person** will bring suit or transfer those rights to us and help us enforce them.

**E.** Assignment

No one covered under this policy may assign or turn over any right or interest in regard to the policy without our written consent.

**F.** Changes

No change or modification of this policy shall be effective except when made by written endorsement signed by our legal representative.

**G.** Concealment or Fraud

The entire policy will be void if, whether before or after a loss, you or an **insured person** have:

   **1.** Intentionally concealed or misrepresented any material fact or circumstance;

   **2.** Engaged in fraudulent conduct; or

   **3.** Made false statements;

   relating to this insurance.

**H.** Reasonable Care

You must use reasonable care to maintain heat in your **residence** or shut off and drain the water system or appliances if the home is vacant, unoccupied or being constructed. We do not cover any loss caused by water freezing in a plumbing, heating, or air conditioning system or household appliance if reasonable care has not been exercised.

**I.** Conformity to Statutes

Any provision of this policy, which is in conflict with state or local law, is amended to conform to the law.

**J.** Liberalization

If we broaden the coverages provided by your policy without an additional premium charge, the changes will automatically apply to your policy as of the effective date on which the changes are adopted in your state.

**K.** Bankruptcy or Death

The **insured person's** bankruptcy or insolvency shall not relieve us of any of our obligations. Further, if the **insured person** dies or becomes bankrupt or insolvent during the Policy Period, this policy, unless cancelled, will cover the **insured person's** legal representative for the remainder of the Policy Period.

**L.** Legal Action Against Us.

No action shall be brought against us unless the **insured person** has complied with this policy's provisions and for Liability coverage, not until final judgment or agreement has set the amount of the **insured person's** legal obligation to us.

You also agree to bring any action against us within one year after a loss occurs, but not until thirty (30) days after proof of loss has been filed and the amount of loss has been determined.

For Liability coverage, no one has the right to join us in any action against any other **insured person.**

12

## M. Appraisals

If you and we fail to agree on the amount of loss, either party may make a written demand that each selects an independent appraiser. In this event, the parties must notify each other of their selection within twenty (20) days. The independent appraisers will select an arbitrator within fifteen (15) days. If an arbitrator is not agreed upon within that time, either party may request the arbitrator be selected by a judge. The independent appraisers will then appraise the loss and submit any differences to the arbitrator. A decision in writing agreed to by the two appraisers or either appraiser and the arbitrator will be binding. Each appraiser will be paid by the party that has selected the appraiser. You and we will share the expenses of the arbitrator equally.

## N. Other Insurance

If a loss covered by this policy is also covered by other insurance, we will pay only the proportion of the loss that the limit of liability that applies under this policy bears to the total amount of insurance covering the loss.

## O. Mortgage Clause.

The word mortgagee includes trustee. If a mortgagee is named in this policy, any covered loss will be paid to you and the mortgagee as interests appear. If there is more than one mortgagee named in this policy, the order of payment will be identical to the order of precedence.

If your claim is denied, the denial will not apply to a valid claim submitted by the mortgagee if they:

1. Notify us of any change in ownership or substantial change in risk of which they are aware;

2. Pay any premium due on this policy or on demand if you have neglected to pay the premium; and

3. Submit a sworn statement of loss within sixty (60) days after receiving notice from us of your failure to do so.

If your policy is cancelled or not renewed by us, the mortgagee will be notified in writing at least ten (10) days before the cancellation or nonrenewal takes effect.

If we deny payment to you but pay the mortgagee:

1. We are subrogated to all the rights of the mortgagee granted under the mortgage on the property; or

2. At our option, we may pay the mortgagee the entire principal on the mortgage plus any accrued interest. In this event we will receive a full assignment and transfer of the mortgage and all securities held as collateral to the mortgage debt.

Subrogation will not impair the right of the mortgagee to recover the full amount under the mortgagee's claim.

## P. Your Cancellation

You may cancel this policy or any part of it at any time by notifying us in writing of the future date that the cancellation is to take effect .

## Q. Our Cancellation

To cancel this policy we must notify you in writing. This notice will be mailed to you at the last mailing address shown on the Declarations Page and we will obtain an U.S. Post Office certificate of mailing. This notice will include the date the cancellation is to take effect and the reason for the cancellation. It shall also state that any excess premium, if not returned, shall be refunded on demand. In the event of cancellation by you or by us, we will refund any unearned premium on the effective date of cancellation, or as soon as possible afterwards. The unearned premium will be computed *pro rata* for the unexpired term of the policy.

We may cancel this policy subject to the following conditions:

1. Nonpayment of Premium

   If you fail to pay the premium by the date it is due we may cancel this policy with (ten) 10 days notice, whether the premium is due to us, to our agent, or under any finance or credit plan.

2. Misrepresentation

   We may cancel this policy with thirty (30) days notice if there has been a material misrepresentation of fact or omission of fact either of which, if known to us, would have caused us not to issue the policy.

3. Increase in Hazard

   We may cancel this policy with thirty (30) days notice in the event or circumstance of a material increase in, or a change to, the covered property that increases the hazard insured against.

4. Conviction of Crime

   We may cancel this policy with thirty (30) days notice if you have been convicted of a crime arising out of an act that increases the hazard insured against.

## R. Nonrenewal

If we elect not to renew this policy, we shall mail to you at the last address known to us written notice of nonrenewal not less than thirty (30) days before the end of the Policy Period as stated on the Declarations Page.

Regardless, this policy will terminate at the end of the Policy Period stated on the Declarations Page if you have failed to discharge when due any of your obligations in connection with the payment of premium for the renewal of this

policy, or if you have notified us or our agent that you do not wish this policy to be renewed.

Proof of mailing of notice mentioned above shall be sufficient proof of notice.

Includes copyrighted material from Insurance Services Office, Inc. with its permission.

PCHO (09/06)

14

In witness whereof, we have caused this policy to be executed and attested, and if required by state law this policy shall not be valid unless countersigned by our authorized representative.

AIG Advantage Insurance Company                    (Home Office Address: 70 Pine Street, New York, NY  10270)

*Elizabeth M. Tuck*
Secretary

*J. Ernest Hansen*
President

AIG Preferred Insurance Company                    (Home Office Address: 70 Pine Street, New York, NY  10270)

*Elizabeth M. Tuck*
Secretary

*J. Ernest Hansen*
President

AIG Premier Insurance Company                      (Home Office Address: 70 Pine Street, New York, NY  10270)

*Elizabeth M. Tuck*
Secretary

*J. Ernest Hansen*
President

AIU Insurance Company                              (Home Office Address: 70 Pine Street, New York, NY  10270)

*Elizabeth M. Tuck*
Secretary

President

American Home Assurance Company                    (Home Office Address: 70 Pine Street, New York, NY  10270)

*Elizabeth M. Tuck*
Secretary

President

American International Insurance Company            (Home Office Address: 70 Pine Street, New York, NY  10270)

*Elizabeth M. Tuck*
Secretary

*J. Ernest Hansen*
President

PCHO (09/06)                                        15

American International Insurance Company of California
(Home Office Address: 70 Pine Street, New York, NY 10270)

*[signature: Elizabeth M. Tuck]*
Secretary

*[signature: J. Everet Aurora]*
President

American International Pacific Insurance Company

(Home Office Address: 70 Pine Street, New York, NY 10270)

*[signature: Elizabeth M. Tuck]*
Secretary

*[signature]*
President

American International South Insurance Company

(Home Office Address: 70 Pine Street, New York, NY 10270)

*[signature: Elizabeth M. Tuck]*
Secretary

*[signature]*
President

American Pacific Insurance Company

(Home Office Address: 70 Pine Street, New York, NY 10270)

*[signature: Elizabeth M. Tuck]*
Secretary

*[signature]*
President

Audubon Indemnity Company

4150 Sherwood Forest Boulevard, Baton Rouge, LA 70816

*[signature: Elizabeth M. Tuck]*
Secretary

*[signature]*
President

Audubon Insurance Company

4150 Sherwood Forest Boulevard, Baton Rouge, LA 70816

*[signature: Elizabeth M. Tuck]*
Secretary

*[signature]*
President

Includes copyrighted material from Insurance Services Office, Inc. with its permission.

 **Private Client Group**

American International Ins Co.
Name of Issuing Company

This Privacy Policy relates only to policyholders who have purchased personal insurance such as private passenger automobile, homeowners, collection and personal umbrella liability insurance. If you have purchased another type of policy from another AIG member company not listed above, please contact that company to receive a copy of the relevant privacy policy.

## PRIVACY NOTICE

The member companies of American International Group, Inc. (AIG)  that provide personal auto, home, collection and umbrella insurance policies recognize the importance of respecting the privacy of our policyholders and want to make sure that you know the steps we take to protect the privacy of the customer information we collect and, in some cases, disclose.

We encourage you to read the following information about how we collect, disclose and protect your information. No action is required on your part.

1. **What information do we collect?**

   The member companies of AIG that underwrite the insurance products listed above and its agencies collect only information necessary to underwrite and provide accurate insurance rates, and to maintain and improve customer service and claims handling for our policyholders. We obtain nonpublic personal information about you, our policyholder, from you in your request for a quotation of rates, applications, policy transactions, including claims, and other interactions with us, as well as from credit reporting agencies, motor vehicle departments, claim history reporting agencies and other third parties. For property insurance, we may send someone to inspect your property and verify information about the value and condition of your property. The information collected may include, for example, your name, address, birth date, phone number, e-mail address, driver's license number, accident/violation history, information about vehicle operators, mortgages, lien/lease holders, vehicle information, credit card information, credit report information, occupation and whether you own or rent your home. We obtain and use this information only in accordance with state and federal law.

2. **How do we use collected information?**

   The information we gather helps us identify who you are, manage our relationship with you, develop products and services that meet your needs, provide you with accurate rates and provide excellent customer service. We do not sell your information to other companies for any reason.

3. **What information do we disclose?**

   We may disclose information to affiliates and unaffiliated third parties for the purpose of servicing customers' insurance needs, performing business services for us or as otherwise permitted or required by law. For example, at times we disclose information about our policyholders such as name, address, telephone number, policy number and coverages to service providers for the provision of specific services such as inspections and appraisals after a claim and marketing our insurance products. For purposes of fraud prevention, we also participate in several insurance industry supported databases of reported claims and additional driver information. We may disclose information to organizations conducting actuarial or research studies and to companies that perform research and marketing services on our behalf.

PCG-GLBA  (03/06)

**4. What security procedures are used?**

We maintain technical and organizational safeguards to protect the confidentiality of nonpublic personal information about our policyholders against (i) unauthorized access or disclosure and (ii) accidental loss, alteration, or destruction. We permit only authorized employees, who are trained in the proper handling of policyholder information, to have access to that information. We strive to ensure that the companies we use as our business partners support our commitment to privacy protection in their handling of personal data about our policyholders. We require service providers and others to keep your information strictly confidential and to use the information solely on our behalf and as directed by us, and we require them to protect this information as we would. We maintain physical, electronic and procedural safeguards to protect and safeguard your nonpublic personal information.

**5. If you are an Internet user:**

To better serve you, our websites provide information about our products. When accessing our websites, please be sure to read the Privacy Notice that appears there.

## NOTICE OF INSURANCE INFORMATION PRACTICES

State law requires us to notify you of our information gathering practices and your rights relating to those practices.

Our information practices are as follows:

1. Personal information may be collected from persons other than the individual or individuals proposed for coverage;

2. The information we collect as well as other personal or privileged information collected by us may, in certain circumstances, be disclosed to third parties without authorization;

3. You have the right to access this information and the right to correct this information; and

4. You have the right to a more detailed notice of our information practices upon request by you. Such requests should be sent to:

American International Companies
Private Client Group
70 Pine Street
21st Floor
New York, NY 10270

PCG - MAIP (03/04)

**DEDUCTIBLE WAIVER FOR LARGE LOSSES**

With respect to coverage provided by this endorsement, all provisions and conditions of the policy apply unless they are changed by this endorsement.

It is agreed and understood that for the premium charged Part II - PROPERTY. B. Payment of a Loss, Deductible is deleted and replaced with the following:

Deductible

The deductible shown on the Declarations Page is the amount of a covered loss you will pay for each **occurrence**. The deductible does not apply to a covered loss of more than $50,000. This waiver of deductible does not apply to:

1. Special deductibles for wind, hurricane, hail or earthquake; or
2. Separate coverage deductibles contained within the Equipment Breakdown or Fraud Safe-guard endorsements.

PCHO-DWLL (09/06)

## Flood Coverage

With respect to coverage provided by this endorsement, all provisions and conditions of the policy apply unless they are changed by this endorsement.

Flood Zone Assignment:

| | |
|---|---|
| X | Flood zone B, C, or X |
| | Flood zone A or V |

As respects **Flood** coverage provided by this endorsement, PART I - DEFINITIONS is amended to include the following:

**Basement** means any area of your **house** or **other permanent structure** including any sunken room or sunken portion of a room, having its floor below ground level (sub grade) on all sides.

**Flood** means:

1. A general and temporary condition of partial or complete inundation of normally dry land area from:
   a. Overflow of inland or tidal waters;
   b. Unusual and rapid accumulation or runoff of surface waters from any source; or
   c. **Mudflow**.

2. Collapse or subsidence of land along the shore of a lake or similar body of water as a result of erosion or undermining caused by waves or currents of water exceeding anticipated cyclical levels that result in a **flood** as defined in 1.a. above.

   All flooding in a continuous or protracted event will constitute a single **flood**.

**Landslide** means the rapid movement of a mass of soil downslope along a curved or planar failure surface, without deformation of the soil structure.

**Mudflow** means a river of liquid and flowing mud occurring on level or near-level surfaces of normally dry land areas that have not been affected by **landslide**, as when earth is carried by a current of water. Other earth movements, such as **landslide**, slope failure, or a saturated soil mass moving by liquidity down a slope, are not **mudflows**.

**National Flood Insurance Program (NFIP)** means the program of **flood** insurance coverage and floodplain management administered under the Act and applicable Federal regulations in Title 44 of the Code of Federal Regulations, Subchapter B.

**Special Flood Hazard Area (SFHA)** means an area having special **flood**, or **mudflow**, and/or **flood**-related erosion hazards, and shown on a **Flood** Hazard Boundary Map or **Flood** Insurance Rate Map as Zone A, AO, A1-A30, AE, A99, AH, AR, AR/A, AR/AE, AR/AH, AR/AO, AR/A1-A30, V1-V30, VE or V.

**Tsunami** means a series of pressure waves caused by a sudden shift in the ocean floor. Such shifts are usually caused by earthquakes, but they can also be caused by undersea **landslides** or slumps, volcanoes, or even meteor impacts.

PART II - PROPERTY, C. Additional Coverage is amended as follows:

The following Additional Coverage is added:

### Flood

We will pay for physical loss or damage to your **house, contents or other permanent structures** including debris removal caused directly by **flood** unless an exclusion applies.

The **Flood** Insurance Rate Map (FIRM) in place as of the effective date of the policy or renewal term determines the amount we will pay for a covered loss.

### Payment of a Loss:

For your listed residence located in a designated B, C or X flood zone eligible for the Preferred Risk Program of the NFIP:

1. We will pay up to the lesser of the coverage limit shown on your Declarations Page or $250,000 for property damage to your **house** and **other permanent structures**; including up to $25,000 for **property damage** to the interior walls, ceilings, fixtures and flooring materials within the **basement**. These payments do not increase the amount of your coverage.

2. We will pay up to the lesser of the coverage limit shown on your Declarations Page or $100,000 for **property damage** to your **contents** located at the covered **residence**. These payments do not increase the amount of your coverage. The limit shown for each of the following categories is the maximum we will pay for that type of **contents** for each **occurrence**. These special limits do not increase the amount of coverage for your **contents**.

| | | |
|---|---|---|
| i. | **Contents** located within the **basement** | $10,000 |
| ii. | Jewelry, watches, precious and semiprecious stones, or articles of gold, silver or platinum | $2,500 |
| iii. | Antiques, artwork, photographs, rare books collectibles or memorabilia, including but not limited to, porcelain or other figures and sports cards | $2,500 |
| iv. | Furs or any article containing fur which represents its principal value | $2,500 |

3. We will pay up to $5,000 for Additional Living Expenses, which consist of:

   a. Extra living expenses - the reasonable increase in living expenses incurred by you to maintain your household's usual standard of living if your **residence** is uninhabitable.

   b. Loss of fair rental value - if you are not able to rent out your **residence**, or part of your **residence**, that you usually rent to others, we will pay the fair rental value for the reasonable amount of time necessary to restore your **residence** or that part of your **residence** to a habitable condition.

   c. Forced evacuation - if you are forced to evacuate your **residence** as a direct result of loss or a reasonable threat of loss, we will reimburse you for the reasonable increase in your living expenses necessary to maintain your household's normal standard of living for up to thirty (30) days.

These payments do not increase the amount of your coverage.

4. We will pay up to $25,000 for the extra expense to obey any law or ordinance that regulates the repair, rebuilding or demolition of property damaged by **flood**. These payments do not increase the amount of your coverage.

5. We will pay up to $1,000 for the expense you incur to protect your **residence** from a **flood** or imminent danger of **flood**. These payments do not increase the amount of your coverage.

<u>For your listed **residence** located in a designated **Special Flood Hazard Area** or a B, C or X flood zone not eligible for coverage in the Preferred Risk Program of the  **NFIP**:</u>

The coverage limits specified below will be reduced by any payments available through the **NFIP** policy insuring the **residence** or if the **residence** is eligible to be written under an **NFIP** policy but there is no such policy in effect, then we will pay only for the amount of loss in excess of the maximum limit that can be insured under the **NFIP** policy. If we provide broader coverage than the **NFIP** policy, we will pay the difference in conditions not to exceed the limits defined below whether or not you can collect on the **NFIP** policy.

The most we will pay for each **occurrence** is as follows:

1. We will pay up to the lesser of $250,000; the "Coverage A - Building Property Limit" listed on the most recent **NFIP** Declarations Page; or the coverage limit shown on your Declarations Page for **property damage** to your **house** and any detached garage.

   The limit shown for each of the following categories is the maximum we will pay for that type of **property damage** for each **occurrence**. These special limits do not increase the amount of coverage for your **house** or **other permanent structures**.

   | | | |
   |---|---|---|
   | i. | other permanent structures | $25,000 |
   | ii. | property damage to the interior walls, ceilings, fixtures and flooring materials within the basement | $25,000 |

2. We will pay up to the lesser of $100,000; the "Coverage B - Personal Property Limit" listed on the most recent **NFIP** Declarations Page; or the coverage limit shown on your Declarations Page for **property damage** to your **contents** located at the covered **residence**.

   The limit shown for each of the following categories is the maximum we will pay for that type of **contents** for each **occurrence**. These special limits do not increase the amount of coverage for your **contents**.

   | | | |
   |---|---|---|
   | i. | Contents located within the basement | $10,000 |
   | ii. | Jewelry, watches, precious and semiprecious stones, or articles of gold, silver or platinum | $2,500 |
   | iii. | Antiques, artwork, photographs, rare books collectibles or memorabilia, including but not limited to, porcelain or other figures and sports cards | $2,500 |
   | iv. | Furs or any article containing fur which represents its principal value | $2,500 |

3. We will pay up to $5,000 for Additional Living Expenses, which consist of:

   a) Extra living expenses - the reasonable increase in living expenses incurred by you to maintain your household's usual standard of living if your **residence** is uninhabitable.

PCHO-FLD (06/05)

b) Loss of fair rental value - if you are not able to rent out your **residence**, or part of your **residence**, that you usually rent to others, we will pay the fair rental value for the reasonable amount of time necessary to restore your **residence** or that part of your **residence** to a habitable condition.

c) Forced evacuation - if you are forced to evacuate your **residence** as a direct result of loss or a reasonable threat of loss, we will reimburse you for the reasonable increase in your living expenses necessary to maintain your household's normal standard of living for up to thirty (30) days.

These payments do not increase the amount of your coverage.

4. We will pay up to $25,000 for the extra expense to obey any law or ordinance that regulates the repair, rebuilding or demolition of property damaged by **flood**. These payments do not increase the amount of your coverage.

5. We will pay up to $1,000 for the expense you incur to protect your **residence** from a **flood** or imminent danger of **flood**. These payments do not increase the amount of your coverage.

**PART II - PROPERTY, D. Exclusions, is amended as follows:**

A. The following exclusion is deleted in its entirety and replaced as follows:

1. Surface and Ground Water Damage

   We do not cover any loss caused by:

   a. **Flood**, surface water, waves, tidal water overflow of a body of water, or spray from any of these, whether or not driven by wind; or

   b. Water below the surface of the ground, including water which exerts pressure on, or seeps or leaks through a building, sidewalk, driveway, foundation, swimming pool or other structure.

   This exclusion does not apply to:

   a. **Contents** away from any **residence** you own or live at;
   b. Ensuing covered loss unless another exclusion applies; or
   c. Coverage provided under PART II - PROPERTY. Additional Coverage. **Flood**.

B. With respect to **Flood** coverage, the following exclusions are added:

1. We do not provide coverage for physical loss or **property damage** resulting from **flood** to any of the following types of property:

   a. Underground structures and equipment, including wells, septic tanks, and septic systems;

   b. Those portions of walks, walkways, decks, driveways, patios, and other surfaces, all whether protected by a roof or not, located outside the perimeter, exterior walls of the insured **house** or **other permanent structure** or the building in which the insured **residence** is located;

   c. Containers, including related equipment, such as, but not limited to, tanks containing gases or liquids;

   d. Fences, retaining walls, seawalls, bulkheads, pilings, wharves, piers, bridges, and docks;

   e. Boat houses or other open structures, and any **contents** located within these structures, if the structure is located on or over a body of water;

   f. Any **house** or **other permanent structure**, and any **contents** located within, that is not fully enclosed by walls and a roof;

    g.  Hot tubs and spas that are not bathroom fixtures, and swimming pools, and their equipment such as, but not limited to, heaters, filters, pumps, and pipes, wherever located; or

    h.  **Contents** you own in common with other condominium owners comprising the membership of a condominium association.

2.  We do not cover any loss or **property damage** caused by or resulting from any **flood** that is already in progress at the time and date:

    a.  the policy term begins; or

    b.  coverage is added at your request

If the **flood** is due to the overflow of inland or tidal waters, then the **flood** is considered to begin when the water first overflows its banks.

3.  We do not cover any loss, directly or indirectly, and regardless of any cause or event contributing concurrently or in any sequence to the loss, caused by or resulting from a **tsunami.**

4.  We will not pay that part of the loss that is attributable to any Deductible(s) in the **NFIP** policy.

5.  We do not cover any loss or **property damage** caused by or resulting from **flood** to an **SFHA** designated **residence** located in an Emergency Program Community. An Emergency Program Community means a community participating in the Emergency Program of the **NFIP.**

6.  We do not cover any loss or **property damage** caused by or resulting from earth movement, such as **landslide,** slope failure, or a saturated soil mass moving by liquidity down a slope whether caused directly or indirectly by **flood.**

**PART IV - CONDITIONS,** is amended as follows:

The Other Insurance provision is amended to include:

Other Insurance

Payments under this coverage are in excess over the payments made by the **NFIP** policy and subject to the maximum limits available through the **NFIP.** This provision applies whether or not the maximum **NFIP** limit was obtained or maintained, and whether or not you can collect on the **NFIP** policy.

## AIG  Fraud SafeGuard® Coverage

With respect to coverage provided by this endorsement, all provisions and conditions of the policy apply unless they are changed by this endorsement.

## SCHEDULE

| | Limit of Insurance | | Deductible |
|---|---|---|---|
| Fraud, Embezzlement or Forgery | $30,000 | (each event) | $2,500 |
| | $30,000 | (each insured annual aggregate) | |
| ATM Robbery | $2,500 | (each insured) | No deductible applies |
| | $2,500 | (each insured annual aggregate) | |
| Stolen Identity Event | $30,000 | (each event) | No deductible applies |
| | $30,000 | (each insured annual aggregate) | |

It is agreed and understood that **PART I - DEFINITIONS** has been amended to include the following:

**Forgery** means the signing of the name of another person or organization with intent to deceive; it does not mean a signature which consists in whole or in part of one's own name signed with or without authority, in any capacity, for any purpose. **Forgery** will result directly from **forgery** of checks, drafts, promissory notes, or similar written promises, orders or directions to pay a sum certain in money that are:

    a. Made or drawn by or drawn upon you or a **family member**; or

    b. Made or drawn by one acting as your or a **family member's** agent;

      or that are purported to have been so made or drawn.

**Fraud or embezzlement** means:

    a. An electronic, telegraphic, cable, teletype, telefacsimile, telephone, computer, or magnetic tape instruction which purports to have been transmitted by you or a **family member**, but which was in fact fraudulently transmitted by someone else without your or a **family member's** knowledge or consent;

    b. A written instruction issued by you or a **family member**, which was forged or altered by someone other than you or a **family member** without your or a **family member's** knowledge or consent, or which purports to have been issued by you or a **family member** but was in fact fraudulently issued without your or a **family member's** knowledge or consent; or

    c. Any other intentional perversion of truth by someone other than you or a **family member** perpetrated in order to induce you or a **family member** to part with something of value.

**Fraud Safeguard event** means fraud, embezzlement, or forgery, ATM robbery, or **stolen identity event** as set forth in this endorsement.

**Money** means:

    a. Currency, coins and bank notes in current use and having a face value;  and

    b. Travelers checks, register checks and money orders.

**Other property** means and is limited to jewelry, precious metals, antiques, fine art, ceramics, furs, collectibles, and gemstones.

**Restoration Services** means those services performed in response to a **stolen identity event**, and on your or a **family member's**, behalf after receipt of authorization from you or a **family member**, including but not limited to:

1. Providing you or a **family member** with a package of information which includes a description of the resolution process, educational articles, and guidance for avoiding future complications.

2. Notifying the three major credit bureaus and providing assistance with requesting that a fraud alert be placed on your or a **family member's** credit files and affected credit accounts.

3. Reviewing your or a **family member's** credit files with you or a **family member** to determine the accuracy of the file and potential areas of fraud.

4. Notifying as needed, your or a **family member's** affected creditors, financial institutions, credit card companies, utility providers, and merchants of the identity fraud.

5. Providing information to the Federal Trade Commission (FTC), and to other government agencies as appropriate.

6. When appropriate, providing assistance with obtaining and reviewing your Social Security Personal Earnings and Benefits Statement.

7. Creating and maintaining a case file to document the identity fraud.

8. When appropriate, providing other assistance we might reasonably be able to offer you or a **family member** on a case by case basis, as determined in our sole and absolute discretion.

   We reserve the right to refuse or terminate the provision of restoration services where you or a **family member** are deemed to be committing fraud or other illegal acts, making untrue statements, or failing to perform your or the **family member's** portion of the recovery plan.

**Robbery** means the unlawful taking of property from the care and custody of a person, accomplished by means of force or fear.

**Securities** mean negotiable and non-negotiable instruments or contracts representing either **money** or property.

**Stolen identity event** means the illegal use of your or a **family member's** name, social security number, or other method of identity without permission.

It is agreed and understood that **PART III - LIABILITY** has been amended to include the following:

**FRAUD SAFEGUARD**

**Insuring Agreements**

**A. Fraud, Embezzlement or Forgery**

   We will pay you or a **family member** for loss of **money, securities,** or **other property** up to the applicable Limits of Insurance shown in the schedule, resulting directly from **fraud, embezzlement, or forgery** perpetrated against you or a **family member** during the Policy Period. The loss must be discovered not later than ninety (90) days from the end of the Policy Period.

**B. ATM Robbery**

   We will pay you or a **family member,** up to the applicable Limits of Insurance shown in the schedule, for loss of **money** resulting directly from a **robbery** that occurs within 100 feet from an Automatic Teller Machine (ATM), immediately after withdrawing such **monies** from the same ATM. This coverage does not apply to any other loss of money or valuables in your or a family member's possession resulting from the robbery.

**C. Stolen Identity Event**

We will pay Costs and Legal Costs, as set forth below in Payment of Loss for a **stolen identity event**, up to the applicable Limits of Insurance shown in the schedule, including a **stolen identity event** occurring on or arising out of the use of the Internet. The **stolen identity event** must occur and be discovered during the Policy Period.

**1. Payment of Loss For A Stolen Identity Event**

**a. Costs**

1. Costs incurred by you or a **family member** for re-filing applications for loans, grants, other credit or debt instruments that are rejected solely because the lender received from any source incorrect information as a result of a **stolen identity event**;

2. Costs for notarizing affidavits or other similar documents, long distance telephone calls, and postage reasonably incurred as a result of your or a **family member's** efforts to report a **stolen identity event** or amend or rectify records as to your or a **family member's** true name or identity as a result of a **stolen identity event**;

3. Costs incurred by you or a **family member** for a maximum of six (6) credit reports from an entity approved by us. The first credit report may not be requested until after the discovery of a **stolen identity event**;

4. Costs for contesting the accuracy or completeness of any information contained in a credit report following a **stolen identity event**;

5. Actual lost wages not to exceed $10,000 that would have been earned in the United States, whether partial or whole days, for time reasonably and necessarily taken off work and away from your or a **family member's** work premises solely as a result of your or a **family member's** efforts to amend or rectify records as to your or a **family member's** true name or identity as a result of a **stolen identity event**. Actual lost wages includes remuneration for vacation days, discretionary days, floating holidays, and paid personal days but not for sick days or any cost arising from time taken from self-employment. Coverage is limited to wages lost within twelve (12) months after your or a **family member's** discovery of a **stolen identity event** and is limited also to the applicable Aggregate Limits of Insurance shown in the schedule.

**b. Legal Costs**

Costs for reasonable fees for an attorney appointed by us and related court fees, incurred by you or a **family member** with our consent, for:

1. Any legal action brought against you or a **family member** by a creditor or collection agency or entity acting on behalf of a creditor for non-payment of goods or services or default on a loan as a result of a **stolen identity event**;

2. Removing any civil judgment wrongfully entered against you or a **family member** as a result of a **stolen identity event**; and

3. Criminal defense for charges brought against you or a **family member** as a result of a **stolen identity event**.

**2. Additional Coverage - Stolen Identity Event**

Restoration Services

We will provide you or a **family member** with **restoration services** after a **stolen identity event**. The **stolen identity event** must occur during the Policy Period. Restoration services expenses do not reduce the amount of limit available under Payment of a Loss for a **stolen identity event**.

**Special Limits of Insurance**

1. We will only pay the amount of loss in excess of any applicable Deductible, up to the applicable Limit of Insurance shown in the schedule for that coverage.

2. The most we will pay each **insured** for all loss resulting from **fraud, embezzlement, or forgery** is the Fraud, Embezzlement, or Forgery Each Insured Aggregate Limit shown in the schedule.

3. The most we will pay each insured for all loss resulting from a **stolen identity event** is the Stolen Identity Each Insured Aggregate Limit shown in the schedule.

4. The most we will pay each insured for all loss resulting from an ATM Robbery is the ATM Robbery Each Insured Aggregate Limit shown in the schedule.

5. All loss arising from continuous, repeated, or related **fraud guard events** will be treated as one **fraud guard event.**

6. The most we will pay for any loss is the applicable Limit of Insurance. If, however, a loss:

   a) Exceeds the applicable Limit of Insurance; and

   b) There is more than one **insured person** claiming a loss; and

   c) The combined loss is greater than the Limit of Insurance for any one **insured person;** and

   d) The affected **insured persons** can reasonably demonstrate joint ownership of the **money, securities,** or **other property;**

   we will pay each **insured person** up to the applicable Limit of Insurance for **money, securities, or other property,** until the loss is satisfied, but under no circumstance will we pay:

   1) more than the adjusted value of the **money, securities, or other property;** or

   2) each **insured person** for the same **money, securities** or **other property,** or portion thereof.

7. We will not pay for loss for any occurrence of **fraud, embezzlement, or forgery** until the amount of loss exceeds the Fraud, Embezzlement, or Forgery Deductible shown in the schedule. A separate Fraud, Embezzlement, or Forgery Deductible will apply to each insured.

It is agreed and understood that **PART III - LIABILITY,** Exclusions, has been amended to include the following:

As respects FRAUD SAFEGUARD coverage provided by this endorsement:

This insurance does not provide coverage for liability, defense costs or any other cost or expense for:

1. Intentional Loss

   We do not cover any loss for any act committed at your or a **family member's** direction or with your or a **family member's** knowledge.

2. Dishonest Acts

   We do not cover any loss arising out of any dishonest or criminal act by you or a **family member.**

3. Confiscation

   We do not cover any loss caused by the confiscation, destruction, or seizure of property by any government or public entity or their authorized representative.

4. Computer Error

   We do not cover any loss resulting from an error in computer programming or error in instructions to a computer.

5. Business Or Professional Services

   We do not cover any loss arising out of a **business** or professional service engaged in by you or a **family member.**

6. **Property Damage, Bodily Injury, or Personal Injury.**

   We do not cover any **bodily injury, property damage, or personal injury.**

7. Financial Guarantees

   We do not cover any guarantee of the financial performance of any financial instrument or investment vehicle.

8. Indirect Loss

   We do not cover any loss that is an indirect result of any **fraud guard event** including but not limited to:

   a) Your or a **family member's** inability to realize income that you would have realized had there been no loss or damage to **money, securities, or other property;**

   b) Payment of damages of any type for which you or a **family member** are legally liable; or

   c) Payment of costs, fees or other expenses you or a **family member** incur in establishing either the existence or the amount of loss under this endorsement other than those set forth under this endorsement.

9. Legal Expenses

   Expenses related to any legal action, except as set forth in this endorsement related to a **stolen identity event.**

10. Games of Chance

   Any loss resulting from any game of chance.

11. Forgeries

   Any **forgery** that is electronic, digital, or mechanical.

12. Service Disputes

   Any loss arising out of any dispute or disagreement concerning the quality of goods or services unless the loss arises out of **fraud, embezzlement, or forgery.**

13. Not-for-Profit Organizations

   Any loss arising out of the giving of any contribution, donation, restricted gift, or payment of any kind to any not-for-profit organization.

14. Investment Loss Due to Corporate Fraud

   We do not cover any loss due to the change in value of **securities** issued by a business where loss results directly or indirectly from or alleges or involves in any manner whatsoever, **fraud, embezzlement or forgery** by the business including but not limited to its Directors or Officers, which issued the **securities.**

It is agreed and understood that **PART IV - CONDITIONS** has been amended to include the following:

A. Your or a **Family Member's** Duties After a **Fraud Safeguard Event**

   In the event of a **Fraud Safeguard Event** or loss you or a **family member** must:

   1. Notify the police if a law may have been broken;

   2. Provide us with a police report or a report that was submitted to the appropriate civil authorities;

   3. Give us prompt notice of the loss;

   4. Take action to avoid future loss, including securing any **residence,** safeguarding your or a **family member's** assets and ending your or a **family member's** business relationship with any one responsible for a **Fraud Safeguard Event;**

5. As soon as possible, give us a description of how, when, and where the loss occurred and a description of the loss, including a description of **money, securities, and other property**;

6. If requested, permit us to question you and **family members** under oath at such times as may be reasonably required, about any matter relating to this insurance or your or a **family member's** claim, including inspection of your or a **family member's** books and records. In such event, your or a **family member's** statement containing your or a **family member's** answers will be signed;

7. Send us a signed, sworn proof of loss or affidavit containing the information we request to investigate the claim. You or a **family member** will do this within thirty (30) days after our request. We will supply you or a **family member** with the necessary forms;

8. In the event of a credit card loss, in addition to all of the above, you or a **family member** will notify the credit card service company or the issuing bank immediately, but in no event no later than two (2) business days after discovery;

9. Upon discovery of an event of a loss involving an electronic fund transfer, in addition to all of the above, you or a **family member** will notify the service providers and financial institutions involved in the transfer immediately, but in no event no later than two (2) business days after discovery;

10. You or a **family member** must cooperate with us in investigating, evaluating and settling a claim and help us:

    a) Enforce any legal rights you, a **family member** or we may have against anyone who may be liable to you or a **family member**;

    b) Attend depositions, hearings and trials; and

    c) Secure and give evidence, and obtain the attendance of witnesses; and

11. We reserve the right to request any other reasonable document or action of you or a **family member**.

B. Valuation

   1. Securities

   In the event of a loss of **securities**, we may elect to pay you or a **family member** the cost of replacing such **securities**, determined by the market value at the time of such settlement. We will not be liable for more than the actual cash value of the **securities** at the close of business on the business day preceding the day on which the loss was discovered. If our payment is not sufficient to indemnify you or a **family member** in full for the loss of **securities**, our liability is limited to the replacement of or the payment for such **securities** whichever is less, but in no event will the payment be more than the applicable Limit of Insurance.

   2. Foreign Currency

   In the event of a loss of foreign currency, we will be liable for the United States dollar equivalent at the exchange rate published in the Wall Street Journal on the day of the discovery of the loss.

   3. Other Property

   In event of loss of **other property**, we will not be liable for more than the actual cash value of the **other property** on the date of the discovery of the loss, or for more than the actual cost of repairing or of replacing such property with property or material of like quality and value.

HOMEOWNERS AMENDATORY ENDORSEMENT
ILLINOIS

Part II - PROPERTY, Section D, Exclusions, Pollution or Contamination is amended to include the following:

Pollution or Contamination.

This exclusion does not apply to bodily injury or property damage caused by heat, smoke, or fumes from a hostile fire. As used in this exclusion, a hostile fire means one which becomes uncontrollable or breaks out from where it was intended to be.

Part II - PROPERTY. Section D. Exclusions, Fungi or Bacteria is deleted and replaced with:

Fungi or Bacteria

We do not cover any loss caused by the presence, growth, proliferation, spread or any activity of fungi or bacteria. Including the cost to test for, monitor, clean up, move, remediate, contain, treat, detoxify, neutralize or in any way respond to, or assess the effects of fungi or bacteria.

This exclusion does not apply to:

a. Coverage provided under PART II - PROPERTY. Additional Coverage. Ensuing Fungi or Bacteria; or

b. Fungi or Bacteria resulting from fire or lightning unless another exclusion applies; or

c. Ensuing covered loss unless another exclusion applies.

Part II - PROPERTY, Section D, Exclusions, Intentional Acts is amended as follows:

Intentional acts. We do not cover any loss caused by any act, whose consequences could have been foreseen by a reasonable person, committed:

1. By or at the direction of you, your spouse or a family member; and

2 With the intent to cause a loss or damage.

a. However, this exclusion will not apply to deny payment to an innocent family member who did not cooperate in or contribute to the creation of the loss if:

1. Such loss arose out of a pattern of criminal domestic violence; and

2 The perpetrator of the loss is criminally prosecuted for the act causing the loss.

If we pay a claim pursuant to Paragraph 21.a, our payment to the insured person is limited to that insured person's insurable interest in the property less any payments we first made to a mortgagee or other party with a legal secured interest in the property. In no event will we pay more than the Limit of Liability.

Part III - LIABILITY, Section C, Item 6. is hereby deleted from the policy.

Part III - LIABILITY, Section E, Exclusions, Sexual Molestation or Corporal Punishment is deleted and replaced by the following:

Sexual Molestation or Corporal Punishment. This policy does not provide for claims or suits seeking damages, including defense of the same, for any person who actively participates in any act of sexual misconduct, sexual molestation or physical or mental abuse of any person.

PCHO-AEIL (09/06)                                          1

Part III - LIABILITY, Section E, Exclusions, Transmitted Diseases is deleted and replaced by the following:

> <u>Transmitted Diseases</u>. **Personal Injury** resulting directly or indirectly from AIDS or any sexually transmitted disease, transmitted intentionally or unintentionally, by an **insured person** to anyone. We do not cover any **damages** for any threat of exposure or any consequences resulting from that illness, sickness, or disease.

Part III - LIABILITY, Section E, Exclusions, Intentional Acts is amended by the following:

The sentence, "This exclusion does not apply to **bodily injury** if the **insured person** acted with reasonable force to protect any person." is deleted and replaced with the following:

This exclusion does not apply to **bodily injury** or **property damage** if the **insured person** acted with reasonable force to protect any person or property.

Part IV - CONDITIONS, Section B, item 10. is deleted and replaced by the following:

10.   Assist and cooperate with us in the conduct of the defense by helping us:
    a.  To make settlement;
    b.  To enforce any right of contribution or indemnity against any person or organization who maybe liable to an **insured person;**
    c.  To attend hearings and trials; and
    d.  To secure and give evidence.

Part IV - CONDITIONS, Concealment or Fraud is deleted and replaced by the following:

> <u>Concealment or Fraud</u>. This entire policy is void if you or a **family member** has intentionally concealed or misrepresented any material fact, engaged in fraudulent conduct or made false statements relating to this policy before or after a loss.  However, a policy or renewal policy shall not be rescinded after the policy has been in effect for one year or one policy term, whichever is less. Notwithstanding the limitation in this paragraph, we may cancel or non-renew this policy in accordance with the terms of Section P, Our Cancellation or Section Q, Non-Renewal.

Part IV - CONDITIONS, Legal Action Against Us is deleted and replaced by the following:

> <u>Legal Action Against Us</u>. No action shall be brought against us unless the **insured person** has complied with this policy's provisions, nor until final judgment or agreement has set the amount of the **insured person's** legal obligation with us. You also agree to bring any action against us within one (1) year after a loss occurs plus the number of days between the date the proof of loss was filed and the date the claim was denied in whole or in part.  No one has the right to join us in any action against any **insured person.**

Part IV - CONDITIONS, Appraisals is deleted and replaced by the following:

> <u>Appraisals</u>. If you and we fail to agree on the amount of loss, either party may make a written demand that each selects an independent appraiser. In this event, the parties must notify each other of their selection within twenty (20) days. The independent appraisers will select an umpire within fifteen (15) days. If an umpire is not agreed upon within that time, either party may request the umpire be selected by a judge. The independent umpires will then appraise the loss and submit any differences to the umpire. A decision agreed to in writing by the two appraisers or either appraiser and the umpire will be binding. We will pay your appraiser's fee and the umpire's appraisal fee, if the following conditions are met:

1. You demanded the appraisal; and
2. The full amount of loss, as set by your appraiser, is agreed to by our appraiser or the umpire.

Part IV - CONDITIONS, Our Cancellation is deleted and replaced with the following:

Our Cancellation. To cancel this policy we must notify you in writing. This notice will be mailed to you at the last mailing address known to us and we will obtain an U.S. Post Office certificate of mailing. This notice will include the date the cancellation is to take effect and the reason for the cancellation. It shall also state that any excess premium, if not returned, shall be refunded on demand. In the event of cancellation by you or by us, we will refund any unearned premium on the effective date of cancellation, or as soon as possible afterwards. The unearned premium will be computed *pro rata* for the unexpired term of the policy. A copy of the notice will also be sent to the agent or broker and the last known mortgagee or lienholder at the last mailing address known by us.

1. When this policy has been in effect for less than sixty (60) days and is not a renewal with us, we may cancel for any reason.

2. When this policy has been in effect for sixty (60) days or more or if it is a renewal with us, we may cancel:
   a. For nonpayment of premium; or
   b. If this policy was obtained by misrepresentation or fraud; or
   c. For any act which measurably increases the risk originally accepted.

3. If we cancel for nonpayment of premium we will let you know of our action at least ten (10) days before cancellation takes effect. If we cancel for a reason other than nonpayment of premium, we will let you know of our intention at least thirty (30) days before cancellation takes effect.

Part IV - CONDITIONS, Nonrenewal is deleted and replaced by the following:

Nonrenewal.

1. We may elect not to renew this policy at its expiration date or, in the case of a policy written for an indefinite term, at its anniversary date. We will notify you of our intention not to renew, and of our reason for nonrenewal, at least thirty (30) days before the expiration or anniversary date.

2. If we offer renewal and you fail to pay the renewal premium before the expiration date of this policy, this policy will terminate upon ten (10) days' notice to you.

3. If insurance has been issued to the **insured person** and has been in effect with us for five or more years, we will not exercise our right to nonrenewal unless:
   a. The policy was obtained through misrepresentation or fraud; or
   b. The risk originally accepted has measurably increased; or
   c. The **insured person** has received sixty (60) days' notice of our intention not to renew.

4. We will mail the notice to you at your last mailing address known by us, and we shall obtain a certificate of mailing. A copy of the notice will also be sent to the agent or broker and the last known mortgagee or lienholder at the last mailing address known by us.

All other provisions of this policy apply.

Includes copyrighted materials from Insurance Services Office, Inc. with its permission.

PCHO-AEIL (09/06)                3

08CV2325 J. N.
JUDGE CONLON
MAG. JUDGE COLE

# EXHIBIT B

# SMELL & TASTE TREATMENT AND RESEARCH FOUNDATION, LTD.

July 27, 2007

Re:  1526 Sheridan Road
Highland Park, IL 60035

To Whom It May Concern:

I had the pleasure of assessing the Royal house on July 20, 2007 for its ambient aromas.  This house was built in the early 1970's.  The house has been owned by the Royal family for approximately two years.

After living in it for about one year, on April 24, 2007, a substantial effluvium of skunk was noted.  The tenants moved out but the aroma persisted despite removal of the skunk.  It was determined that the skunk had burrowed deep under, and possibly within, the foundation and sprayed recurrently in a few different locations.  In response to the aroma, much of the drywall and interior walls and wood of the living spaces had been removed. Despite that the initial problem occurred approximately three months ago, the skunk aroma has, to an extent, persisted.  Because of the anti-euthenic nature of this skunk aroma, evaluation was sought to assess the degree and extent of the persistent skunk odor.

An odor panel from the Smell & Taste Treatment and Research Foundation arrived and performed assessments of a variety of parameters and sites in the home on the day of evaluation.  Each assessment was performed blinded to the assessments of other members of the panel and unblinding did not occur until all testing was complete.  Five sites were tested as described.

Re:  1526 Sheridan Road
         Highland Park, IL 60035
July 27, 2007
Page 2 of 7

Site 1:  This site was assessed at 11:46 a.m.  Location of primary site where the exposure was initially noted to be the greatest was in the upstairs main level at the room in the northeast corner of that room.  The site was thirty-seven inches off the north wall and sixty-nine inches off the west wall.  All panel assessments were performed in a standing position.  Testing included odor panel hedonics, odor panel descriptions, average Nasal Ranger score, average hedonics, and average Phenylethyl Alcohol (PEA) Intensity Equivalency score.  [See picture]



Nasal Ranger average score greater than sixty.  Physiologic parameters were noted at sites 1 and 2 that included eyes burning, mouth gritty, and bitter taste.  Quantitative odor descriptors from most frequent to least frequent included:  offensive, putrid, sewer-like, musty, swampy, musky, uriniferous, and stale.  Hedonic scores averaged -8.  PEA threshold intensity equivalency score averaged -3.5.

Re: 1526 Sheridan Road
       Highland Park, IL 60035
July 27, 2007
Page 3 of 7

Site 2:  This site was assessed at 12:10 p.m.  This site is located at the entry way site 1
(northeast room) eighteen inches from the west wall, and twenty-four inches from the
south wall.  [See picture]



Nasal Ranger score was greater than sixty.  The quantitative odor descriptors for this
site 2 included:  offensive, sour, spoiled milk-like, uriniferous, stale, septic, yeast-like,
and musky.  Hedonic scores averaged -8.  PEA threshold intensity equivalency score
averaged -4.0.

Re:  1526 Sheridan Road
        Highland Park, IL 60035
July 27, 2007
Page 4 of 7

Site 3:  This site was assessed at 12:40 p.m.  This site is the closet on the first floor front entryway, west of the primary site, to the east side of the primary site.  [See picture]



Nasal Ranger score was between fifteen and thirty.  Quantitative odor descriptors from most frequent to least frequent included:  offensive, uriniferous, sour, decay-like, sewerage-like, and sour.  Hedonic scores averaged -9.  PEA threshold intensity equivalency score averaged -3.5.

Re: 1526 Sheridan Road
        Highland Park, IL 60035
July 27, 2007
Page 5 of 7

Site 4: This site was assessed at 1:40 p.m. This site is in the basement, seventy-three inches from the stairs, at a 45° diagonal towards the center of the room. [See picture]



Nasal Ranger score was between thirty and sixty. Quantitative odor descriptors from most frequent to least frequent included: offensive, mercaptan, mouse-like, musky, musty, decay, stale, and woody. Hedonic scores averaged -7. PEA threshold intensity equivalency score averaged -3.0.

Re:  1526 Sheridan Road
        Highland Park, IL 60035
July 27, 2007
Page 6 of 7

Site 5:  This site was assessed at 2:05 p.m.  This site is an office located on the east side the home, seventy-three inches from the window, and twenty-eight inches from the wall.

Nasal Ranger score was between two and four.  Quantitative odor descriptors were that of earthy, coffee, woody, paint, musky, and musty.  Hedonic scores averaged zero.  PEA threshold intensity equivalency score averaged -7.0.

In addition to the above, the panel also assessed a sample of clothing that had been returned from restoration.  Odor thresholds did reveal a strong solvent-like smell with substantial trigeminal irritation of nausea and burning eyes, and high readings by the Nasal Ranger.  However, some of these clothing items were still covered in plastic and had not been fully aerated.

In discussions with the homeowner, Vicki Royal, she and her family did experience headaches, nausea, and burning eyes with exposure to the odors in the home and exposure to the restored clothing.

In summary, the tests conducted demonstrated very substantial levels of odors in the primary and secondary locations.  This was clearly the odor of skunk.  The odor in the basement had a less odor of skunk but there were more odors that would be associated with reconstruction and paint.  In the office area, the skunk odor was not detected.  The skunk odor was noted immediately upon entering the house and the level of skunk odor combined with the other construction and restoration odors is so high as to be trigeminal irritants and is equivalent to what I would see at a house located next to a landfill site.  It is this investigator's opinion that these levels of odors are so substantial that these odors, more likely than not, are irritants to individuals and may even be of health risk.  In that the odors are at a very intense level at this time, I strongly encourage the owners to consider not returning to this house pending full remediation of the odors and may require a substantial duration of time for the odor to fully diffuse.

I advise another evaluation after full remediation of the house in order to verify that the odor has been fully removed.  Until then it is recommended that all residents not return to live at this site.

Re:  1526 Sheridan Road
        Highland Park, IL 60035
July 27, 2007
Page 7 of 7

Sincerely,

Alan R. Hirsch, M.D., F.A.C.P.

It is noteworthy to mention that in discussions with Vicki Royal, as occurs at other sites
of odor and skunk, the level of odors will be far greater on days of high humidity, high
dew point, and high temperatures.  Thus, my recorded levels may have even been that
much greater had it been a warmer, more humid day.

ARH/dtf

08CV2325 J. N.
JUDGE CONLON
MAG. JUDGE COLE

# EXHIBIT C



**Smell and Taste**
**Treatment and Research Foundation, Ltd.**

August 28, 2007

FAX: 312-899-0340

Anthony L. Abboud ..
Greenberg Traurig LLP
77 West Wacker Drive, Suite 2500
Chicago, IL 60601

Dear Mr. Abboud:

At your and your client's request, I am writing this addendum to further delineate my opinions in my July 27 report.

It was evident to all investigators present on July 20, 2007 that the Royal house was encumbered by a miasma of malodor that was skunk in nature. This was readily apparent upon initially entering the residence when investigators were overcome by the noisome undeniably skunk effluvium which was of such high intensity, that it induced trigeminal stimulation with irritation of eyes, tearing and throat irritation. The skunk malodor was pervasive throughout the house and all sites tested except in the last room examined (home office). The aroma was characteristic of skunk. As we have discussed, in the science of odor assessment, skunk is not one of the standard choices that is available for qualitative descriptions, however, the descriptions of the odors that the investigators independently assigned to the different sites

*845 North Michigan Avenue, Suite 990w*
*Chicago, IL 60611*
*Tele: 312-938-1047  Fax: 312-649-0458*

Addendum
Re: Royal
August 28, 2007
Page 2

(except last site) would be characteristic descriptors when skunk odor is present. Furthermore, investigators independently described this as characteristic of skunk effluvium. At each site (except the last site) the olfactory perception of the malodor was that of skunk, the qualitative description assigned was consistent with skunk, the hedonic ratings suggested substantially anti-euthenic ambient environment, intensity assessment was consistent with trigeminal levels of skunk odor, investigator trigeminal irritation was consistent with high level of skunk aroma, and Nasal Ranger testing objectified these elevated levels. In all but the last site, it is with high certainty that we designate these areas as being contaminated with skunk scent. Its pervasive nature throughout most of the rooms of the house precluded investigators from identifying a specific site source in each room where the level was most intense. If the level of aroma is reduced substantially, it ultimately may be possible to determine the site of greatest contamination, however, the effluvium has so infused virtually the entire site, localization would be impossible at this time.

Given the duration of elapse from initial contamination and significant subsequent level of odor, despite efforts at remediation, it is evident that the contamination persists. The efforts at remediation and encapsulation have not, to date, been very effective at this site and I would encourage aggressive efforts at remediation. Until such odor removal is able to be performed, I would strongly encourage evacuation until such time as the odor dissipates or is eliminated (which, I base on my past experience, could be as long as up to three years). Aggressive remediation approach, including that of the foundation and all that the odor has impregnated, should be attempted. Sometimes after remediation, even after all of the wood has been removed,

Addendum
Re: Royal
August 28, 2007
Page 3

the skunk aroma recurs. This is sometimes due to changes in temperature and humidity which induces diffusion of absorbed aromas from porous surfaces. This may even involve structural beams and floorboards. If ineffective, given the duration, extent and intensity of contamination, site destruction may have to be considered.

At this site, we did not perform gas chromatographic evaluation because it was apparent it was not necessary to do so due to the undeniable identifiable characteristics of the skunk odor at the trigeminal level.

On the date of my inspection, I was not requested to provide a remediation protocol and I have not offered a suggestion regarding remediation, but would encourage contact with a firm that specializes in constructional remediation with regard to contaminated sites.

I would be happy to address the other questions regarding testing methods and results in a future addendum. These testing methods are all standard practices used in the assessment of odor contamination sites, including with our work with the EPA, Attorney General's office, and superfund and landfill sites across the country. If you wish an additional report detailing each of these testing modalities, I would be happy to provide this. Needless to say, these test results were all consistent with high levels of skunk contamination.

Sincerely,

Alan R. Hirsch, M.D.

ARH/dtf

08CV2325 J. N.
JUDGE CONLON
MAG. JUDGE COLE

# EXHIBIT D



**HUMBOLDT STATE UNIVERSITY**

Department of Chemistry

October 29, 2007

Anthony L. Abboud
Greenberg Traurig LLP
77 West Wacker Drive, Suite 2500
Chicago, IL 60601

Dear Mr. Abboud:

The following is a report on skunk spray contamination of the residence of Mark and Vicki at 1526 Sheridan Rd, Highland Park, IL. The report is based on an analysis of the report and addendum of the inspection on July 20, 2007 by Dr. A. R. Hirsch and the report on the inspection by Martin King on August 31, 2007. I have viewed photographs of the home and previous remediation attempts. Additional information about the type of sealer and cleaning solvents used after the skunk had sprayed were supplied by you in a telephone call. My peer reviewed publications on the chemical constituents of striped skunk spray and MSDSs of products used on the Royal residence are appended to the report.

I was asked to evaluate the above materials because of my research on the components in skunk spray (5 peer review publications) and my research on odor (32 peer review publications). Additionally, my website offers advice on how to neutralize skunk spray. Since 1998 the website has been visited over 300,000 times and it was used as a basic reference for the Martin King Report. My CV is included as a separate document.

Sincerely yours,

*William F. Wood*

William F. Wood
Professor of Chemistry

Arcata, California  95521-4957          Phone Numbers          Office  (707) 826-3109
The California State University                                  Dept.(707) 826-3277
                                                                 FAX      (707) 826-3279
                                        E-Mail                   wfw2@humboldt.edu

Evaluation of the Proposed Remediation of Skunk Spray Contamination
& Recommendations for the Royal Residence, Highland Park, Il.
October 25, 2007

1

# Evaluation of the Proposed Remediation of Skunk Spray Contamination & Recommendations for the Royal Residence

by

William F. Wood
Department of Chemistry
Humboldt State University
Arcata, CA 9552
Phone 707 826-3109
E-Mail wfw2@humboldt.edu

## THE CHEMICAL NATURE OF SKUNK SPRAY

The major components of the striped skunk's defensive spray are a mixture of thiols and thioacetates (Refs. 1&2)[1]. The most volatile compounds in the secretion are the thiols, *trans*-2-buten-1-thiol (38-40%) and 3-methyl-1-butanethiol (18-26%). The other major components in the secretion are acetate derivatives of these thiols, which comprise 14-21% of the secretion. On exposure to water these acetate derivatives slowly decompose into the highly odoriferous thiols. All of these compounds have a low odor threshold (they can be detected in small amounts). The odor threshold for the entire secretion was determined by to be 10 parts per billion (Ref 2).

Soon after being released by a skunk, the more highly volatile components (the thiols) of the liquid starts to evaporate and enter the gas phase as individual molecules. At a later time the liquid acetate derivatives of these thiols will decompose into the more volatile

---

[1] These scientific publications are in peer review journals. These journals submit the original manuscript to several other scientists to critique and recommend acceptance or rejection.

Evaluation of the Proposed Remediation of Skunk Spray Contamination
& Recommendations for the Royal Residence, Highland Park, Il.
October 25, 2007

2

thiols and then evaporate. Once these compounds are in the air the human nose can detect them at a very low concentration.

The volatility of the thiols, the amount of secretion sprayed, the air circulation, and the low odor threshold of these thiols determine how long skunk odor will persist in an area. In the open air, skunk odor will be detectable several days after a skunk has sprayed. The thiols will evaporate from the objects on which it was sprayed and then drift away with the air currents until it becomes too dilute for the human nose to detect. If the spraying is in open air, the temperature is relatively high (speeds evaporations) and there are windy conditions, the odor will dissipate in a few days. If it is trapped inside a building, it will take much longer for the odor to become too dilute to be detected.

## HOW SKUNK SPRAY INTERACTS WITH BUILDING MATERIALS

When skunk spray is trapped inside a closed area (such as a house) the time it takes to dissipate is greatly increased. Once the skunk spray secretion has evaporated it will diffuse into all porous material inside the enclosure. This includes, bricks, concrete, wallboard, flooring, carpeting, paint, etc. – everything inside a house that has air spaces within the structure. Also, skunk thiols are nonpolar (do not dissolve in water), but will be absorbed inside non-porous hydrocarbon-like material such as plastic and paint. Once the skunk spray compounds are inside these materials they will be slowly released over a period of weeks, months or years. The time it takes for this to happen depends on the amount of odoriferous thiol inside the solids, how far inside the solid it resides, the temperature and the air circulation. The only building materials that will not absorb skunk spray molecules are materials made of glass, metal or similar materials that are not porous.

High humidity could cause an accelerated release of skunk thiols by forcing them from concrete or other porous materials. Water is polar (not oily) and when it penetrates into wood or concrete it would displace the non-polar (oily) thiols. This could be likened to oil floating to the surface of water. Once the thiols were displaced into the air, their odor would be more apparent.

Evaluation of the Proposed Remediation of Skunk Spray Contamination                    3
& Recommendations for the Royal Residence, Highland Park, Il.
October 25, 2007

## RELEASE OF SKUNK DEFENSIVE SECRETION AT THE HOME OF MARK AND VICKI ROYAL

In the latter part of April 2007, a skunk that had burrowed under the front porch the Royal residence at 1526 Sheridan Rd, Highland Park, IL, discharged its defensive chemicals into the ground underneath the porch. It is my understanding that it was many days after skunk odor was detected until the skunk was removed. I am told, that a trap was in place for 10 days and did not catch the skunk (per notes of independent adjuster Frank Martino). The skunk was removed by excavation of the den with continued discharge of defensive secretion during this period. Furthermore, I am told all contaminated soil was not removed until a month later. Due to the considerable time between the discharge of the skunk's thiols and any remediation attempts, the chemicals migrated into and through the foundation and into the structure of the house. The fact that skunk odor had permeated most of the Royal's house is clearly documented in the report and addendum of the inspection on July 20, 2007 by Dr. A. R. Hirsch.

## PREVIOUS REMEDIATION ATTEMPTS

To remove the odor, dirt from in front of the house was removed and treated with a "neutralizing solution formulated for skunk spray" (King Report). Also the King Report states the interior of the house, "drywall, insulation and trims" were removed and then "open wall cavities and framing" were coated with a pigmented sealer. I am told this was Kilz Odorless Sealer – Regular and Aerosol. It is my understanding that the house was also treated with the Unsmoke product "Last Resort," and Microban Disinfectant Spray Plus [Material Data Safety Sheets (MSDS)] attached for these products).

It is my opinion that these treatments would not significantly change the skunk spray thiols into non-odorous compounds or remove an appreciable amount of the thiols. The sealer was oil based paint (frequently termed a vapor barrier), and is designed prevent

Evaluation of the Proposed Remediation of Skunk Spray Contamination
& Recommendations for the Royal Residence, Highland Park, Il.
October 25, 2007

4

water from crossing into a room.  The skunk thiols are oily (hydrocarbon-like) and would not be excluded from crossing the Kilz Odorless Sealer "vapor barrier," but would readily be absorbed into this paint and then later released.  This application may slow the out gassing process.  The MSDS of Unsmoke's Last Resort lists isopropyl alcohol (aka rubbing alcohol) and fragrances as the main ingredient.  These will not neutralize (render odorless) the skunk spray thiols.  The final product used was Microban Disinfectant Spray Plus, a product designed to deactivate viruses and kill bacteria contains large amounts of isopropyl alcohol (see MSDS).  All of these products contain large amounts of volatile organic chemical that if not ventilated from the house would adversely affect the air quality.  In all cases they would have little or no effect on the reduction of skunk thiols from the house.

## PROPOSED REMEDIATION BY MARTIN L. KING
## (REPORT OF 20 SEPTEMBER 2007)

The report by Martin King indicates the purpose of the inspection that took place on August 31, 2007 was "to evaluate the intensity of (t)he odor, determine the source(s) and provide a protocol for its removal."  The following is an analysis of how the September 20, 2007 report generated from this inspection addresses three stated purposes, (1) evaluation of intensity of thiols present, (2) determination of the source(s) of the thiols and (3) a protocol for remediation.  Finally the report stated that "the possibility of a return of the odor can be precluded by appropriate remedial action at this time."

**(1) Evaluation of Odor Intensity.**  The report indicates that Mr. King evaluated a number of areas in the house and reported that no discernible skunk odor was present at any of the locations he checked.  It was not stated that Mr. King was trained in evaluation of odor perception or that he was able to detect skunk spray at the levels found in the house. Odor perception differs from individual to individual.  As an example, 40% of humans cannot detect the odor of hydrogen cyanide a compound that is supposed to smell like almonds.  The ability to detect different odors is similar to the variation of human fingerprints; every individual has a different genetic ability to detect different odors.

Evaluation of the Proposed Remediation of Skunk Spray Contamination
& Recommendations for the Royal Residence, Highland Park, Il.
October 25, 2007                                                                                                          5

**Some individuals cannot detect skunk odor.** The inability to perceive an odor is called an anosmia. Also, the concentration at which individuals can perceive the same odor varies from individual to individual. Thus, one individual may say an odor has disappeared, but others may be able to perceive the odor. (An extensive evaluation by a panel of investigators was done previously by Dr. A. R. Hirsch, see report of July 27, 2007 and addendum dated August 28, 2007, that documents skunk odor was present at this earlier evaluation.)

**(2) Source of Skunk Odor.** The King Report indicates that the original source of the skunk odor came from the skunk that had burrowed under the porch of the house. It gives no indication of where the skunk spray chemicals had diffused into the house. In the previous report by Dr. Hirsch it was stated that the "pervasive nature of the odor throughout most of the rooms of the house precluded investigators from identifying a specific site source," in rooms where the odor was detected. More importantly, no reference is made in the King report to evaluation of odor in the cavity between the brick veneer and the house's sheathing, the area that the proposed "remedial action be preformed to eliminate the possibility of any return of odor." This area is specified for treatment, but it was never determined that any odoriferous thiols are present at this location.

**(3) Proposed Remediation.** The proposed remediation in the 20 September 2007 report is based on material that is online on my website (Ref. 3), which was appended to Mr. King's report. The website basically contains the information in my two peer reviewed publications attached to this report that has been rewritten for the general public. The King Report proposes the further remediation that would "eliminate the possibility of any return on the odor." Option 1 in the report involves "opening the sheathing and treating the cavity between the brick veneer and the sheathing" with Krebaum's Formula. This approach will not work for the following reasons.

1. After this length of time the thiols in the skunk spray have diffused into the basic building materials of the house and very little, if any, of the thiols will be in the air cavity between the brick veneer and the sheathing.

Evaluation of the Proposed Remediation of Skunk Spray Contamination                    6
& Recommendations for the Royal Residence, Highland Park, Il.
October 25, 2007

2.  Krebaum's Formula only works when the thiols are dissolved in the 3% hydrogen
    peroxide, sodium bicarbonate solution.  If the thiols are trapped in the concrete,
    wood, etc. they will not come into contact with the neutralizing solution.

3.  Krebaum's Formula decomposes within a few minutes of preparation, so it will
    not continue to work as skunk thiols escape from the structure of the house at a
    later date.

4.  Krebaum's Formula will not penetrate the basic building material of the house
    and neutralize any thiols that are inside these structures.

5.  Treating this limited area will do nothing to remove skunk thiols in other parts of
    the house.

To summarize why Option 1 will not work – the source of the odor has not been
identified and the method recommended will only neutralize any of the skunk spray thiols
(if any) that are in the air space between the veneer and sheathing.  Skunk spray on the
inside of building materials will not be neutralized and will continue to be released at a
later date.

Option 2 of the report involves removal of the brick veneer and washing the outside of
the sheathing and foundation with Krebaum's Formula.  This would only neutralize any
of the thiols on the surface of the sheathing and not any dissolved in the materials that
make up the house.  For the same reasons why Option 1 will be ineffective, Option 2 will
be ineffective in the remediation of the odor.

**In reference to these two options, it is clear that Mr. King's statement "the
possibility of a return of the odor can be precluded by appropriate remedial action
at this time," is without any factual or scientific basis.**

Evaluation of the Proposed Remediation of Skunk Spray Contamination
& Recommendations for the Royal Residence, Highland Park, Il.
October 25, 2007

7

Finally I note that the King Report appends my web pages (Ref. 3), describing the ingredients in skunk spray, and indicates how to neutralize them on pets or on other surfaces. The following statement is from my website about neutralization solutions for skunk odor remediation: these solutions **"will not work for skunk spray that has drifted over a large area or is trapped in a house." This statement would apply to contamination of the Royal's house.**

## REMEDIATION RECOMMENDATIONS

From the Hirsch Report, it is clear that the skunk spray has permeated into the structure of the house. From here it will out-gas for an indeterminate period of time before it is at a level so low that it cannot be perceived. Dr. Hirsch after observing the contamination, has indicated this may take years to dissipate, and based on my knowledge and experience is correct. Other than waiting an indeterminate period of time, the only way to guarantee timely elimination the odor is to remove those parts of the house that have the thiols dissolved in them. This would include removal of the foundation, sub-floor, and brick veneer closest to the original contamination site. Removal of additional material (wood, particle board, paint) would be required because the skunk spray thiols have migrated throughout the house.

Evaluation of the Proposed Remediation of Skunk Spray Contamination                                   8
& Recommendations for the Royal Residence, Highland Park, Il.
October 25, 2007

# REFERENCES

1.  William F. Wood, "New Components in Defensive Secretion of the Striped
    Skunk, Mephitis mephitis."  .J. Chemical Ecology 16, 2057-2065 (1990).

2.  William F. Wood, "The History of Skunk Defensive Secretion Research,"
    William F. Wood, The Chemical Educator, 4, 44-50 (1999).
    (DOI10.1007/s00897990286a1999.)  This is available on line at:
    http://chemeducator.org/sbibs/s0004002/s00040044.htm

3.  http://www.humboldt.edu/~wfw2/deodorize.shtml and
    http://www.humboldt.edu/~wfw2/chemofskunkspray.html.  These web pages
    were a popularization of the previous two references.

*Journal of Chemical Ecology, Vol. 16, No. 6, 1990*

# NEW COMPONENTS IN DEFENSIVE SECRETION OF THE STRIPED SKUNK, *Mephitis mephitis*

WILLIAM F. WOOD

*Department of Chemistry*
*Humboldt State University*
*Arcata, California 95521*

(Received September 11, 1989; accepted November 27, 1989)

**Abstract**—GC-MS analysis of the anal sac secretion of the striped skunk (*Mephitis mephitis*), shows seven major components: (*E*)-2-butene-1-thiol, 3-methyl-1-butanethiol, *S*-(*E*)-2-butenyl thioacetate, *S*-3-methylbutanyl thioacetate, 2-methylquinoline, 2-quinolinemethanethiol, and *S*-2-quinolinemethyl thioacetate. The following compounds previously reported from this secretion could not be confirmed: bis(2-butenyl) sulfide, (*E*)-2-Butenyl methyl disulfide, (*E*)-2-butenyl propyl sulfide, butyl 3-methylbutyl disulfide, and 2-butenyl butyl disulfide.

**Key Words**—*Mephitis mephitis*, striped skunk, anal sac secretion, (*E*)-2-butene-1-thiol, 3-methyl-1-butanethiol, *S*-(*E*)-2-butenyl thioacetate, *S*-3-methylbutanyl thioacetate, 2-methylquinoline, 2-quinolinemethanethiol, *S*-2-quinolinemethyl thioacetate, (*E*)-2-butenyl methyl disulfide, (*E*)-2-butenyl propyl sulfide, butyl 3-methylbutyl disulfide, 2-butenyl butyl disulfide, bis(2-butenyl) sulfide.

## INTRODUCTION

The chemical analysis of the anal sac secretion from the striped skunk, *Mephitis mephitis*, has been the subject of many previous studies. Aldrich (1896) identified 1-butanethiol as a major component of this malodorous secretion, and a study by Aldrich and Jones (1897) identified 2-methylquinoline (I) (Figure 1). Stevens (1945) found it to contain more than 2% dicrotyl sulfide [bis(2-butenyl) sulfide, II]. Andersen and Bernstein (1975) reported (*E*)-2-butene-1-thiol (III), 3-methyl-1-butanethiol (IV), and (*E*)-2-butenyl methyl disulfide (V) as the major components of this secretion using NMR and gas chromatography and showed 1-butanethiol was not a major component. A subsequent study by Andersen and

0098-0331/90/0600-2057$06.00/0 © 1990 Plenum Publishing Corporation

I, R = H

XI, R = SH

XII, R = S–C–CH$_3$ (with O above)

XIV, R = SCH$_2$CH$_2$CH$_3$

II, R = CH$_2$CH=CHCH$_3$

III, R = H

V, R = SCH$_3$

VI, R = CH$_2$CH$_2$CH$_3$

VIII, R = SCH$_2$CH$_2$CH$_3$

X, R = C–CH$_3$ (with O above)

IV, R = H

VII, R = C–CH$_3$ (with O above)

IX, R = SCH$_2$CH$_2$CH$_2$CH$_3$

XIII, R = CH$_2$CH$_2$CH$_3$

XV, R = SCH$_3$

XVI

XVII

XVIII

FIG. 1. Structures of compounds discussed in article.

coworkers used gas chromatography–mass spectrometry (GC-MS) to investi-
gate the minor components of this defensive secretion (Andersen et al., 1982).
In this latter study, Andersen and coworkers were unable to confirm the pres-
ence of (E)-2-butenyl methyl disulfide, but (E)-2-butenyl propyl sulfide (VI)
and S-3-methylbutyl thioacetate (VII) were reported at 7% and 1.4% of the
volatiles, respectively. They confirmed Stevens' identification of dicrotyl sul-
fide [bis(2-butenyl)sulfide], finding 1.1% of this compound. Furthermore, three
disulfides, 2-butenyl butyl disulfide (VIII), butyl 3-methylbutyl disulfide (IX),
and an isomer of butyl 3-methylbutyl disulfide, were reported to make up 10.7%
of the volatiles.

   In the present study, using GC-MS, seven components were found to make
up the bulk of the volatiles in this secretion, including three that had not pre-

viously been reported. These new compounds are S-(E)-2-butenyl thioacetate (X), 2-quinolinemethanethiol (XI), and S-2-quinolinemethyl thioacetate (XII). A number of compounds previously identified could not be confirmed. These are (E)-2-butenyl methyl disulfide, (E)-2-butenyl propyl sulfide, bis(2-butenyl) sulfide, and the three disulfides previously identified by GC-MS (VIII, IX, and the isomer of IX).

Several other compounds were prepared during the current study. 3-Methylbutyl propyl sulfide (XIII) and propyl 2-quinolinemethyl sulfide (XIV), compounds with the same molecular weights as compounds VII and XII, were prepared since Andersen and coworkers had identified a propyl sulfide derivative (VI) from this secretion. 3-Methylbutyl methyl disulfide (XV) was prepared as a by-product in the synthesis of compound V from anal gland secretion. Bis[(E)-2-butenyl] disulfide (XVI), (E)-2-butenyl 3-methylbutyl disulfide (XVII), and bis(3-methylbutyl) disulfide (XVIII) were prepared to show disulfides VIII and IX were not destroyed during analysis.

## METHODS AND MATERIALS

All skunks were from Humboldt County, California, and were obtained alive from a professional trapper who removed them from areas where they were a nuisance. Two were male and two were female. They were sacrificed with diethyl ether and within an hour a sample of the defensive secretion was obtained by inserting a needle into the anal sac and withdrawing the contents. A portion of this secretion was immediately placed in diethyl ether and analyzed by GC-MS.

GC-MS was done on a Hewlett Packard gas chromatograph (model 5890) fitted with a mass selective detector (model 5970) using a 12-m cross-linked methyl silicone capillary column. The gas chromatograph was programmed so the oven temperature was kept at 40°C for 4 min, then increased to a final temperature of 250°C at a rate of 30°C/min and kept at this temperature for 4 min. Mass spectral fragments below $m/z = 35$ were not recorded. An isotope peak ($M^+ + 2$) was observed for all sulfur-containing compounds that had a molecular ion. The relative amount of each component is reported as the percent of the total ion current.

FT-IR was done on a Perkin-Elmer 1600 and NMR on a Perkin-Elmer R12A using TMS as an internal standard.

3-Methyl-1-butanethiol, 2-methylquinoline, and 1-chloro-2-butene were purchased from Aldrich Chemical Co. 2-Bromomethylquinoline was prepared from 2-methylquinoline by conversion to 2-tribromomethylquinoline (Hammick, 1923) and subsequent reduction with freshly prepared tin(II) bromide (Brown et al., 1951).

(E)-2-Butenyl methyl disulfide (V) and 3-methylbutyl methyl disulfide (XV).
To 5 mg of skunk anal sac secretion (source of III and IV) in 50 ml of $Et_2O$ at
0°C was added 1.0 ml of methanethiol and 100 mg of $I_2$. The solution was
stirred for 15 min at 0°C. It was washed with 25 ml of $H_2O$ and dried ($Na_2SO_4$).
GC-MS analysis of this solution showed three compounds that were not in the
original solution: dimethyl disulfide ($RT = 2.00$ min, $M^+$ at $m/z = 94$); com-
pound V at 6.62 min, EI-MS, $m/z = 134(M^+, 18)$, 80(13), 79(6), 64(6),
55(100), 53(9), 47(6), 45(18), 43(10), and 39(20); and compound XV at 7.10
min, EI-MS, $m/z = 152(2)$, 150($M^+$, 18), 80(11), 79(6), 71(12), 55(8), 45(12),
43(100), 41(18), and 39(9).

S-(E)-2-Butenyl propyl sulfide (VI). To 11.3 g (0.1 mol) of 1-chloro-2-
butene (80%, predominantly the *trans* isomer) in 25 ml of MeOH was added
7.6 g (0.1 mol) of thiourea. After refluxing for 16 hr, 8.0 g (0.2 mol) of NaOH
was added over 10 min and refluxing was continued for 1 hr. 1-Bromopropane
(24.6 g, 0.2 mol) was added dropwise and then refluxed for 1 hr. The reaction
mixture was added to 100 ml of $Et_2O$ and the solids removed by filtration. The
liquid was washed with $2 \times 25$ ml of 5% $NaHCO_3$, dried ($Na_2SO_4$), and con-
centrated in vacuo. Yield 7.0 g. The spectral properties of this liquid are 60
MHz [$^1H$]NMR ($CCl_4$) $\delta = 5.4$ (m, 2H), 2.95(d, 2H), 2.3(t, 2H), 1.65(d, 3H),
1.45(m, 2H), and 0.95(t, 3H); FT-IR (neat) 3020, 2962, 2934, 2872, 1649,
1454, 1377, 1224, 1094, and 964 $cm^{-1}$; and EI-MS $m/z = 130(M^+, 25)$, 88(7),
87(13), 55(100), 54(35), 53(13), 47(13), 45(18), 41(18), and 39(23).

S-3-Methylbutyl thioacetate (VII). To 1.04g (10 mmol) of 3-methyl-1-
butanethiol in 50 ml of 95% EtOH was added 0.40 g (10 mmol) of NaOH. The
mixture was stirred on a steam bath until the NaOH had dissolved, then cooled
in an ice bath, and 2.4 g (30 mmol) of acetyl chloride was added dropwise to
the stirred solution. The solution was stirred for 15 min and then the solvent
was removed in vacuo. The residue was extracted with 50 ml of $Et_2O$. This
solution was washed with $2 \times 25$ ml of 5% $NaHCO_3$, dried ($Na_2SO_4$), filtered,
and evaporated to dryness. Yield 0.2 g. EI-MS, $m/z = 146(M^+, 20)$, 0.4), 103(2),
86(12), 70(13), 69(6), 61(5), 55(8), 47(3), 43(100), 41(11), and 39(6).

S-(E)-2-Butenyl thioacetate (X). To 11.3 g (0.1 mol) of 1-chloro-2-butene
(80%, predominantly the *trans* isomer) in 25 ml of MeOH was added 7.6 g
(0.1 mol) of thiourea. After gently refluxing for 16 hr, 8.0 g (0.2 mol) of NaOH
was added over 10 min and refluxing was continued for 1 hr. The mixture was
placed in an ice bath and was stirred while 15.7 g (0.20 mol) of acetyl chloride
was added dropwise over 15 min. The mixture was stirred for 30 min and then
concentrated in vacuo. The residue was extracted with $2 \times 50$ ml of $Et_2O$. This
solution was washed with 5% $NaHCO_3$, dried ($Na_2SO_4$), and concentrated in
vacuo. Yield 3.5 g. The spectral properties of this liquid are 60 MHz [$^1H$]NMR
($CCl_4$) $\delta = 5.45$(m, 2H), 3.35(d, 2H), 2.2(s, 3H), and 1.65(d, 3H); FT-IR
(neat) 3023, 2965, 2937, 2917, 1694, 1451, 1354, 1228, 1133, and 963 $cm^{-1}$;

and EI-MS $m/z = 130$ ($M^+$, 10), 88(21), 87(9), 59(5), 55(34), 54(10), 53(9), 50(17), 43(100), and 39(14).

*2-Quinolinemethanethiol (XI).* To 3.6 g (0.016 mol) of 2-bromo-methylquinoline in 50 ml of 95% ethanol was added 2.3 g (0.03 mol) of thio-urea. The mixture was refluxed 3 hr, cooled, and the solvent removed in vacuo to give an oil. To the oil was added 50 ml of $H_2O$ and 2.0 g (0.05 mol) of NaOH. This was refluxed for 3 hr, cooled, and washed with 3 × 25 ml of $Et_2O$. The aqueous solution was carefully neutralized to pH 7 with 6 M HCl and then extracted with 3 × 25 ml of $Et_2O$. The $Et_2O$ was removed in vacuo to give 2.0 g of product. EI-MS, $m/z = 176(11)$, 175($M^+$, 100), 174(71), 142(10), 130(37), 129(55), 128(26), 116(11), 115(25), and 102(11).

*S-2-Quinolinemethyl thioacetate (XII).* To 175 mg (1.0 mmol) of X in 10 ml of 95% EtOH was added 40 mg (1.0 mmol) of NaOH, and the solution was refluxed until the NaOH had dissolved. The solution was cooled to room temperature, and 393 mg (5.0 mmol) of acetyl chloride was added dropwise and stirred for 15 min. The solvent was removed in vacuo and the residue extracted with 10 ml of $Et_2O$. After being washed with 5 ml of 5% $NaHCO_3$, the $Et_2O$ solution was dried ($Na_2SO_4$), and the solvent removed in vacuo. Yield 94 mg. EI-MS, $m/z = 217(M^+$, 3), 176(10), 175(55), 174(100), 142(8), 130(14), 129(20), 128(20), 115(12), and 43(48).

*3-Methylbutyl propyl sulfide (XIII).* To 1.04 g (10 mmol) of 3-methyl-1-butanethiol in 50 ml of 95% EtOH was added 0.40 g (10 mmol) of NaOH. The mixture was refluxed until the NaOH had dissolved and then 6.2 g (50 mmol) of 1-bromopropane was added dropwise over several minutes. The solution was gently refluxed for 1 hr, cooled, and solvent removed in vacuo. The residue was extracted with 50 ml of $Et_2O$. This solution was dried ($Na_2SO_4$), filtered, and evaporated to dryness. Yield 0.4 g. EI-MS, $m/z = 146(M^+$, 26), 103(10), 89(12), 70(100), 61(37), 55(50), 47(21), 43(48), 42(34), and 41(48).

*Propyl 2-quinolinemethyl sulfide (XIV).* To 175 mg (1.0 mmol) of XI in 10 ml of 95% EtOH was added 40 mg (1.0 mmol) of NaOH, and the solution was refluxed until the NaOH had dissolved. Then 1.23 g (10.0 mmol) of 1-bromopropane was added and the mixture refluxed for 1 hr. On cooling, the volatiles were removed in vacuo, and the residue was extracted with 10 ml of $Et_2O$. After being washed with 5 ml of 5% $NaHCO_3$, the $Et_2O$ solution was dried ($Na_2SO_4$), and the solvent removed in vacuo. Yield 180 mg. EI-MS $m/z = 174(3)$, 144(9), 143(100), 140(4), 129(3), 128(7), 116(6), 115(9), 101(3), and 89(4).

*Bis[(E)-2-butenyl] disulfide (XVI), (E)-2-Butenyl 3-methylbutyl disulfide (XVII), and Bis(3-methylbutyl) disulfide (XVIII).* To 5 mg of skunk anal sac secretion in 50 ml of $Et_2O$ was added 100 mg of $I_2$. After being stirred for 15 min, the solution was washed with 25 ml of $H_2O$ and dried ($Na_2SO_4$). GC-MS analysis showed the thiols (III and IV) had completely reacted to give the fol-

lowing disulfides: compound XVI at 8.42 min, EI-MS $m/z$ = 174($M^+$, 5), 128(2), 122(2), 120(15), 56(4), 55(100), 53(7), 46(1), 45(10), and 38(12); compound XVII at 8.71 min, EI-MS $m/z$ = 190($M^+$, 7), 136(12), 71(10), 56(4), 55(100), 53(6), 45(7), 43(30), 41(14), and 39(12); and compound XVIII at 8.97 min, EI-MS $m/z$ = 207(2), 206($M^+$, 13), 136(4), 103(3), 102(3), 71(35), 55(11), 43(100), 41(19), and 39(8).

($E$)-2-Butene-1-thiol from the skunk's secretion has the following mass spectrum; EI-MS $m/z$ = 88(37), 73(6), 55(100), 54(42), 53(25), 51(8), 50(8), 47(13), 45(35), and 39(52).

### RESULTS AND DISCUSSION

GC-MS analysis of a diethyl ether solution of the anal sac secretion from four skunks showed seven volatile compounds at a concentration greater than 1%, that totaled 96–98% of the volatiles. These compounds and their amounts (maximum variation) are ($E$)-2-butene-1-thiol (38–44%), 3-methyl-1-butane-thiol (18–26%), ($S$)-($E$)-2-butenyl thioacetate (12–18%), ($S$)-3-methylbutanyl thioacetate (2–3%), 2-methylquinoline (4–11%), 2-quinolinemethanethiol (3–12%), and ($S$)-2-quinolinemethyl thioacetate (1–4%). The identification of these compounds is discussed in order of their gas chromatographic retention time ($RT$).

($E$)-2-Butene-1-thiol ($RT$ = 1.73 min) and 3-methyl-1-butanethiol ($RT$ = 2.62 min) were reported previously from this secretion. ($E$)-2-Butene-1-thiol was identified by its mass spectrum. 3-Methyl-1-butanethiol from the secretion had the same retention time and mass spectrum as an authentic sample.

The third most abundant component ($RT$ = 6.16 min) was identified as $S$-($E$)-2-butenyl thioacetate. The mass spectrum of this compound has a molecular ion at $m/z$ = 130 and a base peak at $m/z$ = 43, indicating it may contain an acetyl group ($CH_3CO$—) attached to a thiobutenyl group. A possible candidate for this compound, $S$-($E$)-2-butenyl thioacetate, was prepared and had an identical retention time and mass spectrum as the natural compound. A strong FT-IR absorption at 963 cm$^{-1}$ indicated a *trans* geometry for the double bond. This component appears to have been identified previously as ($E$)-2-butenyl propyl sulfide, a compound with the same molecular weight and similar GC retention time as $S$-($E$)-2-butenyl thioacetate (Andersen et al., 1982). A synthetic sample of this sulfide had a different retention time (6.29 min) and a different mass spectrum from the compound in the secretion.

It is also likely that $S$-($E$)-2-butenyl thioacetate has previously been identified as ($E$)-2-butenyl methyl disulfide (Andersen and Bernstein, 1975). The disulfide was identified by comparison to the GC retention time and NMR spectrum of a synthetic sample. The reported NMR spectrum of the disulfide is

almost identical to the spectrum of $S$-$(E)$-2-butenyl thioacetate. When $(E)$-2-butenyl methyl disulfide was not found during one investigation, it was suggested that "it does not survive the high injector temperature" (Andersen et al., 1982). To check this, a sample of this disulfide was prepared by treating the anal sac secretion (source of III and IV) with methanethiol and iodine in an ether solution cooled to 0°C. GC-MS analysis of the reaction mixture showed three compounds not found in the skunk's secretion. These were identified as dimethyl disulfide ($RT$ = 2.00 min), $(E)$-2-butenyl methyl disulfide ($RT$ = 6.62 min), and 3-methylbutyl methyl disulfide ($RT$ = 7.10 min) by their mass spectra. Thus, it is clear that $(E)$-2-butenyl methyl disulfide is not a major component in this secretion.

$S$-3-Methylbutyl thioacetate ($RT$ = 6.56 min) was identified previously by comparison to a spectrum in the NBS Library (Andersen et al., 1982). A synthetic sample of this compound had an identical mass spectrum and retention time to that found in the skunk secretion. 3-Methylbutyl propyl sulfide, a compound with the same molecular weight that might be expected to give a similar mass spectrum was prepared. It had a different retention time (6.77 min) and mass spectrum.

2-Methylquinoline ($RT$ = 8.35 min) has been previously reported from this secretion and was identified by comparison to an authentic sample.

The sixth compound had a retention time of 9.85 min and an odd mass molecular ion (base peak) at $m/z$ = 175, suggesting that it contained a nitrogen. Analysis of the spectrum showed fragments from the loss of SH ($M^+$−33) and a $CH_2S$ ($M^+$−46). Moreover, it had a fragmentation pattern similar to 2-methylquinoline. This suggested it might be 2-quinolinemethanethiol. A synthetic sample of this compound was prepared from 2-bromomethylquinoline and thiourea followed by basic hydrolysis. It had the same retention time and mass spectrum as the natural compound. This compound previously has been prepared by other methods (Yousif et al., 1982; Sturis et al., 1985).

Finally, the last compound had a retention time of 10.89 min. The mass spectrum had a weak molecular ion at $m/z$ = 217, a base peak at $m/z$ = 174 (loss of 43 amu), and a fragmentation pattern similar to 2-quinolinemethanethiol, suggesting this compound is either an $S$-acetyl or $S$-propyl derivative of 2-quinolinemethanethiol. Both compounds were prepared. The acetate derivative, $S$-2-quinolinemethyl thioacetate, had identical GC-MS properties to the compound found in the secretion. The retention time (10.76 min) and mass spectrum of the propyl derivative, propyl 2-quinolinemethyl sulfide, were different.

Bis(2-butenyl) sulfide, reported by Stevens (1945) to make up more than 2% of the secretion and reconfirmed by Andersen and coworkers (1982) at 1.1%, was not observed in fresh secretion. An examination of all minor components in the secretion failed to find a compound with a molecular ion at $m/z$ = 142.

2064                                                                    WOOD

This compound should have survived the analysis, as (E)-2-butenyl propyl sulfide was easily detected. The three butyl-substituted disulfides (VIII, IX, and an isomer of IX) reported in the GC-MS study of Andersen et al. (1982) also were not seen in the present study. To check if disulfides similar to VIII and IX might be destroyed during the GC-MS analysis, a sample of skunk's secretion in diethyl ether was oxidized with $I_2$. GC-MS analysis showed the thiols (III and IV) had reacted completely to give three disulfides, bis [(E)-2-butenyl] disulfide (RT = 8.41 min), (E)-2-butenyl 3-methylbutyl disulfide (RT = 8.71 min), and bis(3-methylbutyl) disulfide (RT = 8.97 min). Thus, the butyl-substituted disulfides would have been detected in the present study. [(E)-2-Butenyl 3-methylbutyl disulfide was observed as a minor component (0.2–1.6%) in all of the samples.]

There may be several explanations why compounds previously identified could not be confirmed in this study. Some may be artifacts caused by bacterial action, air oxidation, or other factors during the isolation procedures. Stevens identified bis(2-butenyl) sulfide from secretion that had been stored for several months, treated with ethanolic mercuric chloride, and distilled three times. When Andersen and coworkers confirmed the identification of this compound and identified the disulfides (VIII and IX), they used a stored solution that was distilled (80°C, 0.2 mm) before analysis. Alternatively, the defensive secretion of skunks in New England may differ from those of skunks in northern California.

In conclusion, with the exception of 2-methylquinoline, the major volatile components of the striped skunk's defensive secretion identified in this study exist as thiols or as acetate derivatives of these thiols. Possibly, they are biosynthesized as the thioacetates and then hydrolyzed to the thiol, since thioacetates are used extensively in many biosynthetic pathways.

*Acknowledgments*—Jace Comfort, Animal Damage Control Specialist, USDA, is thanked for supplying the skunks used in this study. William Stanley, Assistant Curator, Vertebrate Museum, Humboldt State University, is thanked for confirming the identification of the skunks.

### REFERENCES

ALDRICH, T.B. 1896. A chemical study of the secretion of the anal glands of *Mephitis mephitica* (common skunk), with remarks on the physiological properties of this secretion. *J. Exp. Med.* 1:323–340.

ALDRICH, T.B., and JONES, W. 1897. α-Methyl-quinoline as a constituent of the secretion of the anal glands of *Mephitis mephitica*. *J. Exp. Med.* 2:439–452.

ANDERSEN, K.K., and BERNSTEIN, D.T. 1975. Some chemical constituents of the scent of the striped skunk (*Mephitis mephitis*). *J. Chem. Ecol.* 1:493–499.

ANDERSEN, K.K., BERNSTEIN, D.T., CARET, R.L., and ROMANCZYK, L.J., JR. 1982. Chemical constituents of the defensive secretion of the striped skunk (*Mephitis mephitis*). *Tetrahedron* 38:1965–1970.



## 5. Fire Fighting Measures

| Flammability<br>Yes [X] No [ ] | If yes, under which<br>conditions? | Flammable liquid. Potential fire hazard when exposed to<br>excessive heat, flame or other souces of ignition. |
|---|---|---|
| Flashpoint:<br>70 °F      (21.1 °C) | Upper flammable limit<br>% by volume  12.0 @ 77 °F (25 °C) | Lower flammable limit<br>% by volume     2.0 @ 77 °F (25 °C) |
| Autoignition temperature<br>        n. av. | Hazardous combustion products<br>Carbon monoxide and/or carbon diox-<br>ide | Explosion data<br>        n. ap. |

| Means of extinction:   Apply alcohol type or all purpose foam for large fires. Use dry chemical media or carbon dioxide<br>extinguishers for small fires. SCBA and bunker gear for fire department personnel. |
|---|

## 6. Accidental Release Measures

| Eliminate all sources of ignition.<br>Wear personal protective equipment.<br>Do not allow spill to reach watercourse or sewers.<br>Contain spill with absorbent mats or booms or inert materials such as sand. Material should be readily available in the<br>workplace.<br>Collect and store waste materials in suitable containers for disposal i.e. metal drums. |
|---|

## 7. Handling & Storage

| Use non sparking tools and explosion proof mechanical equipment when working with this liquid i.e. pumps and sprayers.<br>Extinguish all sources of ignition in the work area. If the product is stored in metal containers the container must be ground-<br>ed and bonded prior to dispensing the liquid. To prevent vapor escaping to the atmosphere keep all containers closed or<br>covered. The product should be stored in a separate room equipped for flammable liquid storage or small volumes may be<br>stored in a flammable liquid cabinet. Check local Health and Safety Authority for the volume limits in these situations. Eye-<br>wash stations are required in the workplace. If eye irritation is encountered the use of a full facepiece respirator is recom-<br>mended. Mechanical ventilation is recommended in enclosed workspaces. Area should be evacuated of all non essential<br>personnel prior to application of product. |
|---|

## 8. Exposure Controls & Personal Protection

| Personal Protective Equipment | | |
|---|---|---|
| Gloves<br>Natural Rubber | Respirator<br>NIOSH TC-23C organic vapor respira-<br>tor or equivalent | Eye<br>Goggles or full face respirator |
| Footwear<br>n. ap. | Clothing<br>Coveralls or equivalent | Other<br>n. ap. |

| Exposure Guidelines | | | | |
|---|---|---|---|---|
| *none established for product* | | | | |
| | OSHA | | ACGIH | |
| | TWA | STEL | TWA | STEL |
| 2-propanol | 400 ppm | 500 ppm | 400 ppm | 500 ppm |

## 9. Physical and Chemical Properties

| Physical state Liquid | Odor and appearance Light yellow color, strong floral aroma | |
|---|---|---|
| Odor threshold (ppm) n. av. | Vapor pressure (mm Hg) 62 | Vapor density (Air=1) n. av. |
| Evaporation (butyl acetate = 1)    45 | Boiling point 179.6 °F (82 °C) | Freezing point n. av. |
| pH 6.0 | Specific gravity 0.89 | Coefficient water/oil distribution n. av. |
| Solubility in water n. av. | Viscosity n. av. | % Volatiles (by weight) 100% |

## 10. Stability and Reactivity

| Chemical Stability Yes [X] No [ ] | If no, under which conditions? | |
|---|---|---|
| Incompatibility with other substances Yes [X] No [ ] | If yes, under which conditions? | Avoid contact with strong oxidizing agents, inorganic acids. |
| Reactivity, and under what conditions? | Stable under normal conditions. | |
| Hazardous decomposition products? | Carbon monoxide and/or carbon dioxide as combustion by-products. | |

## 11. Toxicological Information

Route of Entry    Skin Contact [X]    Skin Absorption [ ]    Eye Contact [X]    Inhalation [X]    Ingestion [X]

No toxicity studies have been conducted for the product.

| Carcinogenicity No | Mutagenicity No | Teratogenicity No | Reproductive toxicity No |
|---|---|---|---|
| Synergistic products No | Sensitization No | Neurotoxicity No | Target organs Eyes and Skin |

## 12. Ecological Information

n. av.



## 13. Disposal Considerations

Do not dispose of product in storm or sanitary sewer systems.
Do not allow discharge into groundwater or a watercourse.
If product is to be disposed of, contact a licensed or registered waste disposal firm to incinerate the product.

## 14. Transport Information

Shipping Name:   FLAMMABLE LIQUIDS, N.O.S. [Contains: 2-Propanol]
Hazard Class:   3 (Packing Group II)
UN Identification #:   1993
Packing Group II Quarts ship as ORM-D Consumer Commodity in the United States

## 15. Regulatory Information

This material safety data sheet has been prepared in accordance with the requirements of the OSHA Hazard Communication Standard (29 CFR 1910.1200) and the Hazardous Products Act (Can.) and the Controlled Products Regulations (Can.) This product has been classified in accordance with the hazard criteria of the CPR (Can.) and the MSDS contains all the information required by the CPR (Can.).

This product is classed as a **flammable liquid and as a skin and eye irritant** - 29 CFR 1910.1200 and Controlled Products Regulations (Can.)

WHMIS classification **B2 D2B**

This product is not subject to the reporting requirement of Section 313 of Title III of Superfund Amendments and Reauthorization Act (SARA) 1986 and 40 CFR part 372.

## 16. Other Information

This product is a commercial deodorizing chemical.

For chemical emergency during transportation call INFOTRAC (US) **1-800-535-5053** (INT'L) **1-352-323-3500**

Prepared by: II Rep-Z, Inc., Coraopolis, PA / Cliff Zlotnik    Phone No: 1-412-264-8340    Date: July 24, 2006

Abbreviations:
n. av. = not available
mm Hg = millimeters of Mercury
COC = Cleveland Open Cup
LD = Lethal Dose

n. ap. = not applicable
PMCC = Pensky Martens Closed Cup
TWA = Time Weighted Average
LC = Lethal Concentration

ppm = parts per million
TCC = Tagliabue Closed Cup
STEL = Short Term Exposure Limit
CS = centistokes

This information is furnished without warranty, expressed or implied except that it is accurate to the best knowledge of II Rep-Z, Inc. The data and information on this sheet relates only to the specific material designated herein. II Rep-Z, Inc. assumes no legal responsibility for use or reliance upon this data.

🖨 PRINT      🔍 GLOSSARY

**View MSDS :   1   2   3   4   5   6   7   8   9   10   11   12   13   14  .15   16**

## SECTION 1 - PRODUCT AND COMPANY IDENTIFICATION



|  |  |
|---|---|
| Product Name: | **KILZ® Odorless** |
| MSDS Manufacturer Number: | 1004 |
| Manufacturer Name: | Masterchem Industries LLC |
| Address: | 3135 Old Highway M<br>Imperial, MO 63052-2834 |
| General Phone Number: | (636) 942-2510 |
| General Fax Number: | (636) 942-3663 |
| Customer Service Phone Number: | (800) 325-3552 |
| CHEMTREC: | For emergencies in the US, call CHEMTREC: 800-424-9300 |
| Canutec: | In Canada, call CANUTEC: (613) 996-6666 (call collect) |
| MSDS Creation Date: | 06/26/2006 |
| MSDS Revision Date: | 05/09/2007 |

NFPA
2
1   0
NA

**HMIS**

| Health Hazard | 1 |
| Fire Hazard | 2 |
| REACTIVITY | 1 |
| Personal Protection | x |

\* Chronic Health Effects:

## SECTION 2 - COMPOSITION/INFORMATION ON INGREDIENTS

| Chemical Name | CAS# | Ingredient Percent |
|---|---|---|
| Anhydrous aluminum silicate | 66402-68-4 | 5 - 10 by weight |
| Titanium dioxide | 13463-67-7 | 5 - 10 by weight |
| Acrylic polymer | Proprietary | 5 - 10 by weight |
| Carbonic acid calcium salt | 471-34-1 | 10 - 30 by weight |
| Heavy Hydrotreated Naphtha (Petroleum) | 64742-48-9 | 10-30 by weight |
| Nepheline Syenite | 37244-96-5 | 10 - 30 by weight |
| Non-hazardous ingredients | | 30-60 by weight |
| Triethylene glycol bis(2-ethylhexanoate) | 94-28-0 | 1 - 5 by weight |
| Palygorskite | 12174-11-7 | 0.1-1 by weight |

## SECTION 3 - HAZARDS IDENTIFICATION

| | |
|---|---|
| Emergency Overview: | Combustible. Irritant. |
| Potential Health Effects: | |
| Eye: | May cause irritation. |
| Skin: | May cause irritation. |
| Inhalation: | Prolonged or excessive inhalation may cause respiratory tract irritation. |
| Ingestion: | Harmful if swallowed. Ingestion can cause nausea, vomiting, diarrhea and gastrointestinal irritation. |

10/17/2007 01:45 PM

| | |
|---|---|
| Chronic Health Effects: | Prolonged or repeated contact can result in defatting and drying of the skin, which may result in skin irritation and dermatitis (rash). Repeated or prolonged inhalation may cause toxic effects. |
| Signs/Symptoms: | Overexposure can cause headaches, dizziness, nausea, and vomiting. |
| Target Organs: | Eyes. Skin. Respiratory system. Digestive system. Central nervous system. Kidney. |
| Aggravation of Pre-Existing Conditions: | May aggravate pre-existing respiratory disorders, allergy, eczema, or skin conditions. |

## SECTION 4 - FIRST AID MEASURES

| | |
|---|---|
| Eye Contact: | Immediately flush eyes with plenty of water for 15 to 20 minutes. Get medical attention, if irritation or symptoms of overexposure persists. |
| Skin Contact: | Immediately wash skin with soap and plenty of water. Get medical attention if irritation develops or persists. |
| Inhalation: | If inhaled, remove to fresh air. If not breathing, give artificial respiration or give oxygen by trained personnel. Seek immediate medical attention. |
| Ingestion: | If swallowed, do NOT induce vomiting. Call a physician or poison control center immediately. Never give anything by mouth to an unconscious person. |
| Other First Aid: | Due to possible aspiration into the lungs, DO NOT induce vomiting if ingested. Provide a glass of water to dilute the material in the stomach. If vomiting occurs naturally, have the person lean forward to reduce the risk of aspiration. |

## SECTION 5 - FIRE FIGHTING MEASURES

| | |
|---|---|
| Flammable Properties: | Combustible liquid. |
| Flash Point: | 104°F (40°C) |
| Flash Point Method: | TCC |
| Lower Flammable/Explosive Limit: | 1% |
| Upper Flammable/Explosive Limit: | 7% |
| Fire Fighting Instructions: | Combustible. Cool fire-exposed containers using water spray. |
| Extinguishing Media: | Use alcohol foam, carbon dioxide, dry chemical, or water fog or spray when fighting fires involving this material. |
| Protective Equipment: | As in any fire, wear Self-Contained Breathing Apparatus (SCBA), MSHA/NIOSH (approved or equivalent) and full protective gear. |
| Unusual Fire Hazards: | Combustible liquid. At elevated temperatures, vapors can form an ignitable mixture with air. Vapors can flow along surfaces to distant ignition sources and flash back. |

**NFPA Ratings:**

| | |
|---|---|
| NFPA Flammability: | 2 |
| NFPA Health: | 1 |
| NFPA Reactivity: | 0 |
| NFPA Other: | NA |

## SECTION 6 - ACCIDENTAL RELEASE MEASURES

| | |
|---|---|
| Personnel Precautions: | Use proper personal protective equipment as listed in section 8. |
| Environmental Precautions: | Avoid runoff into storm sewers, ditches, and waterways. |
| Spill Cleanup Measures: | Remove all sources of ignition. Absorb spill with inert material (e.g., dry sand or earth), then place in a chemical waste container. Provide ventilation. Collect spill with a non-sparking tool. Place into a suitable container for disposal. |

---

## SECTION 7 - HANDLING and STORAGE

| | |
|---|---|
| Handling: | Use with adequate ventilation. Avoid breathing vapor and contact with eyes, skin and clothing. Material will accumulate static charges which may cause an electrical spark (ignition source). Use proper grounding procedures. |
| Storage: | Store in a cool, dry, well ventilated area away from sources of heat, combustible materials, and incompatible substances. Keep container tightly closed when not in use. |
| Work Practices: | To reduce potential for static discharge, bond and ground containers when transferring material. |
| Special Handling Procedures: | Do not reuse containers without proper cleaning or reconditioning. |
| Hygiene Practices: | Wash thoroughly after handling. Avoid contact with eyes and skin. Avoid inhaling vapor or mist. |

---

## SECTION 8 - EXPOSURE CONTROLS, PERSONAL PROTECTION - EXPOSURE GUIDELINES

| | |
|---|---|
| Engineering Controls: | Use appropriate engineering control such as process enclosures, local exhaust ventilation, or other engineering controls to control airborne levels below recommended exposure limits. Good general ventilation should be sufficient to control airborne levels. Where such systems are not effective wear suitable personal protective equipment, which performs satisfactorily and meets OSHA or other recognized standards. Consult with local procedures for selection, training, inspection and maintenance of the personal protective equipment. |
| Eye/Face Protection: | Wear appropriate protective glasses or splash goggles as described by 29 CFR 1910.133, OSHA eye and face protection regulation, or the European standard EN 166. |
| Skin Protection Description: | Chemical-resistant gloves and chemical goggles, face-shield and synthetic apron or coveralls should be used to prevent contact with eyes, skin or clothing. |
| Respiratory Protection: | A NIOSH approved air-purifying respirator with an organic vapor cartridge or canister may be permissible under certain circumstances where airborne concentrations are expected to exceed exposure limits. Protection provided by air purifying respirators is limited. Use a positive pressure air supplied respirator if there is any potential for an uncontrolled release, exposure levels are not known, or any other circumstances where air purifying respirators may not provide adequate protection. |
| Other Protective: | Facilities storing or utilizing this material should be equipped with an eyewash facility and a safety shower. |

EXPOSURE GUIDELINES
**Titanium dioxide :**

| | |
|---|---|
| Guideline ACGIH: | TLV-TWA: 10 mg/m3 |
| Guideline OSHA: | OSHA-TWA: 15 mg/m3 |

**Carbonic acid calcium salt :**

| | |
|---|---|
| Guideline ACGIH: | TLV-TWA: 5 mg/m3 (Respirable) |
| Guideline OSHA: | OSHA-TWA: 5 mg/m3 Respirable |

---

## SECTION 9 - PHYSICAL and CHEMICAL PROPERTIES

| | |
|---|---|
| Physical State Appearance: | Liquid |
| Boiling Point: | No Data |
| Melting Point: | No Data |
| Density: | 12 - 14 Lbs./gal. |
| Vapor Density: | Greater than 1 (Air = 1) |
| pH: | No Data |

MSDS                                                                10/17/2007 01:45 PM

| Molecular Formula: | Mixture |
| Molecular Weight: | Mixture |
| Flash Point: | 104°F (40°C) |
| Flash Point Method: | TCC |

## SECTION 10 - STABILITY and REACTIVITY

| Chemical Stability: | Stable under normal temperatures and pressures. |
| Hazardous Polymerization: | Not reported. |
| Conditions to Avoid: | Heat, flames, ignition sources, and sparks. Incompatible materials. Freezing or temperatures below 32 deg. F. |
| Incompatible Materials: | Oxidizing agents. Strong acids and alkalis. |

## SECTION 11 - TOXICOLOGICAL INFORMATION

**Titanium dioxide :**
| RTECS Number: | XR2275000 |
| Skin: | Skin - Rabbit; Standard Draize Test : 300 ug/3D; (Intermittent) mild. (RTECS) |
| Ingestion: | Ingestion - Rat TDLo: 60 gm/kg; Gastrointestinal - hypermotility, diarrhea Gastrointestinal - other changes. (RTECS) |
| Carcinogenicity: | IARC: Group 2B: Possibly carcinogenic to humans |
| RTECS Number: | FF9335000 |

**Triethylene glycol bis(2-ethylhexanoate) :**
| RTECS Number: | MO7725000 |
| Skin: | Skin - Guinea pig; LD50: >20 mL/kg - Details of toxic effects not reported other than lethal dose value.. (RTECS) |
| Ingestion: | Ingestion - Rat LD50: 31 gm/kg - Behavioral - somnolence (general depressed activity) Gastrointestinal - other changes Kidney, Ureter, Bladder - other changes] |
| | Ingestion - Mouse LD50: >3200 mg/kg - Details of toxic effects not reported other than lethal dose value.. (RTECS) |

**Palygorskite :**
| Carcinogenicity: | IARC: Group 2B: Possibly carcinogenic to humans |

## SECTION 12 - ECOLOGICAL INFORMATION

| Ecotoxicity: | No ecotoxicity data was found for the product. |
| Environmental Fate: | No environmental information found for this product. |

## SECTION 13 - DISPOSAL CONSIDERATIONS

| Waste Disposal: | Consult with the US EPA Guidelines listed in 40 CFR Part 261.3 for the classifications of hazardous waste prior to disposal. Furthermore, consult with your state and local waste requirements or guidelines, if applicable, to ensure compliance. Arrange disposal in accordance to the EPA and/or state and local guidelines. |
| Important Disposal Information: | DANGER! Rags, steel wool and waste soaked with this product may spontaneously catch fire if improperly discarded or stored. To avoid a spontaneous combustion fire, immediately after use, place rags, steel wool or waste in a sealed, water-filled, metal container. Do not store unused product |

inside the home. For disposal guidance, contact your household refuse collection service, fire department, county or state government environmental control agency.

## SECTION 14 - TRANSPORT INFORMATION

| | |
|---|---|
| DOT Shipping Name: | Paint. |
| DOT UN Number: | UN1263 |
| DOT Hazard Class: | 3 |
| DOT Packing Group: | III |

## SECTION 15 - REGULATORY INFORMATION

**Anhydrous aluminum silicate :**

| | |
|---|---|
| TSCA Inventory Status: | Listed |
| Canada DSL: | Listed |

**Titanium dioxide :**

| | |
|---|---|
| TSCA Inventory Status: | Listed |
| State Regulations: | Listed in the New Jersey State Right to Know List. |
| | Listed in the Pennsylvania State Hazardous Substances List. |
| Canada DSL: | Listed |

**Carbonic acid calcium salt :**

| | |
|---|---|
| Canada DSL: | Listed |

**Heavy Hydrotreated Naphtha (Petroleum) :**

| | |
|---|---|
| TSCA Inventory Status: | Listed |
| Canada DSL: | Listed |

**Nepheline Syenite :**

| | |
|---|---|
| TSCA Inventory Status: | Not listed |
| Canada DSL: | Listed |

**Non-hazardous ingredients :**

| | |
|---|---|
| TSCA Inventory Status: | Contains calcium carbonate (CAS:1317-65-3), which is listed in the TSCA inventory. |

**Triethylene glycol bis(2-ethylhexanoate) :**

| | |
|---|---|
| TSCA Inventory Status: | Listed |
| Canada DSL: | Listed |

**Palygorskite :**

| | |
|---|---|
| TSCA Inventory Status: | Not listed |
| Canada DSL: | Not listed |
| | WARNING: This product contains a chemical known to the state of California to cause cancer and birth defects or other reproductive harm. |

## SECTION 16 - ADDITIONAL INFORMATION

| | |
|---|---|
| HMIS Fire Hazard: | 2 |
| HMIS Health Hazard: | 1 |
| HMIS Reactivity: | 1 |
| HMIS Personal Protection: | x |
| MSDS Creation Date: | 06/26/2006 |
| MSDS Revision Date: | 05/09/2007 |
| MSDS Revision Notes: | Quarterly and format update |
| MSDS Author: | Actio Corporation |

MSDS                                                                                      10/17/2007 01:45 PM

Disclaimer:              This Health and Safety Information is correct to the best of our knowledge and
                         belief at the date of its publication but we cannot accept liability for any loss,
                         injury or damage which may result from its use. We shall ensure, so far as is
                         reasonably practicable, that any revision of this Data Sheet is sent to all
                         customers to whom we have directly supplied this substance, but must point
                         out that it is the responsibility of any intermediate supplier to ensure that such
                         revision is passed to the ultimate user. The information given in the Data
                         Sheet is designed only as a guidance for safe handling, storage and the use of
                         the substance. It is not a specification nor does it guarantee any specific
                         properties. All chemicals should be handled only by competent personnel,
                         within a controlled environment. Should further information be required, this
                         can be obtained through the sales office whose address is at the top of this
                         data sheet.

Trademark:               The trademarks, service marks, graphics and logos used on this MSDS are
                         registered or unregistered trademarks of BEHR Process Corporation. All Rights
                         Reserved.

Copyright© 1996-2007 Actio Software Corporation. All Rights Reserved.

MSDS                                                                    10/17/2007 01:46 PM

 PRINT    🔍 GLOSSARY

---

**View MSDS :    1    2    3    4    5    6    7    8    9    10    11    12    13    14    15    16**
## SECTION 1 - PRODUCT AND COMPANY IDENTIFICATION

|  |  |
|---|---|
| Product Name: | KILZ® Odorless Aerosol |
| MSDS Manufacturer Number: | 1044 |
| Manufacturer Name: | Masterchem Industries LLC |
| Address: | 3135 Old Highway M Imperial, MO 63052-2834 |
| General Phone Number: | (636) 942-2510 |
| General Fax Number: | (636) 942-3663 |
| Customer Service Phone Number: | (800) 325-3552 |
| CHEMTREC: | For emergencies in the US, call CHEMTREC: 800-424-9300 |
| Canutec: | In Canada, call CANUTEC: (613) 996-6666 (call collect) |
| MSDS Creation Date: | 06/26/2006 |
| MSDS Revision Date: | 05/09/2007 |

NFPA
3
1    0
NA

HMIS

| Health Hazard |  |
|---|---|
| Fire Hazard | 3 |
| REACTIVITY | 0 |
| Personal Protection | X |

* Chronic Health Effects:

---

## SECTION 2 - COMPOSITION/INFORMATION ON INGREDIENTS

| Chemical Name | CAS# | Ingredient Percent |
|---|---|---|
| Titanium dioxide | 13463-67-7 | 5 - 10 by weight |
| Vinyl acrylate terpolymer | 118922-88-6 | 5 - 10 by weight |
| Nonane, all isomers | Mixture | 5-10 by weight |
| Nonanes | No data | 5 - 10 by weight |
| Non-hazardous ingredients |  | 30-60 by weight |
| Carbonic acid calcium salt | 471-34-1 | 10 - 30 by weight |
| 1-Nitropropane | 108-03-2 | 1-5 by weight |
| Naphtha (petroleum), light alkylate | 64741-66-8 | 10-30 by weight |
| Isobutane | 75-28-5 | 10-30 by weight |
| Propane | 74-98-6 | 10-30 by weight |
| Trimethyl-1, 3-pentanediol, diisobutyrate | 6846-50-0 | 1 - 5 by weight |
| Resin | Proprietary | 1 - 5 by weight |

---

## SECTION 3 - HAZARDS IDENTIFICATION

| Emergency Overview: | Flammable. Irritant. |
|---|---|
| Potential Health Effects: |  |
| Eye: | May cause irritation. |

| | |
|---|---|
| Skin: | May cause irritation. |
| Inhalation: | Prolonged or excessive inhalation may cause respiratory tract irritation. |
| Ingestion: | Harmful if swallowed. Ingestion can cause nausea, vomiting, diarrhea and gastrointestinal irritation. |
| Chronic Health Effects: | Prolonged or repeated contact can result in defatting and drying of the skin, which may result in skin irritation and dermatitis (rash). Repeated or prolonged inhalation may cause toxic effects. |
| Signs/Symptoms: | Overexposure can cause headaches, dizziness, nausea, and vomiting. |
| Target Organs: | Eyes. Skin. Respiratory system. Digestive system. Central nervous system. Kidney. |
| Aggravation of Pre-Existing Conditions: | May aggravate pre-existing respiratory disorders, allergy, eczema, or skin conditions. |

## SECTION 4 - FIRST AID MEASURES

| | |
|---|---|
| Eye Contact: | Immediately flush eyes with plenty of water for 15 to 20 minutes. Get medical attention, if irritation or symptoms of overexposure persists. |
| Skin Contact: | Immediately wash skin with soap and plenty of water. Get medical attention if irritation develops or persists. |
| Inhalation: | If inhaled, remove to fresh air. If not breathing, give artificial respiration or give oxygen by trained personnel. Seek immediate medical attention. |
| Ingestion: | If swallowed, do NOT induce vomiting. Call a physician or poison control center immediately. Never give anything by mouth to an unconscious person. |
| Other First Aid: | Due to possible aspiration into the lungs, DO NOT induce vomiting if ingested. Provide a glass of water to dilute the material in the stomach. If vomiting occurs naturally, have the person lean forward to reduce the risk of aspiration. |

## SECTION 5 - FIRE FIGHTING MEASURES

| | |
|---|---|
| Flammable Properties: | Flammable liquid. |
| Flash Point: | <32°F (<0°C) |
| Flash Point Method: | |
| Lower Flammable/Explosive Limit: | 1% |
| Upper Flammable/Explosive Limit: | 7% |
| Fire Fighting Instructions: | Flammable. Cool fire-exposed containers using water spray. |
| Extinguishing Media: | Use alcohol foam, carbon dioxide, dry chemical, or water fog or spray when fighting fires involving this material. |
| Protective Equipment: | As in any fire, wear Self-Contained Breathing Apparatus (SCBA), MSHA/NIOSH (approved or equivalent) and full protective gear. |
| Unusual Fire Hazards: | Flammable liquid. Vapors can form an ignitable mixture with air. Vapors can flow along surfaces to a distant ignition source and flash back. |

**NFPA Ratings:**

| | |
|---|---|
| NFPA Flammability: | 3 |
| NFPA Health: | 1 |
| NFPA Reactivity: | 0 |
| NFPA Other: | NA |

## SECTION 6 - ACCIDENTAL RELEASE MEASURES

| | |
|---|---|
| Personnel Precautions: | Use proper personal protective equipment as listed in section 8. |
| Environmental Precautions: | Avoid runoff into storm sewers, ditches, and waterways. |
| Spill Cleanup Measures: | Remove all sources of ignition. Absorb spill with inert material (e.g., dry sand |

or earth), then place in a chemical waste container. Provide ventilation. Collect spill with a non-sparking tool. Place into a suitable container for disposal.

## SECTION 7 - HANDLING and STORAGE

| | |
|---|---|
| Handling: | Use with adequate ventilation. Avoid breathing vapor and contact with eyes, skin and clothing. Material will accumulate static charges which may cause an electrical spark (ignition source). Use proper grounding procedures. |
| Storage: | Store in a cool, dry, well ventilated area away from sources of heat, combustible materials, and incompatible substances. Keep container tightly closed when not in use. |
| Work Practices: | To reduce potential for static discharge, bond and ground containers when transferring material. |
| Special Handling Procedures: | Do not reuse containers without proper cleaning or reconditioning. |
| Hygiene Practices: | Wash thoroughly after handling. Avoid contact with eyes and skin. Avoid inhaling vapor or mist. |

## SECTION 8 - EXPOSURE CONTROLS, PERSONAL PROTECTION - EXPOSURE GUIDELINES

| | |
|---|---|
| Engineering Controls: | Use appropriate engineering control such as process enclosures, local exhaust ventilation, or other engineering controls to control airborne levels below recommended exposure limits. Good general ventilation should be sufficient to control airborne levels. Where such systems are not effective wear suitable personal protective equipment, which performs satisfactorily and meets OSHA or other recognized standards. Consult with local procedures for selection, training, inspection and maintenance of the personal protective equipment. |
| Eye/Face Protection: | Wear appropriate protective glasses or splash goggles as described by 29 CFR 1910.133, OSHA eye and face protection regulation, or the European standard EN 166. |
| Skin Protection Description: | Chemical-resistant gloves and chemical goggles, face-shield and synthetic apron or coveralls should be used to prevent contact with eyes, skin or clothing. |
| Respiratory Protection: | A NIOSH approved air-purifying respirator with an organic vapor cartridge or canister may be permissible under certain circumstances where airborne concentrations are expected to exceed exposure limits. Protection provided by air purifying respirators is limited. Use a positive pressure air supplied respirator if there is any potential for an uncontrolled release, exposure levels are not known, or any other circumstances where air purifying respirators may not provide adequate protection. |
| Other Protective: | Facilities storing or utilizing this material should be equipped with an eyewash facility and a safety shower. |

EXPOSURE GUIDELINES
**Titanium dioxide :**
Guideline ACGIH:        TLV-TWA: 10 mg/m3
Guideline OSHA:         OSHA-TWA: 15 mg/m3
**Carbonic acid calcium salt :**
Guideline ACGIH:        TLV-TWA: 5 mg/m3 (Respirable)
Guideline OSHA:         OSHA-TWA: 5 mg/m3 Respirable
**1-Nitropropane :**
Guideline ACGIH:        TLV-TWA: 25 ppm
Guideline OSHA:         OSHA-TWA: ppm
**Isobutane :**
Guideline ACGIH:        TLV-TWA: 1000 ppm
**Propane :**
Guideline ACGIH:        TLV-TWA: 1000 ppm
Guideline OSHA:         OSHA-TWA: 1000 ppm

## SECTION 9 - PHYSICAL and CHEMICAL PROPERTIES

| | |
|---|---|
| Physical State Appearance: | Liquid |
| Boiling Point: | No Data |
| Melting Point: | No Data |
| Density: | 10 - 12 Lbs./gal. |
| Vapor Density: | Greater than 1 (Air = 1) |
| pH: | No Data |
| Molecular Formula: | Mixture |
| Molecular Weight: | Mixture |
| Flash Point: | <32°F (<0°C) |
| Flash Point Method: | |

## SECTION 10 - STABILITY and REACTIVITY

| | |
|---|---|
| Chemical Stability: | Stable under normal temperatures and pressures. |
| Hazardous Polymerization: | Not reported. |
| Conditions to Avoid: | Heat, flames, ignition sources, and sparks. Incompatible materials. Freezing or temperatures below 32 deg. F. |
| Incompatible Materials: | Oxidizing agents. Strong acids and alkalis. |

## SECTION 11 - TOXICOLOGICAL INFORMATION

**Titanium dioxide :**

| | |
|---|---|
| RTECS Number: | XR2275000 |
| Skin: | Skin - Rabbit; Standard Draize Test : 300 ug/3D; (Intermittent) mild. (RTECS) |
| Ingestion: | Ingestion - Rat TDLo: 60 gm/kg; Gastrointestinal - hypermotility, diarrhea Gastrointestinal - other changes. (RTECS) |
| Carcinogenicity: | IARC: Group 2B: Possibly carcinogenic to humans |
| RTECS Number: | FF9335000 |

**Isobutane :**

| | |
|---|---|
| Inhalation: | Inhalation - Rat LC50: 570,000 ppm/15M - [Behavioral - tremor Behavioral - convulsions or effect on seizure threshold Lungs, Thorax, or Respiration - respiratory depression] (RTECS) |
| RTECS Number: | SA1420000 |

## SECTION 12 - ECOLOGICAL INFORMATION

| | |
|---|---|
| Ecotoxicity: | No ecotoxicity data was found for the product. |
| Environmental Fate: | No environmental information found for this product. |

## SECTION 13 - DISPOSAL CONSIDERATIONS

| | |
|---|---|
| Waste Disposal: | Consult with the US EPA Guidelines listed in 40 CFR Part 261.3 for the |

|                             |                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                    |
|-----------------------------|----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|                             | classifications of hazardous waste prior to disposal. Furthermore, consult with your state and local waste requirements or guidelines, if applicable, to ensure compliance. Arrange disposal in accordance to the EPA and/or state and local guidelines.                                                                                                                                                                                                                                             |
| Important Disposal Information: | DANGER! Rags, steel wool and waste soaked with this product may spontaneously catch fire if improperly discarded or stored. To avoid a spontaneous combustion fire, immediately after use, place rags, steel wool or waste in a sealed, water-filled, metal container. Do not store unused product inside the home. For disposal guidance, contact your household refuse collection service, fire department, county or state government environmental control agency. |

## SECTION 14 - TRANSPORT INFORMATION

| DOT Shipping Name: | Aerosol flammable |
|--------------------|-------------------|
| DOT Hazard Class:  | 2.1               |
| DOT Packing Group: | III               |

## SECTION 15 - REGULATORY INFORMATION

**Titanium dioxide :**

| TSCA Inventory Status: | Listed |
|------------------------|--------|
| State Regulations:     | Listed in the New Jersey State Right to Know List. |
|                        | Listed in the Pennsylvania State Hazardous Substances List. |
| Canada DSL:            | Listed |

**Vinyl acrylate terpolymer :**

| TSCA Inventory Status: | Listed |
|------------------------|--------|
| Canada DSL:            | Listed |

**Non-hazardous Ingredients :**

| TSCA Inventory Status: | Contains calcium carbonate (CAS:1317-65-3), which is listed in the TSCA inventory. |
|------------------------|--------|

**Carbonic acid calcium salt :**

| Canada DSL:            | Listed |
|------------------------|--------|

**1-Nitropropane :**

| State Regulations:     | Listed in the Pennsylvania State Hazardous Substances List.. |
|------------------------|--------|
| Canada DSL:            | Listed |

**Naphtha (petroleum), light alkylate :**

| TSCA Inventory Status: | Listed |
|------------------------|--------|
| Canada DSL:            | Listed |

**Isobutane :**

| TSCA Inventory Status: | Listed |
|------------------------|--------|
| State Regulations:     | Listed in the Pennsylvania State Hazardous Substances List. |
|                        | Listed in the New Jersey State Right to Know List.. |
| Canada DSL:            | Listed |

**Propane :**

| TSCA Inventory Status: | Listed |
|------------------------|--------|
| State Regulations:     | Listed in the Pennsylvania State Hazardous Substances List. |
|                        | Listed in the New Jersey State Right to Know List. |
| Canada DSL:            | Listed |

**Trimethyl-1, 3-pentanediol, diisobutyrate :**

| TSCA Inventory Status: | Listed |
|------------------------|--------|
| Canada DSL:            | Listed |

MSL_                                                                          10/17/2007 01:46 PM

## SECTION 16 - ADDITIONAL INFORMATION

| | |
|---|---|
| HMIS Fire Hazard: | 3 |
| HMIS Health Hazard: | 1 |
| HMIS Reactivity: | 0 |
| HMIS Personal Protection: | x |
| MSDS Creation Date: | 06/26/2006 |
| MSDS Revision Date: | 05/09/2007 |
| MSDS Revision Notes: | Quarterly and format update |
| MSDS Author: | Actio Corporation |
| Disclaimer: | This Health and Safety Information is correct to the best of our knowledge and belief at the date of its publication but we cannot accept liability for any loss, injury or damage which may result from its use. We shall ensure, so far as is reasonably practicable, that any revision of this Data Sheet is sent to all customers to whom we have directly supplied this substance, but must point out that it is the responsibility of any intermediate supplier to ensure that such revision is passed to the ultimate user. The information given in the Data Sheet is designed only as a guidance for safe handling, storage and the use of the substance. It is not a specification nor does it guarantee any specific properties. All chemicals should be handled only by competent personnel, within a controlled environment. Should further information be required, this can be obtained through the sales office whose address is at the top of this data sheet. |
| Trademark: | The trademarks, service marks, graphics and logos used on this MSDS are registered or unregistered trademarks of BEHR Process Corporation. All Rights Reserved. |

Copyright© 1996-2007 Actio Software Corporation. All Rights Reserved.



## Material Safety Data Sheet

### 1. Chemical Product & Company Data

| Product Name: Microban Disinfectant Spray Plus | |
|---|---|
| Manufacturer:<br><br>II Rep-Z, Inc.<br>4660 Elizabeth Street<br>Coraopolis, PA 15108<br>Telephone: 1-412-264-8340 | Supplier: |

### 2. Ingredients

| Name | CAS # | UN # | % by volume |
|---|---|---|---|
| 2-propanol | 67-63-0 | | 5-10 |

### 3. Hazards Identifcation

**Emergency Overview**

Skin and eye irritant.

NOTE: Hazard information is based on the characteristics of the components of this mixture.

**Ingestion** - May cause abdominal discomfort, nausea, vomiting and diarrhea.

**Inhalation** - May cause irritation of the respiratory tract.

**Eye Contact** - May cause eye irritation.

**Skin Contact** - Prolonged contact may cause discomfort and irritation of the skin.

### 4. First Aid

**Inhalation** - Remove patient to fresh air. If not breathing, give artificial respiration. If breathing is difficult, give oxygen. Get immediate medical attention.

**Eye Contact** - Immediately flush with plenty of water. Get medical attention if irritation persists.

**Skin Contact** - Remove contaminated clothing. Wash skin with soap and water. Obtain medical attention if irritation persists.

# William F. Wood

*Department of Chemistry, Humboldt State University, Arcata, CA 95521*
*Phone (707) 826-3109, E-mail wfw2@humboldt.edu*

## EDUCATION

University of California at Santa Barbara, B.A. (1965).

University of California at Santa Barbara, Ph.D. (1968).

## EXPERIENCE

Professor of Chemistry, Humboldt State University, Arcata, CA (1976 to present).

Lecturer in Chemistry, California Polytechnic State University, San Luis Obispo (1976).

Research Scientist, The International Centre of Insect Physiology and Ecology, Nairobi, Kenya (1972-1975).

Postdoctoral Fellow, Cornell University with Dr. Jerrold Meinwald (1971-1972).

Postdoctoral Fellow, University of Wisconsin, with Dr. C. Heidelberger (1969-1971).

## AWARDS

Humboldt State University, Outstanding Professor Award (1993-1994); Phi Kappa Phi (FKF) Honor Society (1993); The Humboldt Medal (1994, 2001); Humboldt State University Commencement Address (1994); Humboldt State University Scholar of the Year (2001) and Convocation Speaker (2001).

## GRANTS

NSF-ILI for NMR Spectrometer, $176,980 (1991); Research Corporation, $14,500

(1991-3); Darrel Nielson Institute, $20,000 (1983, 1987, 1995, 2000, 2001); and Humboldt State University - Research, Scholarship and Creative Activity Awards, $17,995 (1988-2007).


## OFFICES HELD

Chair, Department of Chemistry, (1992-5, 1999); Board of Directors, Humboldt State University Foundation (1995-2000); Chair, Faculty Awards Committee (1994-5); Advisory Board for Research and Creative Activities (1992-94, 2001-3); Reviewer, *J. Chemical Ecology, J. Chem. Ed., Biochem. Systematics and Ecol.* (1990-present) and Humboldt County Science Fair Judge (1986-2001). Chair, University Faculty Promotion Committee 2004-5. Elected member of the Humboldt State University Sponsored Programs Foundation (2004-2007). President, Humboldt State University Sponsored Programs Foundation (2006-2007).


## SKUNK DEFENSIVE SECRETION WEBSITE

1.   **Skunk Defensive Secretion Main Page:** Visits since 1999 – 377,977
       http://www.humboldt.edu/~wfw2/skunkspray.shtml

2.   **How to Remove Skunk Odor:** Visits since 1999 – 316,326
       http://www.humboldt.edu/~wfw2/deodorize.shtml

3.   **The History of Skunk Spray Research:**
       http://chemeducator.org/sbibs/s0004002/s00040044.htm

4.   **Chemistry of Skunk Spray:**
       http://www.humboldt.edu/~wfw2/chemofskunkspray.html

5.   **Skunk Pictures:** http://www.humboldt.edu/~wfw2/skunkpictures.html


## CHEMICAL PUBLICATIONS (* Humboldt State University Student.)

1.   "Irreversible Enzyme Inhibitors. CII. On the Mode of Phenyl Binding of 9-Phenylguanine to Guanine Deaminase and Xanthine Oxidase," B.R. Baker and William F. Wood, J. Medicinal Chemistry 10, 1101-1105 (1967).

2.   "Irreversible Enzyme Inhibitors. CIII On the Mode of Phenyl Binding of 9-Phenylguanine to Guanine Deaminase and Xanthine Oxidase," B.R. Baker and William F. Wood, J. Medicinal Chemistry 10, 1106-1109 (1967).

3.   "Irreversible Enzyme Inhibitors. CXXII. On the Nature and Dimensions of the Hydrophobic Bonding Region of Guanine Deaminase and Xanthine Oxidase," B.R. Baker and W.F. Wood, J. Medicinal Chemistry 11, 644-649 (1968).

4.   "Irreversible Enzyme Inhibitors. CXXIII. Candidate Irreversible Inhibitors of Guanine Deaminase and Xanthine Oxidase Derived from 9-Phenylguanine Substituted with a Terminal Sulfonyl Fluoride," B.R. Baker and William F. Wood, J. Medicinal Chemistry 11, 650-652 (1968).

5.   "Irreversible Enzyme Inhibitors. CXXVI. Hydrocarbon Interaction with Xanthine Oxidase by Phenyl Substrates on Purines and Pyrazolo(3,4-d)-pyrimidines, "B.R. Baker and William F. Wood, and Janos A. Kozma, J. Medicinal Chemistry 11, 661-666 (1968).

6.   "Irreversible Enzyme Inhibitors. CXLVI. Active-Site-Directed Irreversible Inhibitors of Xanthine Oxidase Derived from 9-(Acylamidophenyl)guanines Substituted with a Terminal Sulfonyl Fluoride," B.R. Baker and William F. Wood, J. Medicinal Chemistry 12, 211-214 (1969).

7.   "Irreversible Enzyme Inhibitors. CXLVII. Candidate Active-Site-Directed Irreversible Inhibitors of Xanthine Oxidase Derived from 9-(p-Acylamidoalkoxyphenyl)guanines Bearing a Terminal Sulfonyl Fluoride," B.R. Baker and William F. Wood, J. Medicinal Chemistry 12, 214-216 (1969).

8.   "Irreversible Enzyme Inhibitors. CXLVIII. Active-Site-Directed Irreversible Inhibitors of Guanine Deaminase Derived from 9-Phenylguanine Bearing a Terminal Sulfonyl Fluoride," B.R. Baker and William F. Wood, J. Medicinal Chemistry 12, 216-220, (1969).

9.   "Volatile Ketones in the Hairpencil Secretion of Danaid Butterflies (Amauris and Danaus), "J. Meinwald, C. J. Boriack, D. Schneider, M. Boppre, W. F. Wood and T. Eisner, Experientia 30, 721-722 (1974).

10   "Toluquinone and 2-Methoxy-3-methylbenzoquinone from the Defensive Secretions of Three African Millipedes," William F. Wood, Annals of the Entomological Society of America 67, 988 (1974).

11.  "Ubiquinone-0 in the defensive spray of an African Millipede," William F. Wood, Julian Shepherd, Berni Chong and Jerrold Meinwald, Nature 253, 625-626 (1975).

12.  "Phenols as Sex Pheromones of Ixodid Ticks: A General Phenomen?", William F. Wood, Mary G. Leahy, R. Galun, G. D. Prestwich, J. Meinwald, R. E. Purnell and R. Payne, J. Chemical Ecology 1, 501-509 (1975).

13.  "Chemistry of the Defensive Secretion from the African Termite Odontotermes badius," William F. Wood, W. Truckenbrodt and Jerrold Meinwald, Annals of the Entomological Society of American 68, 359-360 (1975).

14.  "3-Octanone and 3-Octanol; Alarm Pheromones from East African Acacia Ants," William F. Wood and Berni Chong, J. Georgia Entamol. Soc. 10, 332-334 (1975).

15.  "Hydrogen Cyanide Production in North American and African Polydesmoid millipeds," H. E. Eisner, W. F. Wood and T. Eisner, Psyche 82, 20-23 (1975).

16.  "1,13-Tetradecadien-3-one and Homologs:  New Natural Products Isolated from Schedorhinotermes Soldiers," Glenn D. Prestwich, Manfred Kaib, William F. Wood and Jerrold Meinwald, Tetrahedron Letters 52, 4701-4704 (1975).

17.  "Synthesis and Biological Studies of 3-(8-D-Ribofuranosyl)-2,3-dihydro-6H-1,3-oxazine-2,6-dione, a New Pyrimidine Nucleoside Analog Related to Uridine," T. Ling Chwang, William F. Wood, J. Rodney Parkhurst, Stephen Nesnow, Peter V. Dannenberg and Charles Heidelberger, J. Medicinal Chemistry 19, 643-647 (1976).

18.  "QUEST: CAIDI Programs to Set up and Use Question-and-Answer Exercises" William F. Wood and Craig D. Kent**, J. Chemical Education 58, 47 (1981). (This article was republished in "Iterations: Computing in the J. Chemical Education, Ed. by J. W. Moore, J. Chemical Education, Easton P.A., 1981, page 124.)

19.  "p-Chlorophenoxyacetic Acid - Preparation of a Synthetic Plant Hormone," William F. Wood, J. Chemical Education 58, 76 (1981).

20.  "The Sex Pheromone of the Gypsy Moth and the American Cockroach," William F. Wood, J. Chemical Education 59, 35-36 (1982).

21.  "Preparation of Propyl N,N-Diethylsuccinimate:  An Insect Repellent," Robert Caudle**, Gretta Siegel**, and William F. Wood, J. Chemical Education 59, 1069-1070 (1982).

22.  "Chemical Ecology:  Chemical Communication in Nature," William F. Wood, J. Chemical Education 60, 531-539 (1983).  This was the cover story in the issue in which it appeared.

23.  "Anaesthesia of Honeybees by Smoke from the Pyrolysis of Puffballs and Keratin," William F. Wood, J. Apicultural Research 22, 107-110 (1983).

24.  "Uses of a Vinylpyridine Polymer in Undergraduate Organic Syntheses," Damon Getman**, David Hagerty**, George Wilson** and William F. Wood, J. Chemical Education 62, 550-551 (1984).

25.  "Qualitative Identification of Potassium Ions Using Didymium Glasses," William F. Wood, J. Chemical Education 62, 1024 (1984).

26.  "Structure and Absolute Configuration of a New Diterpene, (-)-2(S), 8(R)-Dihydroxyverrucosane, from the Liverwort Gyrothyra underwoodiana (Gyrothyraceae)," Isao Kubo, Akiko Matsumoto, Ken Hirotsu, Hideo Naoki and William F. Wood, J. Organic Chemistry 49, 4644-4646 (1984).

27.  "Calmodulin Inhibitors from the Bitter Mushroom Naematoloma fasciculare," Isao Kubo, Akiko Matsumoto, Mutsuo Kozuka and William F. Wood, Chem. Pharm. Bull. 33, 3821-3825 (1985).

28.  "Combined Effect on Plant Growth of (-)-Epicatechin and Hydroquinone, Compounds from Aesculus californica NUTT. (Hippocastanaceae)", Isao Kubo, Akiko Matsumoto, Makoto Taniguchi and William F. Wood, Chem. Pharm. Bull. 33, 3826-3828 (1985).

29.  "Mushroom Odors:  Student Synthesis of the Odoriferous Compounds of the Matsutake Mushroom," William F. Wood and Mark Fesler**, J. Chemical Education 63, 92 (1986).

30.  "Clitocine, A New Insecticidal Nucleoside From The Mushroom Clitocybe inversa," Isao Kubo, Mujo Kim, William F. Wood and Hideo Naoki, Tetrahedron Letters 27, 4277-4280 (1986)

31.  "The 'Coal Tar' Odor of Tricholoma inamoenum," Richard L. Watson**, David L. Largent and William F. Wood, Mycologia 78, 965-966 (1986).

32.  "The Identity and Metabolic Fate of Volatiles Responsible for the Odor of Hydnellum suaveolens," William F. Wood, Darvin A. DeShazer** and David L. Largent, Mycologia 80, 252-255 (1988).

33.  "Ants and Acacias - In East Africa, Insects and Trees Find it Mutually Beneficial to Live Together," William F. Wood, Animal Kingdom, September/October, page 46-49 (1988).

34.  "The Odor of Agaricus augustus," William F. Wood, Richard L. Watson** and David L. Largent, Mycologia 82, 276-278 (1990).

35.  "New Components in Defensive Secretion of the Striped Skunk, Mephitis mephitis."  William F. Wood, J. Chemical Ecology 16, 2057-2065 (1990).

36.  "The Candy-like Odor of Noleana fructufragrans," David L. Largent, Debra E Bradshaw** and William F. Wood, Mycologia 82, 786-787 (1990).

37.  "Effect of Marine Algal Constituents on the Growth of Lettuce and Rice Seedlings," Isao Kubo, Masamitsu Ochi, Kozo Shibata, Frederick J. Hanke, Tetsuo Nakatsu, Kah-Siew Tan, Makoto Taniguchi, Tadao Kamikawa, Yoshiro Yamagiwa, Mitsuo Arizuka and William F. Wood, J. Natural Products Chemistry 53, 50-56 (1990).

38.  "Volatile Components In Defensive Spray of the Spotted Skunk, Spilogale putorius," William F. Wood, Christopher G. Morgan** and Alison Miller**, J. Chemical Ecology 17, 1415-1420 (1991).

39.  "Corn Chip Aroma - A Classroom Demonstration on the Preparation of a Schiff Base," Antony T. Sartori** and William F. Wood, J. Chemical Education 69, 572 (1992).

40.  "Preparation of Sucrose Octaacetate - Bitter-Tasting Compound", Thierry D. Mann**, James D. Mosher** and William F. Wood, J. Chemical Education 69, 668-669 (1992).

41.  "Why Skunks Smell So Bad", William F. Wood, Peak No. 3, 2-3 (1992). (Peak is a quarterly magazine published by the Hewlett-Packard Company. It has a world wide distribution or 160,000 and was translated into German, French, Dutch, Italian and Chinese.) It was later reprinted as the cover story of Chem 13 News, a publication of the Department of Chemistry, University of Waterloo, Waterloo, Ontario, Canada N2L 3GI.

42,  "2-Aminobenzaldehyde: The Source of the 'Sweet Odor' of Hebeloma sacchariolens", William F. Wood, Mary Brownson** and R. Allen Smudde** and David L. Largent, Mycologia 84, 935-936 (1992).

43.  "Preparation of 2,5-Dimethyl-1-phenylpyrrole", Dennis J. Shaw** and William F. Wood, J. Chemical Education 69, A313 (1992).

44.  "Volatile Components in Defensive Spray of the Hog-nosed Skunk, Conepatus mesoleucus" William F. Wood, Christoph O. Fisher* and Gary A. Graham, J. Chemical Ecology 19, 837-841 (1993).

45.  "Preparation of 2-Aminobenzaldehyde: A Fragrant Component of Floral Odors", Brian D. Foy**, R. Allen Smudde** and William F. Wood, J. Chemical Education 7, 322 (1993).

46.  "Lipids in the Scent Gland Secretion of Dumeril's Ground Boa (Acrantophis dumerili Jan)," John T. Simpson, Thomas R. Sharp, William F. Wood and Paul J. Weldon, Zeitschrift fur Naturforschung 48c, 953-955 (1993).

47.  "trans-2-Nonenal, The Cucumber Odor of Mushrooms", William F. Wood, Mary
     Lou Brandes,** Richard L. Watson,** Ross L. Jones** and David L. Largent,
     Mycologia 86, 560-562 (1994)

48.  "Poly(4-vinylpyridine)," Encyclopedia of Reagents for Organic Synthesis
     (EROS), John Wiley & Sons, New York, 1995.

49.  "Poly(4-vinylpyridinium dichromate)," Encyclopedia of Reagents for Organic
     Synthesis (EROS), John Wiley & Sons, New York, 1995.

50.  "Poly(4-vinylpyridinium bromide perbromide)," Encyclopedia of Reagents for
     Organic Synthesis (EROS), John Wiley & Sons, New York, 1995.

51.  "Volatile Components in Scent Gland Secretions of Garter Snakes (Thamnophis
     sp.)," William F. Wood, Joshua M. Parker** and Paul J. Weldon, Journal of
     Chemical Ecology 21, 213-219 (1995).

52.  "(E)-3-Tridecen-2-one, an antibiotic from the interdigital glands of black-tailed
     deer Odocoileus hemionus columbianus," William F. Wood, Tony B. Shaffer**
     and Aya Kubo, Experientia 51, 368-369 (1995).

53.  "Volatile ketones from interdigital glands of black-tailed deer, Odocoileus
     hemionus columbianus," William F. Wood, Tony B. Shaffer** and Aya Kubo,
     Journal of Chemical Ecology 21, 1401-1408 (1995).

54.  "trans-Methyl Cinnamate: The Major Volatile from some Populations of the
     Liverwort, Conocephalum Conicum (L.) Dumort.," William F. Wood, William C.
     Lancaster, Christoph O. Fisher* And Raymond E. Stotler, Phytochemistry 42,
     241-242 (1996).

55.  "2-Methylbutanoic Acid and 2-Nonanone from the Metatarsal Glands of Impala,
     Aepyceros melampus" William F. Wood, Biochemical Systematics and Ecology
     25, 275 (1997).

56.  "Ozonolysis Experiments using Gas Chromatography-Mass Spectrometry: An
     Undergraduate Organic Chemistry Laboratory Experiment," Charlene M.
     Rhoads,* George R. Farquar* and William F. Wood, Journal of Chemical
     Education, 74 1220-1221 (1997).

57.  "Short-Chain Carboxylic Acids in Interdigital Glands of Gemsbok, Oryx gazella
     gazella" William F. Wood, Biochemical Systematics and Ecology 25, 469-70
     (1997).

58.  "Volatile compounds in interdigital glands of sable antelope and wildebeest
     William F. Wood, Biochemical Systematics and Ecology 26, 367-369 (1998).

59. "Hexanoic acid and phenylacetaldehyde in the false truffle, Truncocolumella citrina" William F. Wood, Brian D. Foy** and David L. Largent, Biochemical Systematics and Ecology 26, 589-591 (1998).

60. "Phenol, the odour compound from Agaricus praeclaresquamosus" William F. Wood, Richard J. Watson** and David L. Largent, Biochemical Systematics and Ecology 26, 793-794 (1998).

61. "2-Methylcarboxylic acids in the interdigital glands of whitetail deer, Odocoileus virginianus dacotensis" William F. Wood, Biochemical Systematics and Ecology 27, 93-95 (1999).

62. "Benzaldehyde and benzyl alcohol, the odour compounds from Agaricus smithii" William F. Wood and David L. Largent, Biochemical Systematics and Ecology 27, 521-522 (1999).

63. "The History of Skunk Defensive Secretion Research," William F. Wood, The Chemical Educator, 4, 44-50 (1999). (DOI 10.1007/s00897990286a1999.)

64. "Different volatile compounds from mycelium and sporocarp of Pleurotus ostreatus," William F. Wood, George R. Farquar*, And David L. Largent, Biochemical Systematics and Ecology 28, 89-90 (2000).

65. "Buzonamine, a new alkaloid from the defensive secretion of the millipede, Buzonium crassipes," William F. Wood, Frederick J. Hanke, Isao Kubo, Jennifer A. Carroll and Phillip Crews, Biochemical Systematics and Ecology 28, 305-312 (2000).

66. "Short-chain carboxylic acids from the anal glands of the binturong, Arctictis binturong (Viverridae, Mammalia)," Paul J. Weldon, Michael F. Gorra, William F. Wood, Biochemical Systematics And Ecology 28, 903-904 (2000).

67. "Antibacterial compounds in the interdigital glands of pronghorn, Antilocapra americana," William F. Wood, Biochemical Systematics and Ecology 29, 417-419 (2001).

68 "1-Octen-3-ol, a banana slug antifeedant from mushrooms," William F. Wood, Cynthia L. Archer* and David L. Largent, Biochemical Systematics and Ecology 29, 531-533 (2001).

69. "A comparison of volatiles in mandibular glands from three Crematogaster ant symbionts of the whistling thorn acacia," William F. Wood, Todd M. Palmer and Maureen L. Stanton, Biochemical Systematics and Ecology 30, 217-222 (2002).

70.    "2-Pyrrolidinone, a putative alerting pheromone from rump glands of pronghorn, Antilocapra americana," William F. Wood, Biochemical Systematics and Ecology 30, 361-363 (2002).

71.    "Mass Spectrometry—Finding the Molecular Ion and What It Can Tell You: An Undergraduate Organic Laboratory Experiment," William F. Wood and Darin Price, The Chemical Educator 7, 226-232 (2002).

72.    "Volatile components in defensive spray of the hooded skunk, Mephitis macroura." William F. Wood, Brian G. Sollers,* Gwen A. Dragoo and Jerry W. Dragoo, Journal of Chemical Ecology, 28, 1853-1858 (2002).

73.    "The scent of the reticulated giraffe (Giraffa camelopardalis reticulata)," William F. Wood and Paul J. Weldon, Biochemical Systematics and Ecology 30, 913-917 (2002).

74.    "Indole and 3-chloroindole: The source of the disagreeable odor of Hygrophorus paupertinus." William F. Wood, Joshua Smith, Kjirsten Wayman and David L. Largent. Mycologia, 95, 807-808 (2003).

75.    "Long-chain fatty acids in the anal gland of the red panda, Ailurus fulgens." William F. Wood, Gwen A. Dragoo, Michael J. Richard and Jerry W. Dragoo, Biochemical Systematics and Ecology 31, 1057-1060 (2003).

76.    "Volatile components in metatarsal glands of sika deer, Cervus nippon." William F. Wood. Journal of Chemical Ecology 29, 2729-2733 (2003)..

77.    "Clitolactone: A banana slug antifeedant from Clitocybe flaccida." William F. Wood,Thomas J. Clark, Debra E. Bradshaw, Brian D. Foy, David L. Largent, and Bradley L. Thompson. Mycologia 96, 23-25 (2004).

78.    "Chemical Released from Host Acacia by Feeding Herbivores is Detected by Symbiotic Acacia-ants." William F. Wood and Brenda J. Wood. Caribbean Journal of Science, 40, 396-399 (2004).

79.    "Comparison of mandibular gland volatiles from ants of the bull horn acacia, Acacia collinsii. William F. Wood. Biochemical Systematics and Ecology 33, 651-658 (2005).

80.    "Straight- and branched-chain fatty acids in the preorbital gland of sika deer, Cervus nippon." William F. Wood. Journal of Chemical Ecology 30,: 479-482 (2004).

81.    "Headspace analysis identifies indole and 1-octen-3-ol as the "coal tar" odor of Tricholoma inamoenum." William F. Wood, David L. Largent and Terry W. Henkel. Mycological Progress 3(4): 325-328 (2004).

82.    "Comparison of mandibular gland volatiles from ants of the bull horn acacia, Acacia collinsii. William F. Wood. Biochemical Systematics and Ecology 33, 651-658 (2005).

83.    The defensive secretion of the millipede, Nearctodesmus salix (Polydesmida: Nearctodesmidae). William F. Wood and Patrick W. Sorensen. Biochemical Systematics and Ecology 33, 1077-1079 (2005).

84.    Volatile compounds from anal glands of the wolverine, Gulo gulo. William F. Wood, Miranda N. Terwilliger,* and Jeffrey P. Copeland J ournal of Chemical Ecology 31, 2111-2117 (2005).

85.    Volatile compounds in shoulder gland secretions of male flying foxes, genus Pteropus (Pteropodidae, Chiroptera), William F. Wood, Allyson Walsh, John Seyjagat, and Paul J. Weldon. Zeitschrift fur Naturforschung 60c,779784 (2005).

86.    Volatiles in the mandibular gland of Tetraponera penzigi: a plant ant of the whistling thorn acacia. William F. Wood, Todd M. Palmer and Maureen L. Stanton. Biochemical Systematics and Ecology 34, 536-538 (2006).

87.    Changing volatile compounds from mycelium and sporocarp of American matsutake mushroom, Tricholoma magnivelare. William F. Wood, and Charles K. Lefevre. Biochemical Systematics and Ecology 35, 634-636 (2007).

88.    Volatile Antimicrobial Compounds in the Pelage of the Mexican Free-tailed Bat, Tadarida brasiliensis mexicana. Wlliam F. Wood and Joseph M. Szewczak. Biochemical Systematics and Ecology 35, 566-568 (2007).


## OTHER SCHOLARLY PUBLICATIONS

1.    "Partyboat Logs Show How Skindivers Fared During 1960, 1961, and 1962", William F. Wood. Calif. Fish and Game 50, 114 (1964)

2.    "Partyboat Logs Show How Skindivers Fared During 1963, 1964", William F. Wood, Calif. Fish and Game 53, 192 (1967)

## PATENTS

1.    "Topical Antimicrobial Agents" William F. Wood, United States Patents, 5,604,262 and 5,610,196 (18 February and 11 March 1997).

2.    "Topical Antimicrobial Agents" William F. Wood, European Patent, EP 0 814 660 B1 (23 June 1999) German Patent No. 696 03 016.0.08 (23 June 1999); Austrian Patent Office No. E 181480 (13 August 1999); Danish Patent No.

DK/EP 0814660 (22 November 1999), Spanish Patent Number 2 134 608 (23 June 1999) and Japanese Patent, 3055701 (14 April 2000).

## SYMPOSIA, RESEARCH SEMINARS AND MEETING PRESENTATIONS
(** Humboldt State University Student.)

1.  "The Chemistry of Millipede Defensive Secretions - Some New Compounds from African Millipedes," William F. Wood, East African Section of the Royal Chemical Society, Nairobi, Kenya, 1973. Presentation time 30 min.

2.  "The Sex Pheromone of the African Ticks Rhipecephales appendiculatus and R. pulcellus," William F. Wood, Research Seminar at The Rothhamsted Experimental Station, Harpenden, Herts, England, December 1974. Presentation time was one hour.

3.  Chairman, Pheromone Section, Gordon Research Conference on Olfaction and Taste, 1975, Proctor Academy, Andover, New Hampshire.

4.  "The Chemistry of the Defensive Secretions of some East African Arthropods and Tick Sex Pheromones," William F. Wood, Seminar to the Chemistry Department at California State Polytechnic University, San Luis Obispo, November 1975. Presentation time was one hour.

5.  "The Chemistry of the Defensive Secretions of some East African Arthropods and Tick Sex Pheromones," William F. Wood, Seminar to the Chemistry Departments at California State University, Northridge and California State University, Los Angeles, December 1975. Presentation time was 1 hour.

6.  "Chemical Ecology and Research on East African Arthropods," William F. Wood, Seminar to the Chemistry Department at Humboldt State University, May 1976. Presentation time was 1 hour.

7.  "Chemistry of the Defense Secretion of the Polydesmid Millipede, Harpathe teladonta", by Steven O. Smith** and William F. Wood, presented at the Annual Northern California Student Affiliates of the American Chemical Society Conference on Undergraduate Research at California State University, Sacramento on April 21, 1979.

8.  "Synthesis of 9-Phenylguanine Derivatives as Reversible and Active-site-directed Irreversible Inhibitors of the Enzymes Xanthine Oxidase and Guanine Deaminase," William F. Wood, Seminar to the Chemistry Department at Humboldt State University, April 1979. Presentation time was 1 hour.

9.  "Biologically Active Compounds from Plants of Northern California," W. F. Wood, D. H. Norris, D. L. Largent and B. L.Thompson**, Pacific Conference on

Chemistry and Spectroscopy, American Chemical Society - 20th Western
Regional Meeting, Sacramento, California, October 11 and 12, 1984.
Presentation time was 30 min.

10. Anaesthesia of the Honeybee with Smoke from Pyrolysis of Puffballs and
Keratin," William F. Wood, Seminar to the Chemistry Department at Humboldt
State University, January 1985. Presentation time was 1 hour.

11. Symposia on Semiochemicals, Organizer and Chair, William F. Wood, American
Chemical Society - 189th National Meeting, Miami Beach, Florida, May 2, 1985.
The organizer of this symposium was responsible for selection of topics, speaker
selection, and the submission of abstracts and a program schedule. The symposia
lasted half a day.

12. "Toxins from Plants of Northern California," William F. Wood, Research
Seminar at The Rothhamsted Experimental Station, Harpenden, Herts, England,
August 1985. Presentation time was one hour.

13. "Toxic Chemicals from Northern California flora," William F. Wood, Research
Seminar at the Royal Botanic Gardens, Kew, England, September 1985.
Presentation time was one hour.

14. "Research on Marine Algae, Fungi and Toxic Plants of Northern
California,"Seminar to the Chemistry Department at Humboldt State University,
February 1987. Presentation time was 1 hour.

15. "Messages from the Devil's Tongue and other Semiochemical Tales," Seminar to
the Chemistry Department at Humboldt State University, April 1989.
Presentation time was 1 hour.

16. "The Defensive Secretion of the Striped Skunk (Mephitis mephitis): Historical
and Recent Research," Seminar to the Chemistry Department at Humboldt State
University, March 1990. Presentation time was 1 hour.

17. "Volatile Components in the Defensive Spray of Three Species of North
American Skunks," William F. Wood, Christoph Fisher**, Christopher
Morgan**, Alison Miller**. An invited presentation at the 203rd National
Meeting of the American Chemical Society, San Francisco, CA, 9 April 1992.

18. "Mushroom Odors" Seminar to the Chemistry Department at Humboldt State
University, 19 Feb. 1993. This seminar covered the history of research on the
odor of wild mushrooms and current research done at HSU. Presentation time
was 1 hour. This was also presented to the Humboldt Bay Mycological Society in
January 1993.

19.    "Odors of Mushrooms" Lecture with slides to the Oregon Mycological Society, Portland, Oregon, 24 May 1993. This lecture covered history and current research done on the odors of wild mushrooms. It also covered the fact that mushrooms are full of flavor enhancers.

20.    The Odors of Wild Mushrooms", California Section of the American Chemical Society, Berkeley, California, June Meeting 1995. A 1 hour lecture with slides to an audience of 50.

21.    "Odors of Mushrooms" Lecture with slides to the Mycological Society of San Francisco at the Randall Museum on 19 September 1995. About 120 people attended this lecture.

22.    "Odors of Mushrooms" Lecture with slides to the Sonoma County Mycological Association on 20 September 1995. About 30 people attended this lecture.

23.    "Deer, Snakes and Antelope: A Common Thread", Lecture with slides to the Chemistry Department at HSU on 27 January 1996.

24.    "United States Patent 5,604,262 - Background and Future Applications". Lecture with slides to the Committee on Planned Gifts, HSU University Relations, at the Sea Grill Restaurant, 27 February 1997. (The Committee for Planned Gifts is made up of community members of local law firms, brokerage houses and certified public accountants. It is advisory to Dr. Linda P. Frank, Director of Planned and Special Gifts.)

25.    "Searching for Antibiotics from Mammalian Skin Glands." Lecture with slides to the lunch meeting of the Southwest Rotary, Eureka, 16 January 1998. About 75 participants attended this 30 minute lecture.

26.    The chemistry and possible biological function of ungulate interdigital gland secretions, Research lecture to Zoology 560, "Advanced Mammalogy," on April 2000.

27.    "The chemistry and possible biological function of ungulate interdigital gland secretions," HSU Veterens Summer Program, Special Lecture Series, 50 participants, July 2000.

28.    "Chemical Warfare in Nature: Millipedes, Snakes, Skunks and Deer," CSU Chico Chemistry Department Seminar, envited lecture to 40 participants, 3 November 2000.

29.    Humboldt Chemistry Department Seminar - "Chemical Warfare In Nature: Millipedes, Snakes, Skunks and Deer," February 2001.

30. Scholar of the Year lecture -"Chemical Ecology: An Introduction." 13 September 2001.

31. Humboldt Preview Lecture - "Chemical Ecology: An Introduction." Spring Semester 2002.

32. Humboldt Bay Mycological Society Lecture - "Chemical Ecology: An Introduction." May 20, 2002.

33. HSU Faculty Brown Bag Colloquium Series. - "Skunk Solutions" 2 October 2002.

34. HSU Retired Faculty Lunch Speaker - "Skunk solutions," 8 October 2002

35. Humboldt County Science Fair - "Chemical Ecology," 14 January 2003  Lecture presentations to 100 potential science fair participants (students and their parents)

36. MacKinleyville High School on 6 February 2003, "Chemical Ecology: An introduction," Lectures to three different chemistry classes and 2 physics classes. These lectures were at the request of the High School Career Development Coordinator, Ms. Tracy Smith.

37. Chemistry Department Seminar, Humboldt State University. "M. A. D. Chemistry: Recent work on Mushrooms, Ants and Deer." 8 September 2003

38. Chemistry Department Seminar, Chico State University. "M. A. D. Chemistry: Recent work on Mushrooms, Ants and Deer." 31 October 2003.

39. William Wood, Jeff Copeland, Iman Horsey* and Lynne McGreevy*.  Volatile Compounds in Wolverine Urine.  April 10, 2007.  USFS Redwood Sciences Laboratory, Arcata, CA.

## POSTER PRESENTATIONS

(** Humboldt State University Student.)

1. "Antibacterials in Pronghorn Hoof Glands," William F. Wood and James T. Welsh.  Humboldt State University New and Used Poster Session, 30 October - 3 October 2000.

2. "A Slug Antifeedant from Mushrooms," William F. Wood, Cynthia L. Archer** and David L. Largent.  Humboldt State University New and Used Poster Session, 30 October - 3 October 2000.

CV W. F. Wood
October 22, 2007

Page 15

3. . "2-pyrrolidinoone, a putative Alerting Pheromone in Pronghorn Rump Glands,"
William F. Wood and James T. Welsh. Humboldt State University New and Used
Poster Session, 2001.

4. Mandibular Galnd compounds from three Crematogaster Ant Symbionts of the
Whistling Thorn Acacaia. Humboldt State University New and Used Poster
Session, 2001.

5. "Indole and 3-Chloroindole: The Source of the Disagreeable Odor of the
Mushroom, Hygrophorus paupertinus".David L. Largent, Joshua Smith, Kjirsten
Wayman, and William F. Wood. Humboldt State University New and Used
Poster Session, April 2003.

6. "The Scent of the Reticulated Giraffe (Giraffa camelopardalis reticulata)."
William F. Wood and Paul J. Weldon. Humboldt State University New and Used
Poster Session, April 2003.

08CV2325 J. N.
JUDGE CONLON
MAG. JUDGE COLE

# EXHIBIT E

February 5, 2008

<u>VIA OVERNIGHT and Email</u>

Vicki and Mark Royal
366 South Avenue
Glencoe, IL 60022

RE:   Insured:          Vicki and Mark Royal
      Claim #:          500929
      Date of Loss:     4/26/07
      Policy#:          302989
      Loss Location:    1526 Sheridan, Highland Park, IL

Dear Mr. and Mrs. Royal:

This letter responds to your claim submission of January 22, 2008 with attached reconstruction estimate dated January 16, 2008. As you know, AIG Private Client Group on behalf of American International Insurance Company ("AIIC") had the opportunity to inspect the current condition of the home on January 28, 2008, two and a half months after retaining and identifying consultants ready to test the home in response to your claim that skunk thiols penetrated the residence.

The January 22, 2008 claim requests coverage for the replacement of the majority of the interior of the home due to alleged skunk thiol contamination. AIIC has consistently disputed that any skunk thiols contaminated the interior of the home based upon its previous inspections and consultants reports. AIIC has paid you $229,550.34 for repairs to the home, including the cost to remove the exterior brick facade and treat any remaining areas of concern, based on our remediation expert's protocol. The total claim paid to date is $576,126.78. Nevertheless, based on your allegations of a remaining smell of skunk in the home, we agreed to test the interior of the home as requested by the Illinois Division of Insurance ("DOI") to determine whether any skunk thiol contamination existed. The agreement to test dates back to early November 2007 when AIIC was contacted by the DOI. At that time, AIIC promptly retained and disclosed consultants to test the building materials and clothes, as well as a laboratory to perform the sample testing. Despite agreeing to do the testing and the passage of over two months time, you failed to disclose that any demolition work was performed at the home until January 18, 2008, when your lawyer advised our counsel and Mr. Allender of the DOI that building materials had already been removed from the residence. Your counsel also reported that the skunk smell was apparently eradicated, and that there was nothing left to test. The January 28, 2008 inspection revealed a large-scale demolition project was completed unilaterally before any testing had been done by the DOI or AIIC. As has been explained to your lawyer in writing,

AIIC was never notified of the demolition project, never approved it, and specifically warned of the consequences of proceeding with such actions in writing on November 15, 2007 shortly after receipt of your claim to "gut" or "demolish" the home.

The following are some of the relevant policy provisions regarding your duties under the Policy to cooperate in the adjustment of your claim, including the duty to allow for timely inspections and to provide all material evidence related to any claimed property damage. These duties were also sent to you previously. Please consult all policy terms, conditions, limitations, exclusions and endorsements of the Policy. We refer you specifically to page 11 of the Policy section entitled "**Part IV - Conditions**," where the following conditions are found:

    A.    Your Duties After a Loss

        In the event of an **occurrence** which is likely to involve this policy, or if you or any other **insured person** under this policy is sued is sued in connection with an **occurrence** which may be covered under this policy, you or an **insured person** must:

                                *   *   *

        4.    Protect the property from further damage. If repairs to the property are required, you must:

            a.  Make reasonable and necessary repairs to protect the property; and
            b.  keep an accurate record of all repair expenses.

        5.    Provide us with bills, receipts and related documents.

        6.    Show us, as often as we reasonably require:

            a.  Show the damaged property;
            b.  Provide us with records and documents we request;
            c.  Submit to separate examination under oath.

                                  *   *   *

Additionally, we refer you specifically to page 2 of the Homeowners Amendatory Endorsement Illinois where the following conditions is found:

F.    <u>Concealment or Fraud.</u>  This entire policy is void if you or a **family member** has intentionally concealed or misrepresented any material fact, engaged in fraudulent conduct or made false statements relating to this policy before or after a loss....

Counsel for AIIC explicitly warned you *not* to remove the allegedly contaminated building materials prior to testing as far back as November 15, 2007.  In counsel's letter of that date, AIIC specifically warned:

> The proposal to demolish the house is completely unsupported by opinions from qualified experts who have actually examined the home and have first-hand knowledge of the extent of skunk odor (or lack thereof).  As discussed further below, if the Royals proceed with gutting the house or demolishing it, such activities will be done at their own peril.  **In any event, all activities should not begin until the indoor air quality assessment and building materials sampling requested by the Illinois Department of Financial and Professional Regulation, Division of Insurance has been conducted.**

Obviously, at that point in time AIIC had no knowledge to the extent demolition work had been done or we would not have warned against *proceeding* with the work.  If the demolition work had already been done, it was done without notice.  If it had yet to be started, the work was later done in breach of the agreement with the DOI to test.  In either case, the fact that the demolition work was done was concealed from AIIC.

As reflected in the above-referenced Policy language and correspondence from AIIC's counsel, you were aware of the contractual duty to cooperate in the adjustment of the claim by making the property available to inspect and to allow for testing of the claimed interior damage before any demolition work. The fact that you agreed to test the building materials confirmed your acknowledgment of this duty. By unilaterally demolishing the majority of the interior of the home, and in turn spoliating any evidence of the alleged skunk thiol contamination, you breached your duty to cooperate in the investigation and presentation of this claim.  By proceeding with the unauthorized demolition work you also breached your duty to show us this allegedly damaged property prior to removing it from the home and discarding it. In addition, your failure to inform AIIC of the completed home interior demolition work for over two months, despite your participation in the planning to test the demolished materials during the same time, is a concealment and misrepresentation of material facts surrounding the claim in breach of the Policy.  We note that during this two-month silence period that you were receiving $13,000 per month in additional living expenses representing the "rent" to reside at your second residence in Glencoe, Illinois.

In addition, under the Policy and Illinois law, it is your burden to establish a covered loss. You cannot sufficiently establish that the interior of the home was contaminated with skunk thiols as alleged without confirmation through testing of the removed materials.  Your

lawyer's consultants' reports do not establish or prove that any skunk thiols existed in the home before the demolition as they never performed any testing for thiols. Dr. Hirsch wrote that he is not a remediation expert (and performed no objective air or materials testing as we had originally requested), and Professor Wood speculated from California that thiols might be in the house. However, because you destroyed the interior building materials, Professor Wood's theory can no longer be tested, despite AIIC's demonstrated willingness to have such tests completed in cooperation with the DOI.

Based on the above breaches of contract, concealment and misrepresentations related to the interior demolition work, AIIC denies your January 22, 2008 dwelling claim. The sole parts of your earlier dwelling claim which may be considered at a later date are outlined in our January 11, 2008 letter. We have not yet received the requested information in support of these parts of your claim and are not in a position to evaluate these further until such information is provided. Please submit any additional claim support for the outstanding request within 21 days of this letter.

Regarding your contents claim, it remains AIIC's position that we have responded to all claims made under your contents coverage with the only exceptions being those which were identified in our January 11, 2008 letter. The total paid for your contents damages is $211,863.36. It is also our position that the clothing items have been restored by Evans Cleaners. Testing has been completed on several pieces of clothing which were identified by Mrs. Royal as being damaged, which confirmed that the "damages" being claimed were in fact normal wear and tear, unrelated to skunk smell and not the result of the cleaning process. The Fine Arts portion of your loss has been paid in its entirety, yet the majority of the restoration work has not been completed. Your electronics items were inspected, cleaned and returned to their pre-loss condition. The costs to clean your household goods which are currently stored at Great Lakes Restoration have been paid, but this restoration work has not yet been authorized by you, and as such has not yet been completed. Any damages caused by your failure to mitigate damages to your contents may not be covered. To the extent that any further claim is made for skunk thiol contamination to your contents, we demand that such items be made immediately available for testing by consultants identified by AIIC.

With respect to ongoing storage charges for contents, based upon the above-noted concealment and misrepresentation of the demolition project and the spoliation of any evidence of the alleged skunk thiol contamination, AIIC denies any further liability for payments for storage of your contents beyond the date of this letter. Based on your indications that the home would be made available for testing, AIIC agreed to pay for storage charges until such time that the home could be tested for the alleged presence of skunk thiols. AIIC's agreement to honor your continued contents storage charges was in the spirit of cooperation to complete testing through the DOI and was based upon your explicit agreement with AIIC and the DOI to make the home available for this testing.

With respect to your claim for Additional Living Expenses, the total paid to date is $128,713.08. AIIC previously agreed to an extension of your rental payments of $13,000 per month until such time that the home could be tested for the alleged presence of skunk thiols. AIIC has paid you for these rental payments through January 31, 2008. AIIC's agreement to honor your continued additional living expense claim was in the spirit of agreement to complete testing through the DOI, and was based upon your explicit cooperation to complete testing through the DOI, and was based upon your explicit agreement with AIIC and the DOI to make the home available for this testing. Due to the above referenced concealment and misrepresentation of the demolition project, AIIC denies any further liability for additional living expenses beyond the date of this letter.

We have responded to the other remaining portions of your claim in our January 11, 2008 letter and have requested that you provide additional information for certain line items. A copy of that letter and all attachments has been attached for your reference. To date, we have not received this information. Please submit any additional claim support for the outstanding request within 21 days. If the requested information is not received, we will proceed to close our file.

AIG Private Client Group on behalf of American International Insurance Company does not intend to, nor does it waive any term, condition, right, definition, exclusion, endorsement, limitation or defense under the Policy or as provided by law. All rights remain reserved, including, but not limited to, voiding the entire policy and seeking return of payments made as a result of any concealment or misrepresentation. Your rights are also reserved under the Policy as well.

Rule 9.19 of the Rules and Regulations of the Illinois Department of Insurance requires that our Company advise you that if you would like to take this matter up with the Department of Insurance it maintains a Consumer Division in Chicago at 100 W. Randolph Street, Suite 15-100, Chicago, Illinois and in Springfield at 320 W. Washington Street, Springfield, Illinois 62767.

We also hereby advise you that the one-year suit limitation expires on April 26, 2008 (81 days). If suit is not filed before that date, it will be barred under the suit limitation provision of the Policy.


Sincerely,


Art Brown
Sr. Property Claims Analyst
AIG Private Client Group on Behalf of American International Insurance Company

Jeremy Nachreiner
Property Unit Manager
AIG Private Client Group on Behalf of American International Insurance Company

cc: via e-mail:        Mr. Dennis Fitzpatrick, Esq.
                       Mr. Anthony Abboud, Esq.

08CV2325 J. N.
JUDGE CONLON
MAG. JUDGE COLE

# EXHIBIT F

## <u>Memorandum of Understanding</u>

In connection with American International Insurance Company's (the "Insurer")

Claim No. 500929, filed by Vicki and Mark Royal (the "Insureds") for a loss sustained

on April 26, 2007, under the Insurer's Policy No. HO 0000302989, the Insurer and

Insureds have agreed as of this date to the following:

1)    On August 31, 2007, the Insurer shall personally deliver to the Insureds the
following:

    a)   a check in the amount of $43,000.  The check shall constitute payment of October
rent ($13,000), an advance on the Policy's coverage for Contents ($10,000), and
an advance on the Policy's coverage for Dwelling Repairs ($20,000);

    b)   any and all photos taken of the Insureds' property by Evans Cleaners;

    c)   the inventory created by Enservio of clothing during the inspection on July 20,
2007; and

    d)   the inventory of all clothing removed from the Insureds' property by Evans
Cleaners on July 20, 2007, and a specific date on which the clothing will be
returned for evaluation.

2)   Provided that the Insurer satisfies each of the items set forth in paragraph 1 prior to
August 31, 2007, at 12:00 p.m., the Insurer and its consultant, Martin King, will be
given access to the Insureds' property at that time for the purpose of conducting an
inspection of the Insureds' home.  The Insurer and its consultant will, at all times, be
accompanied by a representative of the Insureds.   The consultant will not perform
any destructive testing or take any samples from the property or home.

3)   In addition to the foregoing, the Insurer agrees that, **no later than** 5:00 p.m. (CDT)
on Tuesday, September 4, 2007, the Insurer shall deliver to the Insureds or their
attorney a complete response to each and every one of the invoices, receipts and/or
requests for payment or reimbursement (the "Receipts") that the Insureds have
tendered to the Insurer or its representative in connection with this Claim (the
"Response").  The Response shall itemize each of the Receipts and for each it shall
state whether the Insurer accepts or denies its obligation to pay for the Receipt.  If the
Insurer has a good faith basis for denying any of the Receipts submitted it also shall
state that good faith basis with specificity.   The Insurer hereby agrees that by failing
to deliver the Response to the Insureds and their attorney by the date and time
specified above, the Insurer will have voluntarily and knowingly waived its right to
deny or contest any of the Receipts and will be obligated to reimburse the Insureds
for the entire amount of all Receipts submitted to date.

Page 1 of 2

4) Further, **no later than** Wednesday morning, September 5, 2007, at a specific time and place determined by the parties, the Insurer shall personally deliver to the Insureds or their attorney a check in an amount equal to all of the Receipts which the Insurer did not deny in the Response (the "Payment"). The Insurer hereby agrees that by failing to deliver the Payment to the Insureds or their attorney by the date specified, and at the time agreed to, the Insurer will have voluntarily and knowingly waived its right to deny or contest any of the Receipts and will be obligated to reimburse the Insureds for the entire amount of all Receipts submitted to date notwithstanding .

5) The Insurer further agrees that it shall use its best efforts to obtain and deliver to the Insureds all videotapes and/or photographs taken by ServPro within the next seven days.

6) By or before the close of business on Friday, September 7, 2007, the Insurer shall deliver to the Insureds as many professional references that Martin King can provide for the skunk odor remediation projects he has previously handled, including without limitation the project handled with the last six months; a list of any other professional references that Martin King can provide regarding other remediation projects he has previously handled; and the precise chemical compound and/or formula of the substance Mr. King uses to remediate skunk odor, and how it is applied to different types of surfaces.

7) The undersigned represents and warrants that he has the authority to enter into and bind the Insurer to the terms set forth herein.

8) Nothing in this Memorandum of Understanding changes the terms, conditions, or provisions of the Policy or its endorsements. Except as otherwise expressly provided in paragraphs 3 and 4 above, the Insurer and the Insureds hereby expressly reserves all of their respective rights, coverages, and defenses under the Policy.

On behalf of the Insurer,

AMERICAN INTERNATIONAL INSURANCE COMPANY

_____    DATE: 8/31/07

Jeremy Nachreiner

Page 2 of 2